**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
——————————————————————X

**BRIAN C. LONG,**
**as Personal Representative of BRUCE K. LONG**
              **Plaintiff,**            **Case No.:**

**-against-**

**MICHAEL E. JOAQUIN**
**JOHN C. ROSE**
**FATHER AND SONS COLLECTIBLES, INC.**
   **(aka/dba The Family Collectables, Inc.**      **COMPLAINT**
      **Collector's Heaven,**
      **Collector's Haven, Inc. and**
      **Collectors Choice),**
**LEGEND COLLECTIBLES CORP.,**
**ELITE COLLECTIBLES NY, LLC. AND**
**AMERICAN SILVER & GOLD COINS, INC.**     **Jury trial demanded.**

          **Defendants.**
——————————————————————**X**

      Plaintiff, by his attorney, Kenneth G. Walsh, complaining of the defendants, alleges as follows on information and belief:

## NATURE OF THE CASE

**1.**   This case involves a racketeering and fraud conspiracy by a group of Long Island coin dealers who formed an agreement to commit widespread fraud against elderly citizens and rob them of their life savings. In this particular case, the conspirators instituted a three-part scam to defraud and steal some $794,456.00 from Bruce K. Long (sometimes hereinafter "Mr. Long" or "Plaintiff"), an 85-year-old widower with substantial hearing loss and progressive age-related mental decline.

2.    This action is brought under 18 U.S.C. §§ 1961-68 (the Racketeer Influenced and Corrupt Organizations Act) and New York common and statutory law by Brian C. Long, as Personal Representative of his father, Bruce K. Long,[1] against Michael E. Joaquin (RICO Person) and John C. Rose (RICO Person),[2] New York precious metal telemarketing dealers who conducted criminal activities under several registered legal names and also in the names of various non-registered companies. Joaquin and Rose, in various combinations, owned, controlled, operated and manipulated an association-in-fact RICO Enterprise (the "Joaquin Enterprise") composed of Father and Sons Collectibles, Inc. ("F&S") (including various non-registered entities, aliases and/or dbas known as: "The Family Collectibles, Inc.," "Collector's Haven, Inc.," "Collector's Heaven," and "Collectors Choice"), Legend Collectables Corp. ("Legend"), Elite Collectibles NY, LLC. ("Elite") and American Silver & Gold Coins, Inc.) ("ASGCI").[3] The RICO Persons Joaquin and Rose are the ringleaders and masterminds of the Joaquin Enterprise, which is comprised of the Defendant business organizations and their various telemarketing sales agents and employees whose identities at this time are either unknown or known to Plaintiff only as "Tom," "Peter," "Jim," "John," "Tim," "Walter," "Gene," "Henry," "Roger" and "Phil."

3.    Through the predicate acts of racketeering, specifically mail fraud and wire fraud and bank fraud, the RICO Persons, in furtherance of the Joaquin Enterprise, targeted elderly customers, such

---

[1]  Brian C. Long holds a durable power of attorney authorizing him to bring this action on behalf of his father, Mr. Long.
[2]  The various corporate layers, the anonymity afforded by telemarketing, and the use of aliases tend to shield the true identities of other possible RICO persons at the pleading stage.
[3]  Some of the Joaquin Enterprise assumed names do not appear to be viable legal entities under New York Department of State, Division of Corporations. Additionally, some of the other Defendants that are registered to conduct business in New York seem to utilize names that are uncannily similar to other, unrelated legitimate businesses such that confusion and obfuscation appears to be a feature, and not a bug, for the Defendants. For example, Elite Collectibles NY, LLC is almost exactly like Elite Collectibles, Inc. a similar legitimate business located in West Hampton, NY.  Likewise, American Silver & Gold Coins, Inc. is nearly the same as the unrelated entity Americas Gold & Silver Corporation. Not to be outdone, Defendant Legend Collectables Corporation's name seems to parrot the name of the unrelated entity, Legend Collectibles LLC.

as Mr. Long, by repeatedly and systematically using various illegal and unlawful tactics, such as "high-reward/low-risk" investment schemes, slamming the customers' credit cards without permission, drawing on customers' bank accounts without authorization and fraudulently "hustling" customers' coins back via "buy-backs" at a fraction of the original purchase price.

4.     The Joaquin Enterprise was set up solely or primarily as a group of telemarketing and internet precious metal sales businesses and used the interstate wires to market coins to customers and the interstate mails to repeatedly ship the fraudulently priced coins and confirm the fraudulent prices of the coins via sales receipts, invoices and/or electronic banking purchase confirmations to customers, including Mr. Long. The Joaquin Enterprise repeatedly engaged in interstate credit card transactions and electronic bank wire fund transfers involving these same fraudulently priced coins. The Joaquin Enterprise also utilized interstate common carriers to ship coins fraudulently "bought-back" (effectively stolen) from Mr. Long from Arizona to New York. Thus, the Joaquin Enterprise engaged in repeated and systematic mail fraud and wire fraud and bank fraud in violations of 18 U.S.C. §§ 1341, 1343 and 1344.

5.     The predicate acts of mail fraud, wire fraud and bank fraud utilized by Joaquin and Rose (and the other RICO Persons known only to Defendants and yet to be identified by name) conducted in furtherance of the Joaquin Enterprise generated multiple and repeated unlawful coin sales and unauthorized financial transactions, as well as fraudulent "buy-back" transactions, with elderly customers, including specifically Mr. Long, that, in turn, generated exorbitant compensation for the RICO Persons, and specifically Michael E. Joaquin and John C. Rose.

6.     Joaquin and Rose, and members of the Joaquin Enterprise, conspired with each other to conduct and finance the predicate acts of mail fraud, wire fraud and bank fraud described immediately above, as set forth in more detail below.

7.    By their unlawful acts, Joaquin and Rose (i) conspired between themselves and with others to violate 18 U.S.C. § 1962(b) and (c) in violation of 18 U.S.C. §1962(d); and/or (ii) conducted and/or participated in the affairs of the Joaquin Enterprise in violation of 18 U.S.C. § 1962(c), with the specific aim and intent to defraud Mr. Long in the process. Joaquin and Rose committed these substantive RICO offenses personally and/or by causing the business entities comprising the Joaquin Enterprise through their telemarketing sales agents whose identities are known only to Defendants to engage in multiple predicate acts of mail fraud, wire fraud and bank fraud—all the while knowing of, and agreeing to, the overall objective of such fraud—generating exorbitant compensation for themselves.

8.    Joaquin and Rose knew that making overpriced "high-reward/low-risk" investment solicitations, shipping the fraudulently overpriced coins and confirming the fraudulent overpricing of the coins via sales receipts and/or electronic banking purchase confirmations to elderly customers, and specifically Mr. Long, was fraudulent, misleading and unlawful. Joaquin and Rose knew such wrongful acts and practices would generate multiple and repeated unlawful coin sales to and, and on the back end, coin "buy-backs" from Mr. Long that, in turn, would generate exorbitant compensation for themselves.

9.    Joaquin and Rose engaged in a multifaceted scheme to take illegal advantage of Mr. Long. The unlawful acts of Joaquin and Rose proximately and/or directly caused Mr. Long to be substantially and unconscionably overcharged for the coins he purchased from the Joaquin Enterprise. Adding insult to injury, Joaquin and Rose then multiplied the swindle by convincing Mr. Long to sell them back those same coins under financial duress for a small fraction of what Mr. Long had originally paid for them.

10.     Bruce K. Long is an 85-year-old widower living in Mesa, Arizona. Since his wife's death in 2015, Mr. Long has lived alone and suffers from substantial hearing loss which is even more pronounced when using the telephone, as well as progressive age-related mental decline. Mr. Long, like many elderly Americans, forgets details and become easily confused when confronted with multiple tasks from multiple sources. This makes it easy for coin telemarketers to manipulate, intimidate and swindle Mr. Long. Consequently, he is the prototypical victim for elder abuse by dishonest coin dealers such as Joaquin and Rose and the Joaquin Enterprise.

11.   Beginning in 2018 and continuing through 2022, Mr. Long received numerous, frequent and repeated calls on his landline telephone from Joaquin personally, as well as various, numerous telemarketing sales agents of the Joaquin Enterprise whose identities are known only to Defendants,[4] pressuring Mr. Long to buy precious metal coins as an investment.

12.   Joaquin personally, and through telemarketing sales agents of the Joaquin Enterprise whose identities are known only to Defendants, misled Mr. Long and alternately enticed, cajoled, confused, harassed and pressured him[5] into purchasing coins based upon representations that such coins were a sound investment, that they would not only retain their values but would greatly increase in value and that they were unique and/or rare. Joaquin personally, as well as other

---

[4]  Not only does Mr. Long's hearing loss make it difficult for him to catch the names of parties who call him, but there is recorded precedent for fraudulent coin dealers and telemarketers to use aliases when interacting with customers/consumers. *See United States v. Romano,* No. 09-CR-168 (SJ) (VMS), 2013 U.S. Dist. LEXIS 208446, at *20 n.6 (E.D.N.Y. 2013) ("Michelle Stumpf testified at trial that the Defendants and their salespeople used false names when interacting with customers"). Coin fraud telemarketers use fictitious names in an attempt to make it difficult for fraud victims to identify defendants and to plead their claims with specificity.

[5]  *See, e.g., United States v. Romano, supra* at *19 n.5 (E.D.N.Y. 2013) and the testimony adduced at the criminal RICO coin fraud trial against Michael Romano and William Kearney:

    Patrick Coleman, Defendants' former employee, testified at trial that . . .  Mr. Kearney's avowed sales tactics were to "crush weak people" and to "confuse the shit" out of "older people." . . .  Daren Mutone, a former employee of Atlantic Coin Galleries, testified at trial that the Atlantic Coin Galleries salespeople would make fun of the victims because they were old and easier to convince. . . .  Mr. Mutone testified that the elderly were "easier to push around," and that Mr. Romano and Mr. Kearney would hear the jokes and push the sales staff to sell even more coins to a victim who showed susceptibility to pressure and manipulation.

telemarketing sales agents of the Joaquin Enterprise whose identities are known only to Defendants, misrepresented the grade, attributes and value of the coins and failed to advise Mr. Long that he was paying substantially more than the fair market price for the coins and that, far from the coins being "safe and secure investments" as represented, he actually was incurring immediate and substantial losses with each transaction. Thus began the ruinous financial exploitation of the elderly, hearing-impaired, befuddled Mr. Long by Joaquin and Rose through the Joaquin Enterprise that began as gross financial fraud and culminated in outright thievery, bank fraud and financial elder abuse.

**13.**   Joaquin and Rose, both personally and through the acts of the telemarketing sales agents of the Joaquin Enterprise whose identities are known only to Defendants, conspired together to effectuate three separate but related frauds upon Mr. Long, resulting in the loss of at least $722,807.35 of his life savings; to wit:

    **a.**   **First**, Joaquin and Rose, both personally and through telemarketing sales agents of the Joaquin Enterprise whose identities are known only to Defendants, targeted Mr. Long and induced him to "invest" a large portion of his life savings and net worth in grossly overpriced numismatic and bullion coins to the tune of over $196,619.97. While discovery will reveal Mr. Long's true losses, upon information and belief, it can reasonably be expected that he lost at least 86% of his $196,619,97 total investment, or about $172,016.35.[6]

    **b.**   **The second fraud** occurred when Mr. Long discovered that Joaquin and Rose, personally and/or through telemarketing sales agents of the Joaquin Enterprise whose identities are known only to Defendants, had instituted unabashed banking fraud consisting of at least

---

[6] *See* Exhibit 1 for a tabulation of damages from the First Scam.

thirteen (13) fraudulent electronic check transactions in the combined amount of $33,815.00[7]; and

   c. **The third fraud** is the culmination of the confusion and desperation Joaquin and Rose, through the Joaquin Enterprise, had engendered in Mr. Long. When Mr. Long refused to buy more coins due to a lack of funds to meet his debts (which the first and second frauds had created), Joaquin and Rose convinced Mr. Long to sell them back (through the Joaquin Enterprise) the very coin collection that Mr. Long had purchased from Joaquin and F&S (a constituent member of the Joaquin Enterprise), as well as some other coins obtained from other dealers for $531,576.00 for only $14,600.00, resulting is a staggering additional loss to Mr. Long of $516,976.00.[8]

14.   These long-running, intertwined schemes demonstrate a pattern of unlawful, false, misleading and unconscionable misrepresentations, sales tactics, and financial fraud against unsuspecting elderly consumers by Joaquin and Rose (and other agents of the Joaquin Enterprise whose identities are known only to Defendants), including specifically Mr. Long.[9]

15.   Plaintiff brings this suit seeking to recover Mr. Long's coins, to recover the value he paid for the coins and/or to recover actual damages, consequential damages, punitive damages, statutory treble damages, pre-and post-judgment interest, attorneys' fees, litigation expenses and costs of suit.

## JURISDICTION AND VENUE

16.   This Court has original subject-matter jurisdiction over the RICO claims pursuant to 18 U.S.C. §§ 1964(a) and 1964(c), and pursuant to 28 U.S.C. § 1331 insofar as they arise under federal

---

[7] *See* Exhibit 2 for a tabulation of damages from the Second Scam.
[8] *See* Exhibit 3 for a tabulation of damages from the Third Scam.
[9] A Michigan jury previously found Joaquin liable for fraud and conversion based on allegations of a coin fraud scam similar to the third scam set out in this case. *See Miller v. Joaquin*, 431 F. Supp. 3d 906, 911 (E.D. Mich. 2019).

law. This Court has diversity jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(a), as Plaintiff and Mr. Long are both citizens of Arizona and all Defendants are citizens of states other than Arizona, and the amount in controversy exceeds $75,000 exclusive of interest, costs and attorneys' fees. Alternatively, the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 insofar as they are so related to the federal claims that they form part of the same case or controversy.

17.     This Court has *in personam* jurisdiction over Defendants because at all relevant times defendants resided, maintained citizenship, were found, had agents, conducted business and/or sold the collectible numismatic, semi-numismatic, and bullion coins at issue in this case to plaintiff in and/or from New York.

18.     At all relevant times, Defendants resided, were found, had agents and/or conducted business in the Eastern District of New York. Defendants sold the collectible numismatic, semi-numismatic and bullion coins at issue in this case to Mr. Long in and/or from the Eastern District of New York. A substantial part—if not all—of Defendants' wrongful acts and omissions occurred in the Eastern District of New York. Accordingly, venue is proper in this Court pursuant to 28 U.S.C § 1391(a).

## PARTIES

19.  Both Plaintiff, Bruce K. Long, and his personal representative, Brian C. Long, are citizens and residents of Arizona.

20.  Defendant Michael E. Joaquin ("Joaquin") is a natural person and a citizen and resident of the State of New York. His last known address is 870 Carman Ave., Westbury, NY 11590. He possesses New York Driver License No. 772 994 333.

21.   Defendant John C. Rose ("Rose") is a natural person and a citizen and resident of the State of New York. His last known address is 75 Macon Ave. Sayville, NY 11782.  He may also be found at 248 Little East Neck Road, West Babylon, NY 11704 or 9 Venetian Blvd., Lindenhurst, NY 11757.

22.   Defendant Father and Sons Collectibles, Inc. ("F&S") (aka/dba "The Family Collectibles, Inc.," "Collector's Haven," "Collector's Heaven" and "Collectors Choice") is a New York corporation incorporated on August 28, 2014, with its principal place of business at 870 Carman Ave., Westbury, New York 11590. It also lists a business address as 5020 Sunrise Hwy, Suite LB, Massapequa Park, NY 11762, which is a Minuteman Press copy and mail service, with "Suite LB" being a [L]arge mail [B]ox. It also lists its business address as Post Office Box 191, Hickville, NY 11802. Under its assumed name "Family Collectibles Inc.," which is not a business registered with the New York Department of State, Corporation Division, it lists its business address as 26 Railroad Ave. No. 167, Babylon, NY 11702, which is a UPS Store mail box. Father and Son Collectibles, Inc. also operates under different fictitious names which are phonetically similar and/or used interchangeably, including "Collector's Haven," "Collector's Heaven" and "Collectors Choice," none of which are registered with the New York Department of State, Corporation Division, and for whom no business addresses are given. Upon information and belief, F&S is a constituent member of the Joaquin Enterprise and is owned and/or controlled by Joaquin and Rose.

23.   Defendant Legend Collectables Corp. is a New York Corporation incorporated on September 23, 2022, with its principal place of business located at the offices of Legalinc Corporate Services Inc., 1967 Wehrle Dr. Suite 1 #086, Buffalo, NY 14221. Upon information and belief, Legend is

a constituent member of the Joaquin Enterprise and is owned and/or controlled by Joaquin and Rose.

24.   Defendant Elite Collectibles NY LLC., is a New York Limited Liability Company formed on October 31, 2022 with its principal place of business located at the offices of Legalinc Corporate Services Inc., 1967 Wehrle Dr. Suite 1 #086, Buffalo, NY 14221. Upon information and belief, Elite is a constituent member of the Joaquin Enterprise and is owned and/or controlled by Joaquin and Rose.

25.   Defendant American Silver & Gold Coins, Inc., is a New York Corporation incorporated on June 24, 2020 with its principal place of business at 18 Simon Ave., Centereach, NY 11720-4434. Its registered business address is a UPS Store located at 414 S. Service Rd, Box 360, Patchogue, NY 11772. Upon information and belief, ASGI is a constituent member of the Joaquin Enterprise and is owned and/or controlled by Joaquin and Rose.

## STATEMENT OF PERTINENT FACTS

### A.  Background: The Predatory Precious Metals Industry

26.   The precious metals industry is highly complex and nuanced, while at the same time largely unregulated, making it the ideal market for deceptive and fraudulent activity.[10] For several decades, fraudsters, sharp operators and con men have taken advantage of the lack of regulation to lure unsophisticated and trusting customers[11] into purchasing precious metals at prices so far above fair market value as to nullify any reasonable return on investment, thereby resulting in devastating

---

[10]   *See* David J. Gilberg, *Precious Metals Trading-The Last Frontier of Unregulated Investment*, 41 Wash. & Lee L. Rev. 943 (1984) ([https://scholarlycommons.law.wlu.edu/wlulr/vol41/iss3/4](https://scholarlycommons.law.wlu.edu/wlulr/vol41/iss3/4)) for an interesting overview of the precious metals trading industry.

[11]   In this Complaint, whenever the term "customer(s)" appears, Plaintiff intends it to mean both "customer(s)" and "consumer(s)" and vice versa.

losses of elderly customers' life savings with no recourse or chance of recovery. Banking on customers' lack of knowledge, and weaponizing the esoteric and arcane aspects of coin collecting, grading, historical factors and mint populations, unethical coin dealers continue to confuse and confound average, reasonable customers with deceptive claims of significant investment returns and bargains, often culminating in outright fraud and counterfeiting. The complexities and unfamiliarity of the precious metals industry to the average customer provides fertile ground for fraudulent schemes such as those executed by the Defendants.[12]

**27.** Joaquin's and Rose's operation of the Joaquin Enterprise is for the primary purpose of selling collectible numismatic, semi-numismatic and bullion coins[13] directly to customers over the telephone (and/or via the internet) at unconscionably and fraudulently high prices. Each member of the Joaquin Enterprise conspired with the others to conduct the business affairs of the Joaquin Enterprise through a pattern of racketeering activity. Joaquin and Rose (and the other telemarketing sales agents of the Joaquin Enterprise whose identities are known only to Defendants) make hundreds of intrastate and interstate sales calls per month — via the telephone — utilizing one or more of the following unlawful, false, misleading and unconscionable high-pressure sales tactics typical of the precious metals/coins/bullion direct sales industry. These pervasive, industry-wide, unscrupulous sales practices are specifically designed to prevent the customers from making any informed decisions when buying, selling and trading precious metals; for example:

---

[12]  In 2010, the FTC elaborated on precious metal fraudulent schemes identical to those used by the Defendants herein. *See*,https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-precious-coins-and-bullion-disclosure-act/100923coinsbulliamact.pdf.

[13]  In this context, the term "numismatic coin" refers to collectible coins whose value is based upon other qualities in addition to the metal content of the coin, such as appearance, population, grade, rarity, and other attributes.  "Semi-numismatic coin" refers to a coin whose value partially derives from its numismatic value and mainly from the value of its precious metal content.  "Bullion coins" derive their value almost entirely from the fair market value of the precious metal content, commonly referred to as the "spot value."

a. **Misrepresentations of "High-Reward/Low-Risk" Safe Investments:**

(1)  Claiming that the coins being promoted are safe, secure investments with promises of significant returns but failing to disclose that the significant markups or fees incurred at the time of purchase created a substantial loss of the customer's investment simultaneously with the purchase and that the customer will never recover because the precious metal products would have to appreciate to historical highs that have never been realized just for the customer to break even;

(2)  Claiming that certain coins are "rare" and "valuable" and that the promoted coins provide a "better" investment, when in truth such coins have limited numismatic and collectible value (if any) while at the same time ignoring the significant and immediate cost imposed on customers in the form of fraudulent pricing and unconscionably high dealer markups;

(3)  Claiming that certain promoted coins possessed certain qualities and will substantially appreciate quickly with full knowledge that such representations are false and misleading;

(4)  Representing that the coins being offered will outperform other types of investments—without any basis or underlying data to support such assertions;

(5)  Claiming that investment in precious metal coins is a safe haven in a volatile economic market;

(6)  Claiming that investment in the promoted coins is guaranteed or highly likely to render high rates of return, when in truth there is no way to predict the future rate of return on precious metals;

(7)  Convincing customers to trade certain coins in their possession for other coins based upon representations that the customer has thereby attained a better investment position, when in fact the trades cause the customer to experience devastating losses in market value;

(8)  Misrepresenting to customers that the dealers are giving them "special deals" and enjoying "early low prices" when the customer actually was paying significant, unconscionably high percentage markups (margins) on the coins;

(9)   Misrepresenting to customers that in purchasing certain promoted coins they would realize unusually high rates of return on investment due to various false or immaterial market conditions;

(10) Misleading customers with fictitious alleged "tax incentive" aspects of precious metal coins by representing that the promised appreciation or rate of return earned on such coins will be "tax-free" and/or misleading customers to buy or trade for pre-1933 gold coins based upon false representations that by making such purchases or trades the customer will avoid tax issues;

(11)   Claiming that investments in numismatic coins and "modern graded bullion" are non-reportable or "tax-free" when in truth customers ultimately are required to pay taxes on capital gains, regardless of the classification of the coins;

(12) "Upselling" customers from bullion to numismatic coins with unsupported claims that numismatic coins are a better, higher-yielding investment when there is no reliable data to support such claims;

(13)   Selling precious metals to customers by offering a "no risk, money back guarantee" that is illusory and/or has significant, confiscatory fees attached to it; and/or

(14)   Selling precious metals to customers as "no risk" investments based upon representations that the customer can always sell the coins back to the dealers, when in practice customers have no way of knowing that they are buying coins with a markup of 40% (or more) over the "spot price" (market value) of the metal but the "buy back" will be based on the market value (usually less than melt value) minus a liquidation fee or commission.[14]

**b. Misrepresenting the availability/rarity of purported "rare" precious metal coins:**

(1)   Pressuring the customers into believing that they have a limited opportunity to purchase particular coins at a purported substantial discount but that they must buy "immediately" or "act right away" to achieve large profits or else forever lose the chance

---

[14] The State of California has cited an undisclosed 33% markup by Lear Capital as fraudulent. *See California v Lear*, https://docs.simpluris.com/websites/13abd9da-de42-4adb-8903-54649f9c5695/documents/fcc995e5-6132-42f9-8608-aea59c728a84/CA%20Complaint(11118433.2).pdf.

to obtain rare, elusive and "soon-to-be-unavailable" coins. These false, high-pressure tactics create a false, manufactured sense of urgency for the customer to consummate the sale;

(2)   Misrepresenting to customers that investing in numismatics is preferable to investing in more transparently-priced bullion based upon an alleged an imminent risk of bullion being "confiscated" by the government. This unsupported narrative instills an immediate need in the customer to purchase higher-priced and easily mischaracterized numismatics instead of bullion.[15]

c. **Misrepresenting the value of particular precious metal numismatic coins:**

(1)   Utilizing published data (i.e. grade, description, rarity, date, mint, circulation-status) applicable to other, ostensibly similar numismatic coins that to the expert eye have significantly different attributes to represent that the particular coin being purchased is of greater value or investment potential than its actual value;

(2)   Misrepresenting that the coins being marketed are "rare" or of limited population (i.e. numbers in existence) and thereby misleading or deceiving customers/consumers into overpaying for the actual coins purchased;

(3)   Convincing customers via deception, assurances and misrepresentations to ship coins to the coin dealer based upon promises that the dealer will buy the coins for a fair exchange of value, then failing to pay for the coins, paying but a fraction of the fair market value of the coins or shipping back lesser valued coins to the customer "in trade"; and/or

(4) Failing to disclose to customers that their purchase price for coins is over 40% (and often significantly higher) above the market value of the coin and that any return or resale of the coins will be for less than the market value.

---

[15] This ploy is based upon President Franklin Roosevelt's 1933 executive order, in which the government recalled most of the gold owned by private citizens but provided an exception for "rare and unusual coins." https://www.presidency.ucsb.edu/documents/executive-order-6102-requiring-gold-coin-gold-bullion-and-gold-certificates-be-delivered.  It was highly criticized and finally repealed in 1974 by President Gerald Ford.  There is no current law empowering the government to recall precious metals nor is there any way to predict that any precious metal item is immune from a theoretical future recall or confiscation.

**d. Misrepresenting the expertise and experience of the Coin Dealer and its agents:**

(1)  Falsely claiming that the coin dealers and their telemarketer sales agents possess expert knowledge, qualifications and experience in precious metals and numismatics when they do not; and/or

(2)  Falsely claiming that the coin dealers and their telemarketer sales agents have specialized financial investment knowledge and experience regarding the precious metals market when they do not.

**e. Taking, selling or charging for coins without authority:**

(1)  Illegally charging the customer's credit card or banking account using account numbers obtained from earlier transactions to make unauthorized "sales" of coins  without the customer's permission or assent,  shipping unwanted coins (or not even bothering to ship coins), and when confronted about the unauthorized charges, making false representations, bullying or threatening the customer to confuse him and obfuscate the issues;

(2)  Fraudulently obtaining possession of the customer's precious metal coins by offering to "resell" the customer's coin collection with no intent of reselling but, instead, after receiving the coins, converting (stealing) the coins for their own use;

(3)  Fraudulently obtaining possession of the customer's precious metal coins by "baiting" customers with claims that the customer's coins were worth a great amount, then after receiving shipment of the coins, switching their story and paying only a fraction of the amount previously represented;

(4)  Fraudulently obtaining possession of the customer's precious metal coins by claiming some economic or social upheaval (e.g., the COVID epidemic or economic distress) created a unique opportunity to sell precious metals for high returns but then only paying the customer a fraction of the amount previously represented; and/or

(5)  Agreeing to buy the customer's coins over time but, after obtaining possession of the coins, failing to honor that agreement.

**f.  Abusing Elderly customers with intimidating tactics and confusing/stalling them to prevent them from realizing and reporting the fraud:**

(1)  Badgering, harassing, confusing and intimidating elderly consumers with repeated calls, claiming that the customers must buy the coins to protect themselves from financial ruin and, if the customer balks, badgering and intimidating them until they relent.[16]

(2)  Forestalling customer complaints by utilizing the false pretext that the coin dealer will broker the resale or auction of the customer' coins for a substantial profit, when such inducement was merely intended to stonewall the customer, obfuscate the transactions, and delay discovery of the fraudulent purchase price at which the customer purchased the coins from the coin dealer in the first instance;[17]

(3)  Misrepresenting the present market value of the purchased coins to prevent or delay the customer from determining the actual market price of the coins; and/or

(4)  Feigning legitimacy by representing that they have "brick and mortar" business addresses when, in fact, they are simply operating out of "UPS Stores" or other similar private shipping company addresses, utilizing multiple, unauthorized assumed names or "dbas" and telemarketing sales agent aliases to avoid identification of the specific companies and  telemarketer sales agents committing the fraud and using ever-changing "burner" cell phones to prevent customers/consumers from identifying and tracing to their real base of operations.

**g.  Various other acts and practices that may be uncovered during discovery.**

**28.**  In this case, Joaquin and Rose personally, and in their capacities as members and principals of the Joaquin Enterprise, utilized, and continue to utilize, one or more of the above-described unlawful, false, misleading and unconscionable sales tactics (which have been identified as

---

[16]  This is standard operating procedure for dealers on the shady side of the precious metals industry. *See* footnote 5, *supra*.

[17]  On information and belief (and based on past experience), when discovery does begin, the Defendant RICO Persons and Enterprise usually claim that they no longer have any relevant documents concerning the transactions at issue (including cost of goods sold, commissions paid to their telemarketer agents on the sales or any other documents).

fraudulent and prosecuted by various governmental entities[18]) as part of the Joaquin Enterprise's daily on-going business model. More specifically, the numerous, repeated misrepresentations to Mr. Long by Joaquin and Rose (and other telemarketing sales agents of the Joaquin Enterprise whose identities are known only to Defendants) are neither isolated incidents nor unique to Mr. Long's interactions and experiences with the Joaquin Enterprise. Rather, utilizing these deceptive and fraudulent tactics, the Joaquin Enterprise, at the direction of and under the control of the RICO Persons Joaquin and Rose (and possibly other members of the Joaquin Enterprise whose identities are known only to Defendants), have sold multiple thousands, if not millions, of fraudulently overpriced coins to thousands of customers such as Mr. Long over the course of multiple years and have, in turn, stolen and converted coins from numerous customers, such as and including Mr. Long, and continue to do so in a continuous, on-going, open-ended scheme and pattern of fraudulent conduct by the RICO Persons, Joaquin and Rose, through the various, intertwined constituent members of the Joaquin Enterprise.

29.     The Joaquin Enterprise, at the direction of and under the control of the RICO Persons, Joaquin and Rose (and possibly other members whose identities are known only to Defendants), through their telemarketer sales agents, including Joaquin and Rose themselves, make thousands of intrastate and interstate telephonic sales calls per month and ship coins (and have coins shipped back to the Joaquin Enterprise through its constituent companies) by the interstate mails and private interstate delivery services. Using various unscrupulous techniques such as those listed above, the Joaquin Enterprise's telemarketer sales agents, including Joaquin and Rose (and others whose identities are only known to Defendants) prey upon unsuspecting customers, such as Mr. Long, with little or no knowledge of the intricacies and nuances of numismatics and the precious

---

[18] *See, e.g., California v Lear*, pages 7-9, https://docs.simpluris.com/websites/13abd9da-de42-4adb-8903-54649f9c5695/documents/fcc995e5-6132-42f9-8608-aea59c728a84/CA%20Complaint(11118433.2).pdf.

metals industry and trick, bully, harass and cajole the customers into buying fraudulently overpriced coins at unconscionable markups and ship them to customers throughout the United States for the unlawful financial benefit of the Joaquin Enterprise, and the RICO persons, Joaquin and Rose (and possibly other members whose identities are known only to Defendants). In addition, the Joaquin Enterprise, at the direction of and under the control of the RICO Persons, Joaquin and Rose (and possibly other members whose identities are known only to Defendants), through their telemarketer sales agents, including Joaquin and Rose themselves, confuse the customers, such as Mr. Long, through a series of exchanges of coins (which they falsely represent are making the customer "larger profits") or they fail to properly account for coins shipped back to the constituent members of the Joaquin Enterprise and then claim they never received the coins, or else they hold customers' coins "on account" and claim that they will utilize these assets for trade on other "special" coins or that they will place such assets for sale in upcoming auctions that never occur only never to return the funds or the coins to the customer. The criminal ploys used by coin fraud dealers such as Joaquin and Rose, personally and as principals and representatives of the Joaquin Enterprise, to fleece their customers, including Mr. Long, are only limited by their perverse imaginations.

**B.   The Joaquin Enterprise: Illegal Schemes and the Conspiracy to Defraud Mr. Long**

**30.**   Bruce K. Long is an 85-year-old widower who lives alone and suffers from substantial hearing loss and progressive mental decline along with all the complications related to those afflictions. The facts outlined and specifically described below clearly demonstrate that Joaquin and Rose (and other telemarketing sales agents of the Joaquin Enterprise whose identities are known only to Defendants) craftily and unlawfully financially exploited this elderly gentleman with full knowledge that Mr. Long was not capable of understanding the complexities of numismatics or

the details of the transactions at issue.

**31.**     In October 2018, Mr. Long began receiving telephone calls from representatives of the Joaquin Enterprise. Specifically, on or about October 18, 2018, Mr. Long received a cold call from Joaquin who at that time claimed to be a precious metals expert and representative of Defendant Father & Sons, Inc. ("F&S"), a member of the Joaquin Enterprise. Joaquin offered to sell Mr. Long numismatic coins[19] and precious metal bullion[20] based upon claims that the coins were being offered for sale at significant savings and had extraordinary investment potential. Although Mr. Long admitted to Joaquin that he knew very little about precious metals and numismatics, Mr. Long was intrigued about investing in precious metals and purchased Morgan Silver Dollars from Joaquin based upon his representations that they were a high-reward/low-risk investment.

**32.**     Once Joaquin made the initial score on Mr. Long, he and other telemarketing agents[21] who identified as representatives of the Joaquin Enterprise (or its constituent entity members or one of their assumed names) began an unrelenting barrage of high-pressure sales calls to Mr. Long designed to influence, convince, intimidate, unbalance and confuse him. The goal and ultimate result were to fleece Mr. Long by way of a three-pronged scam:

> **a.**     The Joaquin Enterprise telemarketing sales agents, including Joaquin (and others whose identities are known only to Defendants) began a non-stop frenzy of calls and sales to Mr. Long utilizing the fraudulent sales tactics previously identified, but at this juncture mainly overcharging for coins based upon misrepresentations as to value with promises of

---

[19]   Numismatics is the study or collection of currency, including coins, tokens, paper money, medals and related objects. The discipline also includes the broader study of money and other means of payment used to resolve debts and exchange goods.

[20]   Precious metal bullion may occur in various forms – bars (ingots), privately minted coins and coins minted by various countries, including the United States Mint.

[21]   *See* footnote 5, *supra*.

safe investments with large returns.  Through constant telemarketing calls to Mr. Long by Joaquin and the various other high-pressure, fast-talking Joaquin Enterprise telemarketers, Mr. Long was left confused and exasperated and unable to keep up with what coins he had agreed to purchase, which transactions were in process, and which coins had been shipped or received. This financial exploitation of Mr. Long proved highly effective as Mr. Long paid out a total of $196,619.97 to the Joaquin Enterprise. To the extent that Mr. Long's coin purchases can be documented and thus analyzed, they reveal an average markup of 699%, with some markups of over 5,000%. Not surprisingly, Mr. Long's life savings were drained by Joaquin, Rose and the other complicit telemarketing sales agents of the Joaquin Enterprise, before the scams could be uncovered. Extrapolation of this pattern of overcharging reveals that Mr. Long lost, in reasonable probability, over 86% of his $196,619,97 total investment, or losses of about $172,016.35.

**b.**    Subsequent investigation by Mr. Long revealed unauthorized electronic drafts on Mr. Long's bank accounts in favor of the Joaquin Enterprise (under various names and assumed names of its member entities) for which Mr. Long had neither backup documentation nor evidence of ever receiving the coins. When Mr. Long attempted to confront the Joaquin Enterprise telemarketing sales agents—including Joaquin himself—about these unauthorized, undocumented transactions and unreceived coins, they doubled down with a cacophony of lies, including: (1)  that Mr. Long actually had in fact ordered the coins, (2) that the coins would be shipped out soon, (3) that the coins had already been delivered, (4) that the charges to the credit cards or bank drafts were for balances owed on prior purchases, and (5) cynically, but accurately, that Mr. Long was just confused. On other occasions, Mr. Long received shipments of coins without having ever placed an order,

which only added to his confusion and tended to further obfuscate the transactions. The key goal of Joaquin and the Joaquin Enterprise was to gaslight and keep the elderly Mr. Long so off balance and confused that Joaquin and Rose could take full advantage of his age and increasing infirmity.[22]

c.    Finally, once Joaquin and Rose, through the Joaquin Enterprise, had placed him under near debilitating financial distress, Mr. Long began seeking relief from the mounting debts Joaquin and Rose, through the Joaquin Enterprise, had created. Mr. Long expressed a dire need to sell some of his "investment" coins based upon representations from Joaquin and Rose (and possibly other telemarketer sales agents of the Joaquin Enterprise whose identities are known only to Defendants) that they would buy back his coins for a "fair price" which would at least approximate the original purchase price. Using Mr. Long's distress against him, Joaquin personally (and in collaboration with Rose), and as representatives of the Joaquin Enterprise (or its constituent members), effectively stole a total of $516,976.00 through a series of "buy-back" transactions in which Mr. Long received but a minute fraction of the purchase prices he had originally paid for the coins.

### The First RICO Scam - Fraudulent Overpricing/Markup of Coins:

**33.**    From October of 2018 until approximately April of 2022, Joaquin (and other telemarketing sales agents of the Joaquin Enterprise whose identities are known only to Defendants) repeatedly telephoned Mr. Long and cajoled, tricked, harassed and ultimately bullied and intimidated him into making some one hundred three (103) distinct purchases of precious metal products from F&S (or its assumed names), a member of the Joaquin Enterprise, based upon misrepresentations by

---

[22] *See* footnote 5, above, regarding similar tactics reported in *United States v. Romano*, No. 09-CR-168 (SJ) (VMS), 2013 U.S. Dist. LEXIS 208446, at *19 n.5 (E.D.N.Y. 2013).

Joaquin and the other Joaquin Enterprise telemarketers that the coins were exceptional "high-reward/low-risk" investment opportunities that promised tremendous returns upon resale and that Mr. Long needed to "act now" and immediately purchase the coins (by credit card or bank draft) in order for him to receive the "lowest costs" or "dealer's costs" on the coins. The Joaquin Enterprise through F&S (or its assumed names) under the direction and control of Joaquin and Rose (and possibly other principals whose names are known only to the Defendants) shipped Mr. Long the coins via United States mail (or private interstate parcel services) along with enclosed invoices that confirmed the fraudulent prices of the coins.

**34.** Specifically, the coins Mr. Long purchased and received from the Joaquin Enterprise under the direction and control of Joaquin and Rose (and possibly other principals whose names are known only to the Defendants) did not have the attributes and values represented by Joaquin (and the other telemarketing sales agents of the Joaquin Enterprise whose identities are known only to Defendants). Rather, the markups for these coins were typically over 500%--with some coins marked up over 5,000%.[23] Attached as **Exhibit 1** is the list of the coins Mr. Long received from the members of the Joaquin Enterprise, the purchase prices of the coins, and the coins' fair market values which reveals that Mr. Long spent $196,619.97[24] for coins from these Defendants. Of the coins with invoices, Mr. Long spent $78,378.97 with Defendant, but only received coins worth approximately $9,805.00 (a 699% mark-up). Available documentation reveals that Mr. Long lost $68,573.97 as demonstrated and detailed immediately below:

---

[23]  By way of comparison, in *California v. Lear*, the State of California determined that an undisclosed 33% markup by Lear Capital was fraudulent. *See California v Lear*, https://docs.simpluris.com/websites/13abd9da-de42-4adb-8903-54649f9c5695/documents/fcc995e5-6132-42f9-8608-aea59c728a84/CA%20Complaint(11118433.2).pdf.

[24]   *See* paragraph 35, *infra.* Mr. Long has no invoices for 59 of the coins from members of the Joaquin Enterprise because three of the Joaquin Enterprise members (or aliases) did not supply invoices: Collectors Heaven, Collectors Choice, and Legend. Thirty-two of thirty-six of the F&S invoices disappeared after Joaquin made the first in-home visit to Mr. Long during the third scam. *See below* at ¶ 39. However, what information that is available (such as dates, amounts and coin species) from the missing invoices can be reconstructed from credit card and bank records and Mr. Long's handwritten notes.

**34.1**   On 10/30/2018, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1885-O MORGAN SILVER DOLLAR for $331.66 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 1810090, which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $50.00, resulting in an immediate monetary loss to Plaintiff of $281.66. The price charged for this coin represents a fraudulent and unconscionable markup of 563%.

**34.2**   On 10/30/2018, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1887-P MORGAN SILVER DOLLAR for $331.66 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 1810090, which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $50.00, resulting in an immediate monetary loss to Plaintiff of $281.66. The price charged for this coin represents a fraudulent and unconscionable markup of 563%.

**34.3**   On 10/30/2018, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific

misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1889-P MORGAN SILVER DOLLAR for $331.66 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along ith Invoice No. 1810090, which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $50.00, resulting in an immediate monetary loss to Plaintiff of $281.66. The price charged for this coin represents a fraudulent and unconscionable markup of 563%.

**34.4**    On 2/1/2019, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1883-CC MORGAN SILVER DOLLAR MS62 UC NGC for $1,495.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 1901088, which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $225.00, resulting in an immediate monetary loss to Plaintiff of $1,270.00. The price charged for this coin represents a fraudulent and unconscionable markup of 564%.

**34.5**    On 7/24/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1883 MORGAN SILVER DOLLAR MS62 for $1,072.50 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long

along with Invoice No. 9054 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin(s) as of the date of purchase was just $50.00, resulting in an immediate monetary loss to Plaintiff of $1,022.50. The price charged for this coin represents a fraudulent and unconscionable markup of 2,050%.

**34.6**   On 7/24/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1886 MORGAN SILVER DOLLAR MS62 for $1,072 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 9054 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin(s) as of the date of purchase was just $50.00, resulting in an immediate monetary loss to Plaintiff of $1,022.50. The price charged for this coin represents a fraudulent and unconscionable markup of 2,050%.

**34.7**   On 8/18/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1926 50C LIBERTY MS64 PCGS for $1,995.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 9094 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin(s) as of the date of purchase was just $1,050.00, resulting in an immediate

monetary loss to Plaintiff of $945.00. The price charged for this coin represents a fraudulent and unconscionable markup of 90%.

**34.8**    On 9/4/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1887 MORGAN SILVER DOLLAR MS64 for $1,145.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10048 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin(s) as of the date of purchase was just $85.00, resulting in an immediate monetary loss to Plaintiff of $1,060.00. The price charged for this coin represents a fraudulent and unconscionable markup of 1,247%.

**34.9**    On 9/4/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1897 MORGAN SILVER DOLLAR MS61 for $1,145.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10048 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin(s) as of the date of purchase was just $85.00, resulting in an immediate monetary loss to Plaintiff of $1,060.00. The price charged for this coin represents a fraudulent and unconscionable markup of 1,247%.

**34.10**  On 9/18/2020 Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1884 MORGAN SILVER DOLLAR MS62 for $1,225.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10086 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $50.00, resulting in an immediate monetary loss to Plaintiff of $1,175.00. The price charged for this coin represents a fraudulent and unconscionable markup of 2,350%.

**34.11**  On 9/18/2020 Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1886 MORGAN SILVER DOLLAR MS62 for $1,225.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10086 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $50.00, resulting in an immediate monetary loss to Plaintiff of $1,175.00. The price charged for this coin represents a fraudulent and unconscionable markup of 2,350%.

**34.12**  On 9/21/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through

misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1870-CC $1 LIBERTY XF for $3,800.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10102 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $1,000.00, resulting in an immediate monetary loss to Plaintiff of $2,800.00. The price charged for this coin represents a fraudulent and unconscionable markup of 280%.

**34.13**  On 9/29/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1880-S MORGAN SILVER DOLLAR MS63 for $1,447.50 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10114 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $150.00, resulting in an immediate monetary loss to Plaintiff of $1,297.50. The price charged for this coin represents a fraudulent and unconscionable markup of 865%.

**34.14**  On 9/29/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1885

MORGAN SILVER DOLLAR MS62 for $1,447.50 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10114 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $150.00, resulting in an immediate monetary loss to Plaintiff of $1,297.50. The price charged for this coin represents a fraudulent and unconscionable markup of 865%.

34.15    On 10/13/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1880-S MORGAN SILVER DOLLAR MS62 for $1,400.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10150 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $150.00, resulting in an immediate monetary loss to Plaintiff of $1,250.00. The price charged for this coin represents a fraudulent and unconscionable markup of 833%.

34.16    On 10/13/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise)whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1889 MORGAN SILVER DOLLAR MS62 for $1400.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long

along with Invoice No. 10150 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $150.00, resulting in an immediate monetary loss to Plaintiff of $1,250.00. The price charged for this coin represents a fraudulent and unconscionable markup of 833%.

**34.17**  On 10/13/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1921 MORGAN SILVER DOLLAR MS62 for $1400.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10150 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $150.00, resulting in an immediate monetary loss to Plaintiff of $1,250.00. The price charged for this coin represents a fraudulent and unconscionable markup of 833%.

**34.18**  On 10/30/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1872 $10 GOLD AMAZONIAN[25] for $3,999.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10174 under the assumed name "The Family Collectibles, Inc.," which

---

[25] On information and belief, the 1872 $10 Gold Amazonian was likely a replica coin but represented to be an original.

repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $1,000.00, resulting in an immediate monetary loss to Plaintiff of $2,999.00. The price charged for this coin represents a fraudulent and unconscionable markup of 300%.

**34.19**   On 11/3/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1882-CC MORGAN SILVER DOLLAR MS64 NGA for $2,465.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10182 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $275.00, resulting in an immediate monetary loss to Plaintiff of $2,190.00. The price charged for this coin represents a fraudulent and unconscionable markup of 796%.

**34.20**   On 12/1/2020, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase an 1853 3C TRIME BU for $2,895.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10189 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $250.00, resulting in an immediate monetary loss

to Plaintiff of $2,645.00. The price charged for this coin represents a fraudulent and unconscionable markup of 1,058%.

**34.21**    On 2/19/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1922 $1 PEACE MS60 for $2,255.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10625 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $40.00, resulting in an immediate monetary loss to Plaintiff of $2,215.00. The price charged for this coin represents a fraudulent and unconscionable markup of 5,538%.

**34.22**    On 2/19/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1923 $1 PEACE MS61 for $2,255.00 as an investment.  After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10625 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $45.00, resulting in an immediate monetary loss to Plaintiff of $2,210.00. The price charged for this coin represents a fraudulent and unconscionable markup of 4,911%.

**34.23**   On 3/22/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1923 $1 PEACE MS63 for $2,745.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10749 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $65.00, resulting in an immediate monetary loss to Plaintiff of $2,680.00. The price charged for this coin represents a fraudulent and unconscionable markup of 4,123%.

**34.24**   On 3/22/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1925 $1 PEACE MS63 for $2745.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10749 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $65.00, resulting in an immediate monetary loss to Plaintiff of $2,680.00. The price charged for this coin represents a fraudulent and unconscionable markup of 4,123%.

**34.25**   On 4/2/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through

misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1924 MORGAN SILVER DOLLAR MS62 for $2,317.50 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10811 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $50.00, resulting in an immediate monetary loss to Plaintiff of $2,267.50. The price charged for this coin represents a fraudulent and unconscionable markup of 4,535%.

34.26   On 4/2/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1926 MORGAN SILVER DOLLAR MS64 for $2,317.50 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10811 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $65.00, resulting in an immediate monetary loss to Plaintiff of $2,252.50. The price charged for this coin represents a fraudulent and unconscionable markup of 3,465%.

34.27   On 4/9/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1925

$1 PEACE MS61 for $2,315.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10836 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $45.00, resulting in an immediate monetary loss to Plaintiff of $2,270.00. The price charged for this coin represents a fraudulent and unconscionable markup of 5,044%.

**34.28**   On 4/9/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1926-S $1 PEACE MS61 for $2,315.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 10836 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $75.00, resulting in an immediate monetary loss to Plaintiff of $2,240.00. The price charged for this coin represents a fraudulent and unconscionable markup of 2,986%.

**34.29**   On 5/25/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 2013 $1 SILVER AMERICAN EAGLE MS70 PCGS for $998.33 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long

along with Invoice No. 25624 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $150.00, resulting in an immediate monetary loss to Plaintiff of $848.33. The price charged for this coin represents a fraudulent and unconscionable markup of 565%.

**34.30** On 5/25/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 2014 $1 SILVER AMERICAN EAGLE MS70 PCGS for $998.33 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 25624 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $150.00, resulting in an immediate monetary loss to Plaintiff of $848.33. The price charged for this coin represents a fraudulent and unconscionable markup of 565%.

**34.31** On 5/25/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 2015 $1 SILVER AMERICAN EAGLE MS70 PCGS for $998.33 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 25624 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $150.00, resulting in an

immediate monetary loss to Plaintiff of $848.33. The price charged for this coin represents a fraudulent and unconscionable markup of 565%.

**34.32** On 6/15/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 2011-W $1 SILVER AMERICAN EAGLE PR69 PCGS for $1,447.50 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 25716 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $100.00, resulting in an immediate monetary loss to Plaintiff of $1,347.50. The price charged for this coin represents a fraudulent and unconscionable markup of 1,348%.

**34.33** On 6/15/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 2012-S $1 SILVER AMERICAN EAGLE PR69 PCGS for $1,447.50 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 25716 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $100.00, resulting in an immediate monetary loss to Plaintiff of $1,347.50. The price charged for this coin represents a fraudulent and unconscionable markup of 1,348%.

**34.34**  On 6/25/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a CD FRANKLIN HALF ROLL BU for $1,495.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the roll of coins to Mr. Long along with an invoice for the transaction under the assumed name "Collector's Heaven." Mr. Long is no longer in possession of the invoice.[26] The fair market value of the roll of coins as of the date of purchase was just $350.00, resulting in an immediate monetary loss to Plaintiff of $1,145.00. The price charged for this roll of coins represents a fraudulent and unconscionable markup of 327%.

**34.35**  On 7/22/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 2017-W $1 SILVER AMERICAN EAGLE MS70 PCGS for $1,647.50 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No.25879 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $175.00, resulting in an immediate monetary loss to Plaintiff of $1,472.50. The price charged for this coin represents a fraudulent and unconscionable markup of 841%.

---

[26] *See* footnote 24, *supra*, regarding the missing invoices.

**34.36**  On 7/22/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 2018-W $1 SILVER AMERICAN EAGLE MS70 PCGS for $1,647.50 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No.25879 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $175.00, resulting in an immediate monetary loss to Plaintiff of $1,472.50. The price charged for this coin represents a fraudulent and unconscionable markup of 841%.

**34.37**  On 8/5/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 2014 $1 SILVER AMERICAN EAGLE MS70 PCGS for $1,745.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 25938 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $175.00, resulting in an immediate monetary loss to Plaintiff of $1,570.00. The price charged for this coin represents a fraudulent and unconscionable markup of 897%.

**34.38**  On 8/5/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through

misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 2015 $1 SILVER AMERICAN EAGLE MS70 PCGS for $1,745.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 25938 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $175.00, resulting in an immediate monetary loss to Plaintiff of $1,570.00. The price charged for this coin represents a fraudulent and unconscionable markup of 897%.

**34.39**   On 10/29/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1926 $2.50 GOLD LIBERTY MS64 PCGS for $3,645.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 28032 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $700.00, resulting in an immediate monetary loss to Plaintiff of $2,945.00. The price charged for this coin represents a fraudulent and unconscionable markup of 421%.

**34.40**   On 11/26/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1926

50c SILVER LIBERTY MS64 NGC for $1,895.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 28120 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $200.00, resulting in an immediate monetary loss to Plaintiff of $1,695.00. The price charged for this coin represents a fraudulent and unconscionable markup of 848%.

**34.41** On 12/22/2021, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1976-S $1 SILVER LIBERTY EISENHOWER PROOF ROLL for $2,895.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No.28167   under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coins' value. The fair market value of the roll of coins as of the date of purchase was just $1,200.00, resulting in an immediate monetary loss to Plaintiff of $1,695.00. The price charged for this coin represents a fraudulent and unconscionable markup of 141%.

**34.42** On 1/18/2022, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1883-O MORGAN SILVER DOLLAR MS62 for $995.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long

along with Invoice No. 28218 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $50.00, resulting in an immediate monetary loss to Plaintiff of $945.00. The price charged for this coin represents a fraudulent and unconscionable markup of 1,890%.

**34.43**  On 3/1/2022, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 2013-W $1 SILVER AMERICAN EAGLE PR69 PCGS for $2,490.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 28314 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $85.00, resulting in an immediate monetary loss to Plaintiff of $2,405.00. The price charged for this coin represents a fraudulent and unconscionable markup of 2,829%.

**34.44**  On 3/22/2022, Joaquin (or another telemarketing sales agent of F&S (a constituent member of the Joaquin Enterprise) whose identity is known only to Defendants and who was working for F&S under the direction and control of Joaquin), through misrepresentations that the coin being offered for sale was a safe and sound "high-reward/low-risk" investment of limited, short-term availability and specific misrepresentations as to the coin's market value, convinced Mr. Long to purchase a 1891-CC MORGAN SILVER DOLLAR for $2,895.00 as an investment. After receipt of payment, F&S, under the direction, supervision, and control of Joaquin (and possibly others who at this time are known only to the Defendants), shipped the coin to Mr. Long along with Invoice No. 28375 under the assumed name "The Family Collectibles, Inc.," which repeated and independently misrepresented to Mr. Long the coin's value. The fair market value of the coin as of the date of purchase was just $550.00, resulting in an

immediate monetary loss to Plaintiff of $2,345.00. The price charged for this coin represents a fraudulent and unconscionable markup of 426%.

**35.** There are fifty-nine (59) transactions in the first fraud to which Mr. Long does not have invoices. Three of the Joaquin Enterprise constituent members did not supply invoices: Collectors Heaven, Collectors Choice, and Legend.  Thirty-two of thirty-six of the F&S invoices disappeared after Joaquin made the first in-home visit to Mr. Long as part of the third scam.[27] However, hand-written notes and check and credit card receipts indicate that Mr. Long paid out $118,241.00.00 for those transactions. From the pattern established on the first 44 transactions, Joaquin and the other Joaquin Enterprise telemarketers, operating on behalf of the Joaquin Enterprise marked up the coins to 699%. Extrapolating this markup to the other 59 transactions (as shown on the lower half of the Exhibit 1 table), it is reasonable to infer that Mr. Long lost approximately $96,566.86 of his investment (i.e., an 87% loss).[28]

**36.** The coins Mr. Long purchased and received from F&S (a constituent member of the Joaquin Enterprise) under the direction and control of its principal Joaquin (and possibly other principals whose names are known only to the Defendants) did not have the attributes and values represented by Joaquin and the other telemarketing sales agents of F&S (whose identities are known only to Defendants at this time and who were working for F&S under the direction and control of Joaquin and Rose) represented to and convinced Mr. Long that each of the coin purchases detailed and described above were "investments." Unbeknownst to Mr. Long, however, was the fact that immediately upon purchase, he was losing well over 85% of the value of the principal of his "investment" and unwittingly rewarding Joaquin and the Joaquin Enterprise as a result of their

---

[27] Interestingly, F&S did not supply invoices after the first home visit, and it appears to cease selling coins to Mr. Long but instead turned Mr. Long over to Family Collectibles to continue the First Scam.

[28] Of course, discovery should alleviate the need for reliance upon extrapolation.

fraudulent coin scam with Mr. Long's life savings. Ultimately, discovery will reveal the full quantum of Mr. Long's losses and damages attributable to Joaquin and Rose and the Joaquin Enterprise through F&S's fraudulent coin sales to Mr. Long, but it can reasonably be expected that Mr. Long lost *at least* 86% of his $196,619.97 "investment" to the Joaquin Enterprise, and Joaquin and Rose individually, which equates to approximately $172,016.35. The foregoing is textbook "telemarketing fraud directed at elders" as defined in 18 U.S.C. § 2325 and constitutes the First Scam.

### The Second RICO Scam-Unauthorized Bank Drafting and Credit Card Charges

**37.**   During the period of Joaquin's and F&S's marketing of coins to Mr. Long as part of the Joaquin Enterprise, they continually stressed that the purchases must occur quickly before Mr. Long lost the "incredible opportunity" to obtain the coins they were hawking. To ensure immediate processing to secure the coin(s), Joaquin (and other F&S and Joaquin Enterprise telemarketing sales agents whose identities are only known to the Defendants) obtained several of Mr. Long's credit card numbers and his bank account information. They began to use this sensitive financial information through two of the F&S aliases to make illegal, unauthorized charges and thereby to steal an additional $33,815.00 of Mr. Long's life savings, to wit:[29]

    **a.**   Between 7/22/20 and 7/7/2021, Joaquin and the Joaquin Enterprise, through the "The Family Collectibles, Inc." alias, made six (6) fraudulent electronic check transactions in which he wrote checks to the fictitious Family Collectibles entity drawn on Mr. Long's checking accounts with fake check numbers and/or out-of-sequence check numbers in the total amount of $23,095.00. When confronted with the unauthorized bank drafts, an F&S representative (whose identity is only known to Defendants and who was operating

---

[29] *See* Exhibit 2 for a list of unauthorized, fabricated bank drafts and unauthorized credit card charges.

in support of the Joaquin Enterprise) made false representations meant to confuse or confound Mr. Long including, but not limited to: (1) claiming that they had recordings in which Mr. Long authorized the purchases; (2) claiming that the bank draft charges were for outstanding orders that had not been fully processed earlier and (3) claiming that Mr. Long had just forgotten about the purchases and that the coins will soon be shipped. These obfuscation and stalling tactics were effective as they compounded Mr. Long's confusion already intentionally created by Joaquin's and the other telemarketer sales agents' constant harassing and bullying telephone calls pressing for multiple coin sales by multiple salespersons.[30]

**b.** Once Family Collectibles was suspected, another check fraud scheme followed. Between 12/12/21 and 2/10/22, Joaquin and various other F&S telemarketing sales agents (whose identities are only known to Defendants) using the "Collectors Heaven" made seven (7) unauthorized electronic check transactions in which they wrote checks to the fictitious Collectors Heaven entity drawn on Mr. Long's checking accounts with fake check numbers and/or out-of-sequence check numbers in the total amount of $9,820.00.  When confronted with the unauthorized bank drafts, an F&S representative (whose identity is only known to Defendants and who was operating in support of the Joaquin Enterprise) again made false representations meant to confuse or confound Mr. Long including, but not limited to: (1) claiming that they had recordings in which Mr. Long authorized the purchases; (2) claiming that the bank draft charges were for outstanding orders that had not been fully processed earlier and (3) claiming that Mr.

---

[30] *See* footnote 5, *supra*.

Long had just forgotten about the purchases and that the coins will soon be shipped. Of course, these tactics were to continue to confuse and confound Mr. Long.

c. The third bank fraud scheme soon followed.  In a quick sequence between 3/24/22 and 4/22/22, Joaquin and various other F&S telemarketing sales agents (whose identities are only known to Defendants) used the "Collectors" alias to make six (6) unauthorized charges on Mr. Long's credit cards in a total amount of $15,680.00. Fortunately, Mr. Long's family intervened in time to have all but one of these fraudulent charges reversed, limiting his losses from this fraud to only $900.00. That the reversal of these charges was never contested by Collectors is circumstantial evidence that the charges were fraudulent.

38.  Elderly customers almost never challenge credit card or bank drafts within the tight time frame (60-90 days) of the transaction as required by banking regulations. Thus, the elderly who suffer from memory and other aging issues, like Mr. Long, are easily fooled and left without recourse even when they manage to catch the unauthorized electronic charges.  At this stage of his life, Mr. Long is mostly incapable of a careful review of credit card charges and banking records against purchases within the time period required for contesting the transactions with the banks or credit card companies.  Check and credit card fraud (*i.e.* 18 U.S.C. § 1344 Bank Fraud) by Joaquin and the Joaquin Enterprise, ostensibly on behalf of F&S (and its assumed names), constitutes the Second Scam.

## **The Third RICO Scam – Stealing the Coins Back**

39.  As Mr. Long's liquid funds were dissipated by the fraudulent and illegal scams of Joaquin and the other telemarketing sales agents of F&S (a constituent member of the Joaquin Enterprise) whose identities are known only to the Defendants, Mr. Long became desperate and told Joaquin

46

and the other F&S telemarketing sales agents that he was in immediate need of cash and wanted to sell some of his coins to pay his debts. Having utilized the First and Second Scams to create Mr. Long's fiscal dilemma, Joaquin and Rose saw a golden opportunity to spring the Third Scam—essentially stealing back Mr. Long's coins by paying him pennies on the dollar for them. Joaquin responded to Mr. Long's expressed desire to sell coins by telling Mr. Long that F&S (operating in support of and on behalf of the Joaquin Enterprise) would be willing to buy his coins for a "fair price" which would approximate the original prices Mr. Long paid for the coins. Using Mr. Long's distress against him, Joaquin personally (and in collaboration with Rose) and through and on behalf of the Joaquin Enterprise, effectively stole a total of $613,869.60 from Mr. Long, to wit:

    a.   On or about May 30, 2019, Joaquin traveled from New York to Mr. Long's home in Arizona to review the coins that Mr. Long had purchased from members of the Joaquin Enterprise (and other coin dealers). Joaquin claimed that he was there representing F&S. Taking advantage of Mr. Long's significant mental decline, Joaquin convinced Mr. Long that a "fair" purchase price for Mr. Long's coins at issue was a mere $8,000.00, even though Mr. Long had not so long before paid $114,280.00 for those very same coins. In his confusion and desperation, Mr. Long agreed and thereby realized a loss of $106,280.00 (i.e. a 93% investment loss). After Joaquin left with the coins, Mr. Long discovered that he could no longer locate many of the original invoices and receipts for his original coin purchases. On information and belief, Joaquin took the original invoices and receipts with him to destroy evidence of the first RICO scam against Mr. Long (fraudulent and unconscionably high markups).

    b.   On October 5, 2020, Joaquin returned to Arizona because Mr. Long was refusing to buy any additional coins from his telemarketing sales agents and was again

complaining of needing cash and wanting to sell some of his coins. Following the same predatory practices outlined above, Joaquin claimed to Mr. Long that he represented **Legend Collectibles** and this second time convinced Mr. Long to accept $42,830.00 in exchange for some 77 coins for which Mr. Long had originally paid $236,442.00. Joaquin provided Mr. Long with a $10,000 check drawn on a Legend Collectibles bank account and signed by John Rose. Joaquin instructed Mr. Long to hold the check until he cleared it with Rose, but that call never came. Mr. Long was never able to cash the Legend Collectibles check and has never received any funds from this transaction. Again, Joaquin took advantage of Mr. Long's confusion and desperation. In this second "buy-back," Mr. Long realized a 100% investment loss of $236,442.00. Again, Mr. Long discovered that he could no longer locate many of the original invoices and receipts for his original coin purchases. On information and belief, Joaquin again purloined the original invoices and receipts to destroy evidence of the first RICO scam against Mr. Long (fraudulent and unconscionably high markups).

c.  On November 12, 2020, Joaquin decided to "go to the well" a third time. Claiming that he just happened to be in the Mesa, Arizona area, Joaquin returned yet again to Mr. Long's residence. Joaquin indicated to Mr. Long that on this occasion he was acting as a representative of both Legend and Collector's Heaven (the former a constituent member of the Joaquin Enterprise and the latter an assumed name of F&S). Again, taking advantage of Mr. Long's confusion and desperation, Joaquin convinced Mr. Long to accept a $7,790.00 check drawn on a "Legend Collectibles" bank account for coins Mr. Long had originally purchased for $156,824.60. Again, Joaquin told Mr. Long to hold the check until he cleared it with Rose. Mr. Long was never able to cash

the check. After numerous unsuccessful attempts to talk to Rose on the telephone, Rose finally sent Mr. Long a cashier's check in the amount of $800 and three (3) USPS Money Orders for $500 each. Therefore, Mr. Long was paid a total of just $2,300.00 by Rose in exchange for coins for which Mr. Long had originally paid $156,824.60. Through this third coin "buy-back," at the hands of Joaquin and Rose, Mr. Long realized a loss of $154,524.60 (i.e., a 98.5% investment loss). On this occasion, when Joaquin attempted to keep some of the original invoices, Mr. Long demanded them back.  These are the invoices used to create Exhibit 1.

d.   Finally, on or about April 23, 2021, a "John Adams"[31] called Mr. Long on the telephone. "John Adams" told Mr. Long that he and a gentleman known only as "Jim," were representing "Elite" (another constituent member of the Joaquin Enterprise) and wanted to sell Mr. Long coins, but when Mr. Long stated he had all the coins he needed, they inquired if Mr. Long had coins he wanted to sell. Mr. Long, still in financial distress, told "John Adams" that he had some. After discussing Mr. Long's remaining coins, "John Adams" convinced Mr. Long to ship forty-three (43) coins that Mr. Long originally had purchased for $129,650.00 to New York so that "John Adams" could analyze and evaluate and make Mr. Long a purchase offer. Once the coins were shipped and out of Mr. Long's possession, "John Adams" sent Mr. Long a check in the mail for just $4,300.00. The $4,300 check was drawn on a bank account of ASGCI (another constituent member of the Joaquin Enterprise) signed by someone named Lillian Vargas.  By way of this fourth "buy-back" transaction with "John Adams," Mr. Long realized a loss of $125,350.00 (i.e. a 97% investment loss).

---

[31] On information and belief, "John Adams" was an alias. *See* footnote 4, *supra*. Whether "John Adams" was really John C. Rose or some other principal in the Joaquin Enterprise will be determined in discovery.

40.     On March 23, 2022, one of Mr. Long's family members overheard an intimidating phone call to Mr. Long from a telemarketing sales agent of one of the constituent members of the Joaquin Enterprise. In discussion with Mr. Long, his family finally learned of the problems he had encountered through his dealings with Joaquin and Rose and the Joaquin Enterprise. Investigations by Mr. Long's family members ultimately brought to light the gross frauds against Mr. Long committed by Joaquin and Rose and the Joaquin Enterprise, as described above. Mr. Long's family members also uncovered the unauthorized fraudulent checks and credit card charges under the Second Scam.

41.     As a direct and/or proximate result of the above wrongful acts and practices by Joaquin and Rose and the Joaquin Enterprise, Mr. Long has suffered (and continues to suffer) substantial economic damages, which the Defendants have refused to remedy. This case has resulted.

## CLAIMS FOR RELIEF

## THE RICO COUNTS (COUNTS I – III)

42.     All of the preceding factual statements and allegations in this Complaint are incorporated by reference.

### The RICO Persons

43.     Defendants Michael E. Joaquin and John C. Rose are "persons" within the meaning of 18 U.S.C. §§ 1961(3), 1962(c) and 1962(d).

### The Joaquin Enterprise (18 U.S.C. § 1961(4))

44.     The Defendants are a group of persons and entities associated together in fact and referenced herein as the Joaquin Enterprise. The Joaquin Enterprise was engaged in telemarketing, selling, trading and buying precious metal products, and the activities of said enterprise affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4), 1962(c), and 1962(d). The

Defendants, including Michael E. Joaquin and John C. Rose, are a group of persons and entities (including F&S (and its assumed names), Legend, Elite and USGCI) associated together in fact as the Joaquin Enterprise for the common purpose of carrying out an ongoing enterprise, as described in the foregoing paragraphs of this Complaint. Namely, through multiple, individual acts of fraud, theft and conversion, Defendants defrauded and stole property (i.e. money and coins) from Plaintiff.

### A "Pattern of Racketeering Activity"

**45.** The predicate acts described in this Complaint constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); 1962(c) and are part of a common scheme to enrich Joaquin, Rose and the Joaquin Enterprise at the expense of Plaintiff through acts constituting: (i) mail fraud, in violation of 18 U.S.C. § 1341; wire fraud, in violation of 18 U.S.C. § 1334; and (iii) bank fraud, in violation of 18 U.S.C. § 1344.

**46.** As a direct and proximate result of the RICO violations described in this Complaint, Plaintiff has been injured by Defendants, and pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to bring this action to recover treble damages, costs of suit, prejudgment interest and attorneys' fees.

### COUNT I (RICO)

### AGAINST DEFENDANTS MICHAEL E. JOAQUIN AND JOHN C. ROSE FOR VIOLATION OF RICO, 18 U.S.C. § 1962(d) BY CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(c)

**47.** All of the preceding factual statements and allegations in this Complaint are incorporated by reference.

**48.** At all relevant times, Defendants Michael E. Joaquin and John C. Rose were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

49.     At all relevant times the Joaquin Enterprise: (i) was an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that function as a continuing unit.

50.     The Defendants Michael E. Joaquin and John C. Rose, and other persons, the identities of whom are only known by them at this stage in the litigation, entered into a series of agreements between and among each other to engage in a conspiracy to violate 18 U.S.C. § 1962(c). Each Defendant entered into at least one agreement with at least one other Defendant to join the conspiracy, took acts in furtherance of the conspiracy and knowingly participated in the conspiracy. The Defendants conspired to conduct and/or participate in the business and financial affairs of the Joaquin Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5) and 1962(c), to wit: multiple, repeated and continuous predicate acts of mail fraud, wire fraud and bank fraud, in violation of 18 U.S.C. §§ 2, 1341, 1343 and 1344, as described and set out above.

51.     Each Defendant is a member of the Joaquin Enterprise and as co-conspirators are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by Plaintiff that were caused by any of the members of the conspiracy, regardless of whether the Defendants were themselves directly involved in any particular aspect of the Joaquin Enterprise.

52.     Defendants Michael E. Joaquin's and John C. Rose's pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(d) proximately and/or directly caused Plaintiff to suffer injury to his business and/or property within the meaning of 18 U.S.C. § 1964(c), to wit: Plaintiff was damaged by, *inter alia,* the fraudulent and inflated prices he paid for the above-listed coins, the theft of Plaintiff's funds via unauthorized credit card and electronic check fraud, and the

fraudulent "buy-back" (actual or de facto theft and conversion) of his coins under duress (and while Plaintiff suffered with diminished mental capacity due to age) for unconscionably *de minimis* compensation. Each Defendant is a member of the Joaquin Enterprise and, as a co-conspirator, is liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by Plaintiff that were caused by any of the members of the conspiracy, regardless of whether the Defendants were themselves directly involved in any particular aspect of the Joaquin Enterprise.

53.     Michael E. Joaquin and John C. Rose agreed to commit these substantive RICO offenses by using the Joaquin Enterprise to engage in multiple predicate acts of mail fraud, wire fraud and bank fraud, while at all times knowing about, and agreeing to, the overall objective of the various schemes and fraudulent acts—that is, generating exorbitant compensation for themselves. They knew their tactics and marketing practices were misleading and unlawful and would cause Plaintiff to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

## COUNT II (RICO)

**AGAINST DEFENDANTS MICHAEL E. JOAQUIN AND
JOHN C. ROSE FOR VIOLATION OF RICO, 18 U.S.C. § 1962(c),
CONSISTING OF MAIL FRAUD (18 U.S.C. § 1341),
WIRE FRAUD (18 U.S.C. § 1343) AND BANK FRAUD (18 U.S.C. § 1344)**

54.     All of the preceding factual statements and allegations in this Complaint are incorporated by reference.

55.     By engaging in the above-described open-ended and interrelated multifaceted schemes to defraud Plaintiff—schemes which also are part of the consistent, regular and dominant part of the manner in which Defendants Michael E. Joaquin and John C. Rose (and possibly others unknown at this time to Plaintiff), participated in and conducted the day-to-day business affairs of the

Joaquin Enterprise through F&S (including its assumed names), Legend, Elite, and ASGCI (all constituent members of the Joaquin Enterprise) —Defendants instigated, perpetrated and executed the schemes to defraud Plaintiff as described and set out above and in the following particulars:

**Mail Fraud and Wire Fraud (18 U.S.C. §§ 1341, 1343)**

**56.**     In furtherance of their schemes, Defendants Michael E. Joaquin and John C. Rose and the members of the Joaquin Enterprise knowingly executed and/or intentionally participated in a multi-part scheme that was intended to defraud, and did in fact defraud, Plaintiff, and that employed the use of the mails in furtherance thereof. Michael E. Joaquin and John C. Rose in furtherance of the Joaquin Enterprise engaged in repeated and systematic mail fraud and wire fraud, as described above, in violation of 18 U.S.C. §§ 1341 that 1343 that generated multiple and repeated unlawful coin sales to Plaintiff, as described and set out above, that in turn generated exorbitant compensation for them.

**57.**     Defendants further caused the Joaquin Enterprise to use the interstate mails and wires to repeatedly make and/or send fraudulent solicitations, sales receipts and/or purchase confirmations to Plaintiff as well as coins which were sent or delivered by private or commercial interstate carrier to Plaintiff in interstate commerce in relation to the above-described coin transactions over a four-year period. As such, Michael E. Joaquin and John C. Rose conducted and/or participated in the business and financial affairs of the Joaquin Enterprise through a pattern of racketeering activity, to wit: repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, as described above, that generated multiple and repeated unlawful coin sales to Plaintiff that, in turn, generated exorbitant compensation for them. Defendants' specific acts of mail and wire fraud consist of, but are not limited to, the following:

**a.** Telephone calls to Plaintiff which incorporated false and misleading statements regarding the values, grades, attributes and investment potential of the coins sold and shipped to Plaintiff;

**b.** Shipping invoices accompanying the coin shipments to Plaintiff which contained false and misleading statements regarding the values, grades and attributes of the coins sold and shipped to Plaintiff; and

**c.** Telephone calls to Plaintiff seeking to "buy-back" coins from Plaintiff which utilized false and misleading statements regarding the values, grades and attributes of the coins to fool Plaintiff into selling said coins back to the Joaquin Enterprise at unconscionably diminished prices involving losses of principal to Plaintiff in the 90% (or more) range.

**58.** The multiple transactions described and set out in Paragraphs 34.1-34.44; 35 and 39, *supra*, reflect the wrongful actions and fraudulent schemes of Defendants Michael E. Joaquin and John C. Rose and constitute mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, including when the communication was made and how it furthered the fraudulent scheme (i.e. to whom the communication was made and the substance of the communication).

**59.** The multiple, repeated and continuous acts of mail fraud and/or wire fraud described *supra*, constitute a pattern of unlawful activity under 18 U.S.C. § 1961(1); (5). Nothing about Defendants' schemes to defraud Plaintiff indicated, or now indicate, that the schemes would ever terminate. Moreover, and independent of the duration of the schemes, the wrongful acts were a consistent, regular and dominant part of the manner in which they participated and conducted the day-to-day business and financial affairs of the Joaquin Enterprise.

**60.** Upon information and belief, the RICO Persons Michael E. Joaquin and John C. Rose (and possibly others unknown at this time to Plaintiff) have run this telemarketing coin investment

scheme (the Joaquin Enterprise) for at least nine (9) years, and their conduct has at all times manifested an unmistakable nexus between predicate RICO offenses such as mail fraud and wire fraud and a clear threat of continuing activity, and indeed their activity is ongoing. Since the institution of the Joaquin Enterprise, Defendants have perpetrated their mail and wire fraud schemes in interstate commerce upon hundreds if not thousands of unsuspecting victims.

61.     On information and belief, Defendants continue to engage in the same deceptive and fraudulent practices with other victims up to and including the present. Defendants' predicate acts of mail and wire fraud amount to a regular way of conducting the ongoing business of the Joaquin Enterprise and pose a specific threat of repetition extending indefinitely into the future.

### Bank Fraud (18 U.S.C. § 1344)

62.     By the acts described herein, and specifically those designated herein as the Second Scam, the members of the Joaquin Enterprise, and particularly Defendants Michael E. Joaquin and John C. Rose, also knowingly executed and/or intentionally participated in a scheme that defrauded one or more financial institutions.

63.     Further, the members of the Joaquin Enterprise knowingly executed and/or intentionally participated in predicate acts constituting a scheme to obtain Plaintiff's monies under the custody and control of a financial institution by means of false pretenses, representations or promises, constituting bank fraud under 18 U.S.C. § 1344. Defendant's acts included, but are not limited to:

   a.   Unauthorized transfers of funds from Plaintiff's bank accounts via forged electronic checks and

   b.   Unauthorized charges to Plaintiff's credit cards.

64.     Plaintiff incorporates by reference the attached Exhibit 2 which summarizes and sets forth those transfers and charges constituting acts of fraud upon a financial institution by Defendants in

violation of 18 U.S.C. § 1344, including which Defendant and member of the Joaquin Enterprise caused each transfer or charge to be made, the payee of each transfer or charge, when each transfer was made and how each transfer furthered the fraudulent scheme.

65.     At all relevant times, Defendants Michael E. Joaquin and John C. Rose were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

66.     At all relevant times the Joaquin Enterprise: (i) was an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that function as a continuing unit.

67.     At all relevant times the Joaquin Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

68.     At all relevant times, Joaquin and Rose were associated with or agents of the Joaquin Enterprise (individually or through its constituent members) and conducted and participated in the conduct of the Joaquin Enterprise through a pattern of racketeering activity described above.

69.     As a direct and proximate result of the violations set out above, Plaintiff has been injured. Defendants' violations of 18 U.S.C. § 1962(c) are the proximate cause of said injury. As a direct and proximate result of the RICO violations described in this Complaint, Plaintiff has been injured by Defendants, and pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to bring this action to recover treble damages, costs or suit, prejudgment interest and attorneys' fees.

### COUNT III (RICO)
### AGAINST DEFENDANTS MICHAEL E. JOAQUIN AND
### JOHN C. ROSE FOR VIOLATION OF RICO, 18 U.S.C. § 1962(b)

70.     All of the preceding factual statements and allegations in this Complaint are incorporated by reference.

71.     At all relevant times both Joaquin and Rose were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(b).

72.     At all relevant times, the Joaquin Enterprise: (i) was an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that functioned as a continuing unit.

73.     On information and belief, at all relevant times, the Joaquin Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(b).

74.     At all relevant times, Joaquin, through the pattern of racketeering activity described above and throughout this Complaint, including the Exhibits attached hereto and incorporated by reference, acquired and/or maintained his interest in and control of the Joaquin Enterprise.

75.     At all relevant times, Rose, through the pattern of racketeering activity described above and throughout this Complaint, including the Exhibits attached hereto and incorporated by reference, acquired and/or maintained his interest in and control of the Joaquin Enterprise.

76.     As a direct and proximate result of the violations set out above, Plaintiff has been injured. Joaquin's and Rose's violations of 18 U.S.C. § 1962(c) are the proximate cause of said injury. As a direct and proximate result of the RICO violations described in this Complaint, Plaintiff has been injured by Joaquin and Rose, and pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to bring this action to recover treble damages, costs or suit, prejudgment interest and attorneys' fees.

## COUNT IV
## FRAUD AND/OR FRAUDULENT CONCEALMENT

77.     The preceding factual statements and allegations in this Complaint are incorporated herein by reference.

78.     In order to sell the overvalued coins to Plaintiff, Defendants utilized one or more of the above-described unlawful, false, misleading and unconscionable high-pressure sales tactics typical

of the precious metals/coins/bullion direct sales industry. Specifically, Michael E. Joaquin, F&S and their telemarketing sales agents[32] falsely and/or misleadingly represented to Plaintiff the grades and attributes of the coins and misrepresented to Plaintiff that he was purchasing coins at (or even below) market value and that the coins were good investments and that he could always sell the coins back to Joaquin and/or F&S for market value.   Joaquin and F&S, and their telemarketing sales agents, also falsely represented the then-current values of the coins with full knowledge that the coins were not worth the values at which they were sold and purchased and that the coins would never attain the return of investment to Plaintiff as promised.

79.     Joaquin, F&S and their telemarketing sales agents made the above false representations to Plaintiff with the intent that he rely upon them and with full knowledge that such representations were false when made. Plaintiff reasonably relied on those material and false representations when deciding to purchase the grossly overvalued coins which, in fact, he purchased to his financial detriment and the financial gain of Joaquin and F&S (including, on information and belief their telemarketing sales agents), as well as Rose and the Joaquin Enterprise. As a direct and/or proximate result of the false and misleading representations about the overvalued coins, Plaintiff suffered (and continues to suffer) damages in the form of, *inter alia,* the amounts paid for the coins in excess of their actual value, consequential damages related to the funds he used to purchase the coins and mental anguish damages.

80.     Joaquin, F&S and their telemarketing sales agents also concealed their wrongful actions until all, or a significant amount, of the damage to Plaintiff was done. All the above facts were

---

[32] *See* footnote 5, *supra*. As previously explained, all of Plaintiff's coin purchases in the First Scam involved numerous, multiple telephone calls from Joaquin or various other telemarketers affiliated with F&S whom the elderly, hard-of-hearing Mr. Long can only recall as giving the names, "Tom," "Peter," "Jim," "John," "Tim," "Walter," "Gene," "Henry," "Roger" and "Phil."

material to Plaintiff's decision to purchase coins from Joaquin, F&S and their telemarketing sales agents.

81.     By virtue of the confidential business relationship between Plaintiff and Defendants, which was carefully cultivated by Joaquin and the F&S telemarketing sales agents, Defendants had a duty to disclose the above-described concealed material facts to Plaintiff. Their deliberate silence, when they had a duty to speak, and the resulting nondisclosure of the above-described concealed material facts, is the equivalent of false representations and/or omissions. Such false representations and/or omissions were made knowingly and intentionally or, at the very least, in reckless disregard of Plaintiff's rights and interests.

82.     Plaintiff justifiably relied on the false representations and/or omissions of Joaquin, F&S and their telemarketing sales agents to his financial detriment by purchasing the grossly overvalued coins as an investment. The wrongful actions of Joaquin and F&S (through Joaquin and its telemarketing sales agents) constitute fraud at New York common law.

83.     Defendants concealed their wrongful actions with the intent to mislead and defraud Plaintiff. Plaintiff was not aware of, nor through the exercise of due diligence could he have become aware of Defendants' wrongful actions until such wrongful actions were committed and discovered and brought to light by third parties. Due to the confidential business relationships between Plaintiff and Joaquin (and the other F&S telemarketing sales agents), which were predicated on their mutual trust and confidence, and Defendants' superior knowledge and/or means of knowledge, Joaquin and the F&S telemarketing sales agents had a duty to disclose to Plaintiff the above-described materially false information. Defendants' failure to do so constitutes fraudulent concealment at New York common law.

84.     In addition, specifically as regards the Third Scam (the "buy-back" scam), both Joaquin and Rose took advantage of Plaintiff's financial duress (which they caused in the first place) and age-related diminished capacity and mental decline to defraud him and convince him to sell them back all or most of his collection of coins for literally "pennies on the dollar," and sometimes not even that.

85.     Joaquin and Rose took advantage of and defrauded Plaintiff in this Third Scam by falsely representing to Plaintiff that his coins were worth a pittance of the prices he had previously paid for them and then essentially stealing the coins back from Plaintiff  based upon their lies and misrepresentations fueled by Plaintiff's personal financial panic.

86.     The Third Scam by Joaquin and Rose constitutes fraud at New York common law.

### COUNT V
### NEGLIGENT MISREPRESENTATION

87.     The preceding factual statements and allegations in this Complaint are incorporated herein by reference.

88.     Defendants made certain representations to Plaintiff in the course of their business and in transactions in which Defendants had a substantial monetary interest.  Defendants also supplied false information for the specific purpose of guiding plaintiff in his purchase of the grossly overvalued coins and again in his agreement to sell the coins back to Defendants despite losing some 90% or more of the principal amount for which he had purchased the coins from Defendants in the first place.

89.     Defendants, however, failed to exercise reasonable care and competence in obtaining and communicating information to Plaintiff as to the coins' market values, the exorbitant markups being charged for the coins, the coins' attributes and the grades of the coins by, *inter alia,* utilizing one or more of the above unlawful, false, misleading and unconscionable high-pressure sales

tactics typical of the precious metals/coins/bullion direct sales industry and/or making the above false and material misrepresentations and omissions.

90.     Plaintiff justifiably relied on Defendants' negligent misrepresentations both when purchasing the grossly overvalued coins, and when selling those same coins back to Defendants for pennies on the dollar, which negligent misrepresentations directly and/or proximately caused him to suffer damages to the financial benefit of Defendants.  Defendants' wrongful conduct constitutes negligent misrepresentation at New York common law.

## COUNT VI
## NEGLIGENCE

91.     The preceding factual statements and allegations in this Complaint are incorporated herein by reference.

92.     Defendants negligently valued, promoted, marketed, advertised and sold grossly *overvalued* coins to Plaintiff and when grossly *undervaluing* those same coins and repurchasing them from Plaintiff. Defendants owed a duty to Plaintiff to exercise reasonable care in valuing, promoting, marketing, advertising, selling and buying back the coins. Defendants breached their duty to Plaintiff by failing to exercise reasonable care in valuing, promoting, marketing, advertising, selling and buying back the coins. Defendants' wrongful conduct directly and/or proximately caused plaintiff to suffer damages. Defendants' wrongful conduct constitutes negligence at New York common law.

## COUNT VII
## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### *(Deceptive and Unfair Trade Practices)*

93.     The preceding factual statements and allegations in this Complaint are incorporated herein by reference.

94.     Plaintiff is a "consumer" and Defendants are "persons" that may be sued pursuant to § 349 of New York's General Business Law (GBL).

95.     By their above-described wrongful acts and/or misrepresentations constituting the three-part scam, Defendants engaged in false, misleading and deceptive acts and practices in violation of GBL § 349. Defendants have made, and continue to make, deceptive, false and material misleading statements concerning the coins they sell, including: (i) representing that the coins have values, grades and attributes that they do not have and that significant investor and collector demand exists for the coins that will cause them to appreciate in value, which does not exist and will not happen; (ii) representing that the coins are rare and/or unique and have substantial desire to investors and collectors, which will cause the coins to appreciate as investments significantly in the future, which they are not; and (iii) failing to disclose the above information about the coins, which Defendants knew at the time of the transactions, with the intent to induce Plaintiff to purchase coins that Plaintiff would not have purchased had Defendants disclosed such information. Further, after having sold such misrepresented coins at grossly overinflated prices, Defendants turn around and offer to buy back those same coins for pennies on the dollar. Plaintiff relied on Defendants' above-described misrepresentations and omissions in purchasing—and then selling back—the coins to his financial detriment.

96.     By the acts and conduct alleged herein Defendants committed unfair or deceptive acts and practices by, inter alia, induce Plaintiff to purchase collectible numismatic, semi-numismatic, and bullion coins that are not worth the value at which they were purchased and will never attain the value as claimed or return on investment as represented and then to sell back those same coins to Defendants for pennies on the dollar.

97.     The practices employed by Defendants whereby they advertised, promoted, marketed and sold (and then bought back) their coins are unfair, deceptive, and materially misleading.

98.     Defendants F&S, Legend, Elite and ASGCI are liable for the above wrongful acts committed by Joaquin and their nonparty agents/employees during the course and scope of their employment with F&S, Legend, Elite and ASGCI under the doctrine of respondeat superior; to wit, Defendants' agents'/employees' wrongful conduct was committed (i) within their general authority, (ii) in furtherance of Defendants' business, and (iii) to accomplish the objective for which the agents/employees were hired (*i.e.,* marketing overvalued coins to customers like Plaintiff)—all of which directly and/or proximately caused Plaintiff to suffer damages to the financial benefit of Defendants.

99.     The foregoing deceptive acts and practices were directed at consumers, such as the Plaintiff herein.

100.    Plaintiff suffered a loss as a result of Defendants' deceptive and unfair trade practices. Specifically, as a proximate result of same, Plaintiff suffered monetary losses associated with the purchase—and sale—of the coins he obtained from Defendants and/or the premium price (including outrageous markups) paid by the Plaintiff insofar as said purchases were based on the inaccurate representations alleged herein of Defendants.

## COUNT VIII
## CONSPIRACY

101.    The preceding factual statements and allegations in this Complaint are incorporated herein by reference.

102.    Defendants (and possibly others), either working together as a combined group or in sub-combinations of two or more, affirmatively conspired to engage in the wrongful actions set forth above. By doing so, Defendants conspired to accomplish an unlawful purpose or a lawful purposed

by an unlawful means.  As such, Defendants conspired to commit the wrongful actions outlined in Counts IV through VII, above, and took one or more affirmative measures in furtherance thereof, all of which directly and proximately caused Plaintiff to sustain actual and consequential damages. Defendants' wrongful actions constitute civil conspiracy at New York common law.

## COUNT IX
## MONEY HAD AND RECEIVED

103.    The preceding factual statements and allegations in this Complaint are incorporated by reference.

104.    By their above-described wrongful actions and/or inaction, Defendants hold money obtained by a) the wrongfully charged and collected purchase prices paid by Plaintiff for the grossly overvalued coins misrepresented and sold to him by Defendants; and b) coins impermissibly sold to third parties and the funds retained without payment to Plaintiff or replacement of his coins, that, in equity and good conscience, belong to Plaintiff.  Defendants, therefore, should be compelled to refund such wrongfully charged and collected funds under the equitable doctrine of money had and received.

## COUNT X
## UNJUST ENRICHMENT

105.    The preceding factual statements and allegations in this Complaint are incorporated herein by reference.

106.    Defendants (and possibly other persons and entities, including Defendants' agents/employees) have been unjustly enriched by (i) being paid an excessive value for coins that are not supported by any reasonable valuation; (ii) using the fraudulently obtained revenues and profits paid by Plaintiff, and (iii) generating a return on the amounts described in (i) and (ii). Accordingly, Plaintiff seeks to impose a constructive trust over (and recover) all amounts by which

Defendants (and possibly other persons and entities, including Defendants' agents/employees) have been unjustly enriched.

## COUNT XI

## CONVERSION

**107.**    The preceding factual statements and allegations in this Complaint are incorporated herein by reference.

**108.**    Plaintiff has, and maintains, a possessory right and interest over all funds (coins) that Plaintiff invested with Defendants, including the profits earned on any sales of said coins.

**109.**    Plaintiff requested a full liquidation of his account, including the return of his invested funds (coins).

**110.**    Defendants had an obligation to return Plaintiff's funds (coins).

**111.**    Defendants wrongfully continue to exercise control over plaintiff's funds (coins).

**112.**    Defendants' wrongful control over plaintiff's funds (coins) and refusal to return such funds (coins) is an interference with Plaintiff's ownership rights.

**113.**    As a result of Defendants' wrongful control over his funds (coins), Plaintiff has been damaged in the amount $794,456.00, being a loss of the purchase price and consequential damages, as well as interest thereon.

**114.**    By virtue of the foregoing, Defendants have committed the tort of conversion, and Plaintiff is entitled to damages in an amount to be determined at trial, but in no event less than $794,456.00 plus interest.

## TOLLING OF THE STATUTES OF LIMITATIONS

**115.**    The preceding factual statements and allegations in this Complaint are incorporated herein by reference.

116. **EQUITABLE ESTOPPEL.** Defendants took active steps to conceal their above wrongful actions and/or inaction. The details of Defendants' efforts to conceal their unlawful conduct are in their possession, custody and control, and await further discovery. At such time as this material information was first revealed to Plaintiff, he exercised due diligence by retaining counsel and pursuing his claims. As such, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable estoppel.

117. **EQUITABLE TOLLING.** Defendants took active steps to conceal their above wrongful actions and/or inaction. The details of Defendants' efforts to conceal their unlawful conduct are in their possession, custody and control, and await further discovery. Even by exercising reasonable diligence, Plaintiff could not have discovered this information if for no other reason than he had no reason to make such inquiries. At such time as this material information was first revealed to Plaintiff, he exercised due diligence by retaining counsel and pursuing his claims. As such, all applicable statutes of limitations (if any) are tolled under the doctrine of equitable tolling.

## <u>RESPONDEAT SUPERIOR</u>

118. The preceding factual statements and allegations are incorporated herein by reference.

119. Defendants also are liable for the above-described wrongful acts committed by their agents/employees during the course and scope of their employment by the Defendants; to wit, the agents'/employees' wrongful conduct was committed (i) within their general authority, (ii) in furtherance of Defendants' business, and (iii) to accomplish the objective for which the agents/employees were hired (*e.g*., selling overvalued coins to customers like Plaintiff)—all of which directly and/or proximately caused Plaintiff to suffer damages to the financial benefit of Defendants—thus, Defendants are liable under the doctrine of *respondeat superior*.

## RELIEF REQUESTED

**120.** The preceding factual statements and allegations are incorporated herein by reference.

**121.** **ACTUAL AND CONSEQUENTIAL DAMAGES**.  As direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered (and continues to suffer) damages in the form of, *inter alia*, the amounts paid to Defendants for the coins in excess of their value, the value of coins taken from the Plaintiff, and the amounts of the unauthorized checks and credit card charges made by Defendants and stolen from Plaintiff.  In addition, Plaintiff is entitled to recover consequential damages related to the funds he borrowed to purchase the coins and the mental anguish he has suffered in connection with these transactions—in an amount to be determined by the trier of fact.  All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

**122.** **PUNITIVE DAMAGES.**  Defendants' wrongful actions and omissions (and failure to disclose such wrongful actions) were committed intentionally, willfully, with malice and/or with conscious and/or reckless disregard for Plaintiff's rights and interests.  Accordingly, Plaintiff also is entitled to an award of punitive damages against defendants, both as punishment and to discourage such wrongful conduct in the future. All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

**123.** **TREBLE DAMAGES.**  Plaintiff also is entitled to treble damages for Defendants' knowing, willful and intentional wrongful conduct in violation of the RICO statute under 18 U.S.C. § 1964 (c) and New York GBL § 349.  All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

**124.** **ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS.**  plaintiff also is entitled to recover his reasonable and necessary attorneys' fees, litigation expenses and court costs in prosecuting this

action pursuant to, *inter alia*, New York GBL § 349 insofar as Defendants' aforesaid actions were willful and knowing.

**WHEREFORE,** Plaintiff requests that upon final trial or hearing, judgment be awarded in his favor against the Defendants, jointly and severally for:

(a)  With respect to Counts I-III (violations of RICO 18 U.S.C. § 1961, *et seq.*)--

    (i)  threefold the actual damages sustained by plaintiff with costs of suit, attorneys' fees, litigation expenses and court costs, all under 18 U.S.C. § 1964(c), with pre- and post-judgment interest at the highest legal rates; and

    (ii)  equitable relief, as may be appropriate, under 18 U.S.C. § 1964(a), including an equitable accounting for all benefits, consideration and profits received, directly or indirectly, including imposing a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits.

(b)  With respect to Counts IV-XI:

    (i)  rescission;
    (ii)  actual damages to be determined by the trier of fact;
    (iii)  punitive damages;
    (iv)  exemplary damages;
    (v)  all amounts by which Defendants have been unjustly enriched;
    (vi)  an equitable accounting for all benefits, consideration and profits received, directly or indirectly, by Defendants, including imposing a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits;
    (vii)  pre- and post-judgment interest at the highest legal rates;
    (viii)  attorneys' fees and litigation expenses incurred through the trial and any appeals of this case;
    (ix)  costs of suit; and
    (x)  such other and further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all of his claims and causes of action so triable.

Dated: Thornwood, New York
        October 11, 2023

Respectfully submitted,


**LAW OFFICES OF KENNETH G. WALSH**

 _/s/KENNETH G. WALSH_____
**BY: KENNETH G. WALSH (1654)**

59 Kensico Road, Suite 7
Thornwood, New York 10594
(929) 241-7307
kwalsh@kgwalshlegal.com

**R. LYN STEVENS** (pro hace vice forthcoming)
**STEVENS LAW FIRM**
210 Clearview Avenue, Suite C
Friendswood, Texas 77546
(409) 880-9714
*Lyn@Stevens.Law*
Texas Bar No. 19189020

*Attorneys for Plaintiff, Brian C. Long, as Personal*
*Representative of his father, Bruce K. Long*

# EXHIBIT NO. 1

## THE FIRST SCAM – OVER-PRICED COIN SALES TO THE ELDERLY PLAINTIFF
### BY JOAQUIN ENTERPRISE DEFENDANTS

| Date | Invoice | Vendor | Description | # coins | Price Paid | FMV Date of Purchase | Losses to Plaintiff | % Markup |
|------|---------|--------|-------------|---------|-----------|----------------------|---------------------|----------|
| 10/30/2018 | 1810090 | F&S Collectibles | 1885-O $1 Morgan | one (1) | $ 331.66 | $ 100.00 | $ 231.66 | 232% |
| 10/30/2018 | 1810090 | F&S Collectibles | 1887-P $1 Morgan | one (1) | $ 331.66 | $ 100.00 | $ 231.66 | 232% |
| 10/30/2018 | 1810090 | F&S Collectibles | 1889-P $1 Morgan | one (1) | $ 331.66 | $ 100.00 | $ 231.66 | 232% |
| 2/1/2019 | 1901088 | F&S Collectibles | 1883-CC $1 Morgan MS62 UC | one (1) | $ 1,495.00 | $ 225.00 | $ 1,270.00 | 564% |
| 7/24/2020 | 9054 | Family Collectibles | 1883 $1 Morgan MS62 | one (1) | $ 1,072.50 | $ 50.00 | $ 1,022.50 | 2045% |
| 7/24/2020 | 9054 | Family Collectibles | 1886 $1 Morgan MS62 | one (1) | $ 1,072.50 | $ 50.00 | $ 1,022.50 | 2045% |
| 8/18/2020 | 9094 | Family Collectibles | 1926 50c Liberty MS64 | one (1) | $ 1,995.00 | $ 1,050.00 | $ 945.00 | 90% |
| 9/4/2020 | 10048 | Family Collectibles | 1887 $1 Morgan MS64 | one (1) | $ 1,145.00 | $ 85.00 | $ 1,060.00 | 1247% |
| 9/4/2020 | 10048 | Family Collectibles | 1897 $1 Morgan MS61 | one (1) | $ 1,145.00 | $ 85.00 | $ 1,060.00 | 1247% |
| 9/18/2020 | 10086 | Family Collectibles | 1884 $1 Morgan MS62 | one (1) | $ 1,225.00 | $ 50.00 | $ 1,175.00 | 2350% |
| 9/18/2020 | 10086 | Family Collectibles | 1886 $1 Morgan MS62 | one (1) | $ 1,225.00 | $ 50.00 | $ 1,175.00 | 2350% |
| 9/21/2020 | 10102 | Family Collectibles | 1870-CC $1 Liberty XF | one (1) | $ 3,800.00 | $ 1,000.00 | $ 2,800.00 | 280% |
| 9/29/2020 | 10114 | Family Collectibles | 1880-S $1 Morgan MS63 | one (1) | $ 1,447.50 | $ 150.00 | $ 1,297.50 | 865% |
| 9/29/2020 | 10014 | Family Collectibles | 1885 $1 Morgan MS62 | one (1) | $ 1,447.50 | $ 150.00 | $ 1,297.50 | 865% |
| 10/13/2020 | 10150 | Family Collectibles | 1880-S $1 Morgan MS62 | one (1) | $ 1,400.00 | $ 150.00 | $ 1,250.00 | 833% |
| 10/13/2020 | 10150 | Family Collectibles | 1889 $1 Morgan MS62 | one (1) | $ 1,400.00 | $ 150.00 | $ 1,250.00 | 833% |
| 10/13/2020 | 10150 | Family Collectibles | 1921 $1 Morgan MS62 | one (1) | $ 1,400.00 | $ 150.00 | $ 1,250.00 | 833% |
| 10/30/2020 | 10174 | Family Collectibles | 1872 $10 Gold Amazonian | one (1) | $ 3,999.00 | $ 1,000.00 | $ 2,999.00 | 300% |
| 11/3/2020 | 10182 | Family Collectibles | 1882-CC $1 Morgan MS64 | one (1) | $ 2,465.00 | $ 275.00 | $ 2,190.00 | 796% |
| 12/1/2020 | 10189 | Family Collectibles | 1853 3c Trime BU | one (1) | $ 2,895.00 | $ 250.00 | $ 2,645.00 | 1058% |
| 2/19/2021 | 10625 | Family Collectibles | 1922 $1 Peace MS60 | one (1) | $ 2,255.00 | $ 40.00 | $ 2,215.00 | 5538% |
| 2/19/2021 | 10625 | Family Collectibles | 1923 $1 Peace MS61 | one (1) | $ 2,255.00 | $ 45.00 | $ 2,210.00 | 4911% |
| 3/22/2021 | 10749 | Family Collectibles | 1923 $1 Peace MS63 | one (1) | $ 2,745.00 | $ 65.00 | $ 2,680.00 | 4123% |
| 3/22/2021 | 10749 | Family Collectibles | 1925 $1 Peace MS63 | one (1) | $ 2,745.00 | $ 65.00 | $ 2,680.00 | 4123% |
| 4/2/2021 | 10811 | Family Collectibles | 1924 $1 Morgan MS62 | one (1) | $ 2,317.50 | $ 50.00 | $ 2,267.50 | 4535% |
| 4/2/2021 | 10811 | Family Collectibles | 1926 $1 Morgan MS64 | one (1) | $ 2,317.50 | $ 65.00 | $ 2,252.50 | 3465% |
| 4/9/2021 | 10836 | Family Collectibles | 1925 $1 Peace MS61 | one (1) | $ 2,315.00 | $ 45.00 | $ 2,270.00 | 5044% |
| 4/9/2021 | 10836 | Family Collectibles | 1926-S $1 Peace MS61 | one (1) | $ 2,315.00 | $ 75.00 | $ 2,240.00 | 2987% |
| 5/25/2021 | 25624 | Family Collectibles | 2013 $1 SAE MS70 | one (1) | $ 998.33 | $ 150.00 | $ 848.33 | 566% |
| 5/25/2021 | 25624 | Family Collectibles | 2014 $1 SAE MS70 | one (1) | $ 998.33 | $ 150.00 | $ 848.33 | 566% |
| 5/25/2021 | 25624 | Family Collectibles | 2015 $1 SAE MS70 | one (1) | $ 998.33 | $ 150.00 | $ 848.33 | 566% |
| 6/15/2021 | 25716 | Family Collectibles | 2011-W $1 SAE PR69 | one (1) | $ 1,447.50 | $ 100.00 | $ 1,347.50 | 1348% |
| 6/15/2021 | 25716 | Family Collectibles | 2012-S $1 SAE PR69 | one (1) | $ 1,447.50 | $ 100.00 | $ 1,347.50 | 1348% |
| 7/22/2021 | 25879 | Family Collectibles | 2017-W $1 SAE MS70 | one (1) | $ 1,647.50 | $ 175.00 | $ 1,472.50 | 841% |
| 7/22/2021 | 25879 | Family Collectibles | 2018-W $1 SAE MS70 | one (1) | $ 1,647.50 | $ 175.00 | $ 1,472.50 | 841% |
| 8/5/2021 | 25938 | Family Collectibles | 2014 $1 SAE MS70 | one (1) | $ 1,745.00 | $ 175.00 | $ 1,570.00 | 897% |
| 8/5/2021 | 25938 | Family Collectibles | 2015 $1 SAE MS70 | one (1) | $ 1,745.00 | $ 175.00 | $ 1,570.00 | 897% |
| 10/29/2021 | 28032 | Family Collectibles | 1926 $2.5 Gold Liberty MS64 | one (1) | $ 3,645.00 | $ 700.00 | $ 2,945.00 | 421% |
| 11/26/2021 | 28120 | Family Collectibles | 1926 50c Silver Liberty MS64 | one (1) | $ 1,895.00 | $ 200.00 | $ 1,695.00 | 848% |
| 12/22/2021 | 28167 | Family Collectibles | 1976-S $1 Silver Liberty (2 PF rolls) | 40 | $ 2,895.00 | $ 1,200.00 | $ 1,695.00 | 141% |
| 1/18/2022 | 28218 | Family Collectibles | 1883-O $1 Morgan MS62 | one (1) | $ 995.00 | $ 50.00 | $ 945.00 | 1890% |
| 3/1/2022 | 28314 | Family Collectibles | 2013-W $1 SAE PR69 | one (1) | $ 2,490.00 | $ 85.00 | $ 2,405.00 | 2829% |
| 3/22/2022 | 28375 | Family Collectibles | 1891-CC $1 Morgan | one (1) | $ 2,895.00 | $ 550.00 | $ 2,345.00 | 426% |
| | | | | 82 | $ 78,378.97 | $ 9,805.00 | $ 68,573.97 | 699% |

| Date | Invoice # | Company | Status | | Amount | | Fee | | Net | % |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/18/2018 | 1810040 | F&S Collectibles | Invoice Missing | | $ | 495.00 | $ | 61.95 | $ | 433.05 | 699% |
| 11/5/2018 | unk | F&S Collectibles | Invoice Missing | | $ | 1,995.00 | $ | 249.69 | $ | 1,745.31 | 699% |
| 11/27/2018 | unk | F&S Collectibles | Invoice Missing | | $ | 1,945.00 | $ | 243.43 | $ | 1,701.57 | 699% |
| 12/6/2018 | unk | F&S Collectibles | Invoice Missing | | $ | 1,735.00 | $ | 217.15 | $ | 1,517.85 | 699% |
| 12/19/2018 | 1812038 | F&S Collectibles | Invoice Missing | | $ | 1,995.00 | $ | 249.69 | $ | 1,745.31 | 699% |
| 1/2/2019 | 1812078 | F&S Collectibles | Invoice Missing | | $ | 1,991.00 | $ | 249.19 | $ | 1,741.81 | 699% |
| 1/29/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 1,980.00 | $ | 247.81 | $ | 1,732.19 | 699% |
| 2/4/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 1,972.00 | $ | 246.81 | $ | 1,725.19 | 699% |
| 2/19/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 1,876.00 | $ | 234.79 | $ | 1,641.21 | 699% |
| 3/5/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 1,742.00 | $ | 218.02 | $ | 1,523.98 | 699% |
| 3/12/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 1,795.00 | $ | 224.66 | $ | 1,570.34 | 699% |
| 3/16/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 2,995.00 | $ | 374.84 | $ | 2,620.16 | 699% |
| 3/20/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 2,495.00 | $ | 312.27 | $ | 2,182.73 | 699% |
| 3/20/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 2,645.00 | $ | 331.04 | $ | 2,313.96 | 699% |
| 3/26/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 1,850.00 | $ | 231.54 | $ | 1,618.46 | 699% |
| 4/1/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 2,395.00 | $ | 299.75 | $ | 2,095.25 | 699% |
| 4/9/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 1,980.00 | $ | 247.81 | $ | 1,732.19 | 699% |
| 4/29/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 2,693.00 | $ | 337.05 | $ | 2,355.95 | 699% |
| 4/30/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 2,790.00 | $ | 349.19 | $ | 2,440.81 | 699% |
| 5/6/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 2,680.00 | $ | 335.42 | $ | 2,344.58 | 699% |
| 5/14/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 2,895.00 | $ | 362.33 | $ | 2,532.67 | 699% |
| 5/20/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 2,200.00 | $ | 275.34 | $ | 1,924.66 | 699% |
| 5/24/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 2,790.00 | $ | 349.19 | $ | 2,440.81 | 699% |
| 6/5/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 2,800.00 | $ | 350.44 | $ | 2,449.56 | 699% |
| 8/12/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 2,443.00 | $ | 305.76 | $ | 2,137.24 | 699% |
| 8/30/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 2,235.00 | $ | 279.72 | $ | 1,955.28 | 699% |
| 9/6/2019 | unk | F&S Collectibles | Invoice Missing | | $ | 1,980.00 | $ | 247.81 | $ | 1,732.19 | 699% |
| 11/26/2019 | 1911024 | F&S Collectibles | Invoice Missing | | $ | 199.00 | $ | 24.91 | $ | 174.09 | 699% |
| 9/16/2020 | unk | Legend | Invoice Missing | | $ | 450.00 | $ | 56.32 | $ | 393.68 | 699% |
| 9/16/2020 | unk | Legend | Invoice Missing | | $ | 479.00 | $ | 59.95 | $ | 419.05 | 699% |
| 9/17/2020 | unk | Legend | Invoice Missing | | $ | 410.00 | $ | 51.31 | $ | 358.69 | 699% |
| 9/17/2020 | unk | Legend | Invoice Missing | | $ | 480.00 | $ | 60.08 | $ | 419.92 | 699% |
| 9/17/2020 | unk | Legend | Invoice Missing | | $ | 499.00 | $ | 62.45 | $ | 436.55 | 699% |
| 1/25/2021 | unk | Family Collectibles | Invoice Missing | | $ | 2,895.00 | $ | 362.33 | $ | 2,532.67 | 699% |
| 2/11/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 1,600.00 | $ | 200.25 | $ | 1,399.75 | 699% |
| 2/16/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 1,495.00 | $ | 187.11 | $ | 1,307.89 | 699% |
| 3/10/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 3,995.00 | $ | 500.00 | $ | 3,495.00 | 699% |
| 3/25/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 3,150.00 | $ | 394.24 | $ | 2,755.76 | 699% |
| 4/5/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 3,300.00 | $ | 413.02 | $ | 2,886.98 | 699% |
| 4/27/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 1,895.00 | $ | 237.17 | $ | 1,657.83 | 699% |
| 6/7/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 950.00 | $ | 118.90 | $ | 831.10 | 699% |
| 6/7/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 995.00 | $ | 124.53 | $ | 870.47 | 699% |
| 6/25/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 1,495.00 | $ | 187.11 | $ | 1,307.89 | 699% |
| 12/1/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 2,995.00 | $ | 374.84 | $ | 2,620.16 | 699% |
| 12/13/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 1,995.00 | $ | 249.69 | $ | 1,745.31 | 699% |
| 12/31/2021 | unk | Family Collectibles | Invoice Missing | | $ | 4,100.00 | $ | 513.14 | $ | 3,586.86 | 699% |
| 1/25/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 995.00 | $ | 124.53 | $ | 870.47 | 699% |
| 1/26/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 990.00 | $ | 123.90 | $ | 866.10 | 699% |
| 1/27/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 3,495.00 | $ | 437.42 | $ | 3,057.58 | 699% |
| 2/1/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 950.00 | $ | 118.90 | $ | 831.10 | 699% |
| 2/4/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 995.00 | $ | 124.53 | $ | 870.47 | 699% |
| 2/7/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 1,980.00 | $ | 247.81 | $ | 1,732.19 | 699% |

Case 2:23-cv-07587-NJC-SIL   Document 1   Filed 10/11/23   Page 73 of 75 PageID #: 73

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/10/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 1,995.00 | $ | 249.69 | $ | 1,745.31 | 699% |
| 3/24/2022 | unk | Collectors Choice | Invoice Missing | | $ | 900.00 | $ | 112.64 | $ | 787.36 | 699% |
| 11/17/2020 | 10169 | Family Collectibles | No invoice | | $ | 2,495.00 | $ | 312.27 | $ | 2,182.73 | 699% |
| 12/30/2019 | unk | F&S Collectibles | 1898-O $1 Morgan | one (1) | $ | 990.00 | $ | 123.90 | $ | 866.10 | 699% |
| 4/16/2019 | unk | F&S Collectibles | 1909-D $5 Gold Indian Head MS62 | one (1) | $ | 1,911.00 | $ | 239.17 | $ | 1,671.83 | 699% |
| 4/21/2019 | unk | F&S Collectibles | 1884-O $1 Morgan MS64 | one (1) | $ | 2,395.00 | $ | 299.75 | $ | 2,095.25 | 699% |
| 2/10/2019 | unk | F&S Collectibles | 1887-P $1 Silver Liberty MS65+ | one (1) | $ | 1,791.00 | $ | 224.16 | $ | 1,566.84 | 699% |
| 9/8/2020 | unk | Family Collectibles | No invoice | | $ | 3,595.00 | $ | 449.94 | $ | 3,145.06 | 699% |
| | | | | | $ | 118,241.00 | $ | 14,798.62 | $ | 103,442.38 | 699% |
| | | | Extrapolation @ 662% | | $ | 196,619.97 | $ | 24,603.62 | $ | 172,016.35 | 699% |

# EXHIBIT NO. 2

## THE SECOND SCAM – Unauthorized Electronic Checking / Credit Card Charges by Joaquin Enterprise Defendants

| DATE | FRAUD TYPE | CHECK / CC # | Financial Entity | Joaquin Enterprise | AMOUNT |
|---|---|---|---|---|---|
| 7/22/2020 | Unauth electronic check | 4648 | Fifth Third | The Family Collectibles, Inc. | $ 2,145.00 |
| 8/17/2020 | Unauth electronic check | 4655 | Fifth Third | The Family Collectibles, Inc. | $ 1,995.00 |
| 10/13/2020 | Unauth electronic check | 4668 | Fifth Third | The Family Collectibles, Inc. | $ 4,200.00 |
| 3/17/2021 | Unauth electronic check | 4684 | Fifth Third | The Family Collectibles, Inc. | $ 5,490.00 |
| 3/30/2021 | Unauth electronic check | 4689 | Fifth Third | The Family Collectibles, Inc. | $ 4,635.00 |
| 4/7/2021 | Unauth electronic check | 4688 | Fifth Third | The Family Collectibles, Inc. | $ 4,630.00 |
| 12/13/2021 | Unauth electronic check | 1111 | Fifth Third | Collector's Heaven | $ 1,995.00 |
| 1/25/2022 | Unauth electronic check | 1119 | Fifth Third | Collector's Heaven | $ 995.00 |
| 1/26/2022 | Unauth electronic check | 2123 | Fifth Third | Collector's Heaven | $ 990.00 |
| 2/2/2022 | Unauth electronic check | 2124 | Fifth Third | Collector's Heaven | $ 950.00 |
| 2/4/2022 | Unauth electronic check | 2238 | Fifth Third | Collector's Heaven | $ 995.00 |
| 2/7/2022 | Unauth electronic check | 2239 | Fifth Third | Collector's Heaven | $ 1,900.00 |
| 2/10/2022 | Unauth electronic check | 1189 | Fifth Third | Collector's Heaven | $ 1,995.00 |
| 3/24/2022 | CC No reversal allowed | 1795 | VISA | Collectors | $ 900.00 |
| **4/15/2022** | CC reversal allowed | 8834 | Citi Costco | Collectors | $ 3,800.00 |
| **4/16/2022** | CC reversal allowed | 8834 | Citi Costco | Collectors | $ 1,995.00 |
| **4/19/2022** | CC reversal allowed | 8834 | Citi Costco | Collectors | $ 2,895.00 |
| **4/21/2022** | CC reversal allowed | 8834 | Citi Costco | Collectors | $ 2,895.00 |
| **4/22/2022** | CC reversal allowed | 8834 | Citi Costco | Collectors | $ 3,195.00 |
|  |  |  |  |  | $ 48,595.00 |
|  |  |  |  | Recovered | (14,780.00) |
|  |  |  |  |  | $ 33,815.00 |

# EXHIBIT NO. 3

**THE THIRD SCAM – STEALING BACK THE COINS SOLD TO THE ELDERLY PLAINTIFF
BY JOAQUIN ENTERPRISE DEFENDANTS**

| "Grab-Back Date" | Purchase Year | Original purchase price | Sell Back Price | Loss | Sold To | Further Explain |
|---|---|---|---|---|---|---|
| | | | | | | |
| 5/30/2019 | 2017-2019 | $114,280 | $8,000 | $106,280 | Father & Son, Michael Joaquin | Taken from Long's Mesa, AZ home by Joaquin. Check issued by Father & Sons Collectibles Inc. |
| | | | | | | |
| 11/12/2020 | 2017-2020 | $297,919 | $2,300 | $295,619 | Legends Collectibles, Michael Joaquin, John Rose | Taken from home 10/5/20 & 11/12/20; Pd $800 '20, Pd $1500 '21= Total $2300 by Michael Joaquin,represented to be Collectors "Haven" or "Heaven," checks issued from Ridgewood Savings Bank |
| | | | | | | |
| 4/23/2021 | 2020, 2021 | $119,377 | $4,300 | $115,077 | American Silver & Gold / Elite / John Rose & Michael Joaquin | Shipped to "Elite"; Check issued by American Silver & Gold. |
| | **TOTALS** | **$531,576** | **$14,600** | **$516,976** | | |