UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____X

BRIAN C. LONG, as Assignee of All Claims
Asserted by Assignor, BRUCE K. LONG
                          Plaintiff,            Case No.: 2:23-cv-07587(NJC) (SIL)
        -against-

MICHAEL E. JOAQUIN
JOHN C. ROSE
FATHER AND SONS COLLECTIBLES, INC.
   (aka/dba The Family Collectables, Inc.        **FIRST AMENDED COMPLAINT**
   Collector's Heaven,
   Collector's Haven, Inc. and
   Collectors Choice)
LEGEND COLLECTIBLES CORP. AND
ELITE COLLECTIBLES NY, LLC.                      **Jury trial demanded.**
                 Defendants.
_____X

Plaintiff, Brian C. Long, as Assignee of all "right, title and interest, legal and equitable, in and to all claims" asserted in this lawsuit by the Assignor, his father, Bruce K. Long, complains of Individual Defendant, Michael E. Joaquin, Entity Defendant, Father & Sons Collectibles, Inc. (aka/dba The Family Collectables, Inc., Collector's Heaven, Collector's Haven, Inc., and Collectors Choice), Entity Defendant, Legend Collectibles Corp., Entity Defendant, Elite Collectibles NY, LLC., and Individual Defendant, John C. Rose, through undersigned counsel, respectfully alleges:

## NATURE OF THE CASE

**1.**   This action is brought under 18 U.S.C. §§ 1961-68 (the Racketeer Influenced and Corrupt Organizations Act) and New York common and statutory law by Mr. Long's son, Brian C. Long,

as Assignee of the claims and causes of action of his father, Bruce K. Long.[1] The case involves a three-part racketeering scheme by a group of Long Island coin dealers to scam elderly citizens[2] across the United States and rob them of their life savings. In this particular case, the racketeers combined via two (2) RICO enterprises and three (3) interrelated racketeering scams to wrongfully take and abscond with some **$703.077.95** from their victim, Bruce K. Long (sometimes hereinafter "Mr. Long" or "Plaintiff"), an elderly Arizona widower.

2.      Mr. Long, an 86-year-old widower with substantial hearing loss and progressive age-related mental decline, fell prey to Individual Defendant Michael E. Joaquin's fraudulent schemes in furtherance of the ***F&S Enterprise*** which has extended for over multiple years[3] and was facilitated by and conducted through: (1) use of the U.S. mail and U.S. wires in violation of 18 U.S.C. §§ 1341, 1343 and which resulted in direct damages to Mr. Long of approximately One Hundred Seventy-two Thousand, Sixteen and 35/100 Dollars (**$172,016.35**); and (2) multiple instances of bank fraud in violation of 18 U.S.C. § 1344 which resulted in additional direct damages to Mr. Long of some Thirty-three Thousand, Eight Hundred, Fifteen and 00/100 Dollars (**$33,815.00**), and in furtherance of the ***AIF Enterprise***, the members of which are Individual Defendants, Michael E. Joaquin and John C. Rose, and the Entity Defendants, Father & Sons Collectibles, Inc., Legend Collectibles, Inc., and Elite Collectibles NY, LLC., as the result of a conspiracy on the part of the Individual Defendants and Entity Defendants and was facilitated by and conducted through use of the U.S. mail and U.S. wires in violation of 18 U.S.C. §§ 1341, 1343 which resulted

---

[1]  *See* ECF No. 15 (the Assignment).

[2]  In this Complaint, whenever the term "customer(s)" appears, Plaintiff intends it to mean both "customer(s)" and "consumer(s)."

[3]  Plaintiff pleads both a "closed-ended" and "open-ended" pattern of racketeering activity. Upon information and belief, Mr. Long is not the only elderly customer targeted and defrauded by the Individual Defendants' fraudulent coin "investment" and "buy-back" schemes in furtherance of the F&S Enterprise and the AIF Enterprise, and such schemes are on-going. Thus, Plaintiff asserts an "open-ended" RICO pattern.

in additional direct damages to Mr. Long of approximately Four Hundred Ninety-seven Thousand, Two Hundred Forty-six and 60/100 Dollars **($497,246.60)**.

3.    Plaintiff seeks to recover consequential damages, exemplary damages, treble damages under 18 U.S.C. § 1964, pre- and post-judgment interest, attorneys' fees, litigation expenses and costs of suit. Finally, Plaintiff asserts additionally or else in the alternative various New York common law and statutory causes of action sounding in fraud, negligence, deceptive business practices, money had and received, unjust enrichment, and conversion, as set forth below.

4.    The first two scams, designated **Scheme One** (mail and wire fraud) and **Scheme Two** (bank fraud), were conducted through Father & Son Collectibles, Inc. ("F&S"), a RICO enterprise (the "F&S Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(b)-(d) by Individual Defendant and RICO Person, Michael E. Joaquin.

5.    Individual Defendant Michael E. Joaquin is the sole principal and officer of F&S who owned, controlled, operated, and masterminded the F&S Enterprise and directed and conducted Scheme One and Scheme Two against Mr. Long. Joaquin maintained an interest in and controlled the F&S Enterprise within the meaning of 18 U.S.C. § 1962(b) and conducted and participated in the conduct of F&S's affairs to advance the F&S Enterprise by defrauding and robbing elderly customers—and particularly Mr. Long—of their life savings through a phony and fraudulent telemarketing investment scam in furtherance of the F&S Enterprise and to generate exorbitant compensation for himself.

6.    **Scheme Three** (mail and wire fraud and conspiracy to commit same) was conducted through an association-in-fact RICO Enterprise (the "AIF Enterprise"[4]) within the meaning of 18 U.S.C. §§ 1961(4) and 1962(b)-(d) composed of Father and Sons Collectibles, Inc. ("F&S") (including

---

[4] "AIF" is simply an abbreviation for "association-in-fact."

3

various non-registered entities, aliases and/or dbas known as: "The Family Collectables, Inc.," "Collector's Haven, Inc.," "Collector's Heaven," and "Collectors Choice"), Legend Collectables Corp. ("Legend"), and Elite Collectibles NY, LLC. ("Elite"),[5] and the Individual Defendants Michael E. Joaquin ("Joaquin") and John C. Rose ("Rose"). Joaquin, the sole principal and officer of F&S (and its various aliases and dbas) and also a principal of Elite, and Rose, who is the sole principal and officer of Legend, controlled, operated, and masterminded the AIF Enterprise, and Joaquin and Rose conspired to conduct and effect the multiple predicate acts constituting **Scheme Three** (the "buy-back" scam) against Mr. Long.

**7.**     As regards **Scheme Three**, Joaquin, Rose, and the Entity Defendant members of the AIF Enterprise, conspired with each other to commit the primary tort of fraud by conducting and financing the predicate acts of mail fraud and wire fraud described immediately above, and as set forth in greater detail below. Specifically, by their unlawful acts, Joaquin and Rose (i) conspired between themselves and with the Entity Defendants to violate 18 U.S.C. § 1962(b) and (c) in violation of 18 U.S.C. §1962(d); and/or (ii) conducted and/or participated in the affairs of the AIF Enterprise in violation of 18 U.S.C. § 1962(c), with the specific aim and intent to defraud Mr. Long in the process. Joaquin and Rose committed these substantive RICO offenses personally and/or by causing the Entity Defendant members of the AIF Enterprise to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud, that is to swindle Mr. Long and generate exorbitant compensation for themselves.

---

[5] Some of the assumed names associated with both the F&S Enterprise and the AIF Enterprise do not appear to be viable legal entities under New York Department of State, Division of Corporations. Additionally, some of the other Entity-Defendants that are registered to conduct business in New York seem to utilize names that are uncannily similar to other, unrelated legitimate businesses such that confusion and obfuscation appears to be a feature, and not a bug. For example, Elite Collectibles NY, LLC is almost exactly like Elite Collectibles, Inc. a similar legitimate business located in West Hampton, NY. Not to be outdone, Defendant Legend Collectables Corp.'s name seems to parrot the name of the unrelated entity, Legend Collectibles LLC.

## SUMMARY OF THE FACTS

**8.**    Bruce K. Long is an 86-year-old widower living in Mesa, Arizona. Since his wife's death in 2015, Mr. Long has lived alone and suffers from substantial hearing loss which is even more pronounced when using the telephone and like so many octogenarians, he simply is not as mentally sharp as when he was younger. Like many elderly Americans, Mr. Long is prone to forget details and become easily confused when confronted with multiple tasks from multiple sources. Unfortunately, this makes it easy for coin telemarketers to manipulate, intimidate, and swindle Mr. Long, and he is the prototypical victim of financial elder abuse by dishonest coin dealers such as Joaquin, Rose, and the F&S and AIF Enterprises.

**9.**    **Scheme One** (**unconscionably overpriced coin sales**) began in 2018 and continued through 2022, with Mr. Long receiving numerous, frequent, and repeated calls on his landline telephone from Joaquin pressuring Mr. Long to buy precious metal coins from F&S as an "investment."

**10.**    Joaquin repeatedly and knowingly misled Mr. Long and alternately enticed, cajoled, confused, harassed, and pressured him[6] into purchasing coins based upon representations that such coins were a sound "investment," that they would not only retain their values but would greatly increase in value, and that they were unique and/or rare. Joaquin misrepresented the grade, attributes, and value of the coins and failed to advise Mr. Long that he was paying substantially more than the fair market price for the coins. Joaquin also failed to advise Mr. Long that, far from the coins being good "investments" as Joaquin represented, Mr. Long actually was incurring immediate and

---

[6]    *See, e.g., United States v. Romano, supra* at *19 n.5 (E.D.N.Y. 2013) and the testimony adduced at the criminal RICO coin fraud trial against Michael Romano and William Kearney:

Patrick Coleman, Defendants' former employee, testified at trial that . . . Mr. Kearney's avowed sales tactics were to "crush weak people" and to "confuse the shit" out of "older people." . . . Daren Mutone, a former employee of Atlantic Coin Galleries, testified at trial that the Atlantic Coin Galleries salespeople would make fun of the victims because they were old and easier to convince. . . . Mr. Mutone testified that the elderly were "easier to push around," and that Mr. Romano and Mr. Kearney would hear the jokes and push the sales staff to sell even more coins to a victim who showed susceptibility to pressure and manipulation.

substantial losses with each transaction. Joaquin used Scheme One to launch the ruinous financial exploitation of Mr. Long by Joaquin and the F&S Enterprise.

11.  In furtherance of the F&S Enterprise, Joaquin targeted Mr. Long and induced him to "invest" a large portion of his life savings and net worth in grossly overpriced numismatic and bullion coins to the tune of over $196,619.97. While discovery will reveal Mr. Long's true losses, upon information and belief, it can reasonably be expected that he lost at least 86% of his $196,619.97 total investment in precious metal coins from F&S, or about **$172,016.35**, in furtherance of the F&S Enterprise.

12.  **Scheme Two (bank and credit card fraud).** The second scam in furtherance of the F&S Enterprise resulted in Joaquin committing unabashed bank fraud consisting of at least thirteen (13) fraudulent, unauthorized electronic check transactions and six (6) fraudulent, unauthorized credit card transactions representing a loss to Mr. Long of **$33,815.00** in favor of Joaquin and in furtherance of the F&S Enterprise.

13.  **Scheme Three (the "buy-back" scam).**  The third scam confirms just how reprobate Joaquin and Rose are in that after Joaquin already had conned and stolen over $200,000.00 from an increasingly confused and desperate Mr. Long, he turned around and conspired with (or was aided by) Rose in furtherance of the AIF Enterprise to "buy-back" Mr. Long's precious metal coin inventory—including the same grossly overpriced coins Mr. Long had purchased from F&S—for "pennies on the dollar." Specifically, when Mr. Long refused to buy more coins from Joaquin due to a lack of funds to meet his debts (which deficits were directly caused by Scheme One and Scheme Two), Joaquin and Rose convinced Mr. Long to sell back for just $10,300.00 the very coin collection that Mr. Long had purchased from Joaquin at unconscionably high prices, as well as additional coins Mr. Long had purchased from other coin dealers, at a total cost of $507,546.60.

Scheme Three resulted in a staggering loss to Mr. Long of an additional **$497,246.60**, in furtherance of the AIF Enterprise.

**14.**  All told, Joaquin and the F&S Enterprise via **Scheme One** and **Scheme Two** and Joaquin and Rose and the AIF Enterprise via **Scheme Three** effectuated a "long con"[7] comprised of three separate but related scams upon Mr. Long, resulting in a combined loss of at least **$703,077.95** of his life savings.

**15.**  These long-running, intertwined schemes demonstrate a pattern of unlawful, false, misleading and misrepresentations, unconscionable sales tactics, and financial fraud against unsuspecting elderly consumers, and particularly Mr. Long, by Joaquin in furtherance of the F&S Enterprise and by Joaquin, Rose, and the Entity Defendants in furtherance of the AIF Enterprise.[8]

**16.**  Plaintiff brings this suit to recover Mr. Long's coins, to recover the value he paid for the coins, and/or to recover actual damages, consequential damages, punitive damages, statutory treble damages, pre-and post-judgment interest, attorneys' fees, litigation expenses and costs of suit.

## PARTIES, JURISDICTION AND VENUE

### *The Parties*

**17.**  Both Bruce K. Long, and his son, Brian C. Long, are citizens and residents of Arizona.

**18.**  Defendant Michael E. Joaquin ("Joaquin") is a natural person and a citizen and resident of the State of New York. His last known address is 870 Carman Ave., Westbury, NY 11590. He possesses New York Driver License No. 772 994 333. On information and belief, Joaquin is the principal/officer of Father & Sons Collectibles, Inc., and he maintained an interest in and

---

[7]  The on-line Dictionary.com defines a "***long con***" as "an elaborate confidence game that develops in several stages over an extended period of time wherein the con man or swindler gains the victim's trust, often bypassing small profits with the goal of reaping a much larger payout in the final maneuver." https://www.dictionary.com/browse/long-con (accessed April 9, 2024).

[8]  A Michigan jury previously found Joaquin liable for fraud and conversion based on allegations of a coin fraud scam similar to Scheme Three in this case. *See Miller v. Joaquin*, 431 F. Supp. 3d 906, 911 (E.D. Mich. 2019).

controlled the F&S Enterprise within the meaning 18 U.S.C. § 1962(b) and who, together with the other defendants herein, as part of the AIF Enterprise, conspired to enrich himself, to fund his own business activities, and to fund the business activities of both the F&S Enterprise and the AIF Enterprise through patterns of racketeering activity.

19.  Defendant Father and Sons Collectibles, Inc. ("F&S") (aka/dba "The Family Collectables, Inc.," "Collector's Haven," "Collector's Heaven" and "Collectors Choice") is a New York corporation incorporated on August 28, 2014, with its principal place of business at 870 Carman Ave., Westbury, New York 11590. It also lists a business address as 5020 Sunrise Hwy, Suite LB, Massapequa Park, NY 11762, which is a Minuteman Press copy and mail service, with "Suite LB" being a [L]arge mail [B]ox. It also lists its business address as Post Office Box 191, Hickville, NY 11802. Under its assumed name "Family Collectables Inc.," which is not a business registered with the New York Department of State, Corporation Division, it lists its business address as 26 Railroad Ave. No. 167, Babylon, NY 11702, which is a UPS Store mailbox. Father and Son Collectibles, Inc. also operates under different fictitious names which are phonetically similar and/or used interchangeably, including "Collector's Haven," "Collector's Heaven" and "Collectors Choice," none of which is registered with the New York Department of State, Corporation Division, and for whom no business addresses are given.

20.  Defendant John C. Rose ("Rose") is a natural person and a citizen and resident of the State of New York. His last known address is 75 Macon Ave. Sayville, NY 11782.  He may also be found at 248 Little East Neck Road, West Babylon, NY 11704 or 9 Venetian Blvd., Lindenhurst, NY 11757. On information and belief, Rose is the principal/officer of one or more of the Entity Defendants herein, and he maintained an interest in and controlled the AIF Enterprise within the meaning 18 U.S.C. § 1962(b). Rose, together with the other defendants herein, as part of the AIF

8

Enterprise, conspired to enrich himself, to fund his own business activities, and to fund the business activities of the AIF Enterprise through a pattern of racketeering activity.

**21.**   Defendant Legend Collectibles Corp. is a New York Corporation incorporated on September 23, 2022, with its principal place of business located at the offices of Legalinc Corporate Services Inc., 1967 Wehrle Dr. Suite 1 #086, Buffalo, NY 14221.

**22.**   Defendant Elite Collectibles NY LLC., is a New York Limited Liability Company formed on October 31, 2022 with its principal place of business located at the offices of Legalinc Corporate Services Inc., 1967 Wehrle Dr. Suite 1 #086, Buffalo, NY 14221.

### *Jurisdiction and Venue*

**23.**   This Court has original subject-matter jurisdiction over the RICO claims pursuant to 18 U.S.C. §§ 1964(a) and 1964(c), and pursuant to 28 U.S.C. § 1331 insofar as they arise under federal law. This Court has diversity jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(a), as Plaintiff and Mr. Long are both citizens of Arizona and all Defendants are citizens of states other than Arizona, and the amount in controversy exceeds $75,000 exclusive of interest, costs, and attorneys' fees. Alternatively, the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 insofar as they are so related to the federal claims that they form part of the same case or controversy.

**24.**   This Court has *in personam* jurisdiction over Defendants because at all relevant times Defendants resided, maintained citizenship, were found, had agents, conducted business and/or sold the collectible numismatic, semi-numismatic, and bullion coins at issue in this case to Mr. Long in and/or from New York.

**25.**   At all relevant times, Defendants resided, were found, had agents and/or conducted business in the Eastern District of New York. Defendants sold the collectible numismatic, semi-numismatic

and bullion coins at issue in this case to Mr. Long in and/or from the Eastern District of New York. A substantial part—if not all—of Defendants' wrongful acts and omissions occurred in the Eastern District of New York. Accordingly, venue is proper in this Court pursuant to 28 U.S.C § 1391(a).

## PROLOGUE

### A. Primer: the Coin *Fraud* Industry

**26.** While there certainly are upstanding, reputable precious metals dealers, a criminal subset (the "coin *fraud* industry") operating in the penumbra of those reputable dealers has been a longstanding problem. In late 1983 and early 1984, federal and state authorities initiated a long-awaited crackdown on precious metals dealers operating fraudulent "boiler room" schemes across the country. These precious metals fraudsters and racketeers had bilked investors out of several hundred million dollars.[9] Banking on customers' lack of knowledge, and using the nuances of coin collecting, grading, historical factors, and mint populations, unethical coin dealers continue to confuse and confound the average consumer with lies and deceptive claims of significant investment returns and bargains, often rising to the level of, and culminating in, outright fraud and counterfeiting. The United States Senate and various Federal and State agencies and commissions have investigated, and continue to investigate, the criminal underbelly of the precious metals industry.

### B. The Coin Fraudsters Prey Upon the Elderly.

**27.** Ten years ago in 2014, a United States Senate Special Committee on Aging conservatively estimated that more than "*10,000 Americans have been victimized through these schemes, with*

---

[9] *See Commodity Investment Fraud II, Hearings Before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs,* 98th Cong., 2d Sess. 145-88 (1984)*; see also War on Florida Boiler Rooms,* N.Y. Times, Nov. 14, 1983; *Regulating Bullion Dealers,* N.Y. Times, Oct. 31, 1983; *Senate to Study Gold Dealers,* N.Y. Times, Oct. 27, 1983; *Bullion Fraud: Who Protects the Investor?,* Chicago Tribune, Oct. 25, 1983.

*losses around $300 million.*"[10] The U.S. Senate Report further revealed that the "*overwhelming number of victims in precious metal fraud are seniors*."[11] Likewise, the FBI has found that corrupt coin dealers intentionally target the elderly specifically "*because they [are] elderly and [the dealers] thought [they] could get away with it"* and that, while the amounts defrauded as to any individual elderly customer may seem small in comparison to certain other more high profile financial frauds, "*it represents a great deal to the victims – it was one man's life savings.*"[12] In fact, most of the fraud advisories and enforcement actions by the Federal and State agencies focus on the financial exploitation of the elderly at the hands of fraudulent coin dealers.[13]

**28.**  More recently, the New York Attorney General published a consumer alert specifically warning against "**Coin Swindles**" in which she warns that: "*[s]o called 'rare coins' are often sold to unwary investors who are led to believe that they are a good investment that will increase in value over the years. Representations made about the expected increase in the value of these coins are almost always untrue and part of a scam perpetrated against unsophisticated, often elderly victims.*"[14] In fact, most of the fraud advisories and enforcement actions by Federal and State agencies focus on the financial exploitation of the elderly at the hands of fraudulent coin dealers.[15] True to form, Defendants in this case targeted the elderly Mr. Long.

---

[10]  *See Exploring the Perils of the Precious Metals Market*, U.S. Senate Special Committee on Aging, *https://www.aging.senate.gov/download/precious-metals-market-committee-staff-investigation*, at 17 (hereinafter "US Senate Report*").

[11]  *See* US Senate Report at 16.

[12]  *See Fraudster Targeted Elderly Victims*" https://www.fbi.gov/news/stories/the-case-of-the-corrupt-coin-dealer.

[13]  *See, e.g.,* https://dfpi.ca.gov/2022/02/01/dfpi-sues-to-stop-68-million-precious-metals-and-coin-fraud-targeting-elderly/.

[14]  *See* https://ag.ny.gov/common-investment-scams. Other state attorneys general have also issued precious metals fraud consumer alerts. *See, e.g.,* https://www.texasattorneygeneral.gov/consumer-protection/investing-gold-coins (Texas) and https://www.ag.state.mn.us/consumer/publications/CoinDealers.asp  (Minnesota).

[15]  *See, e.g.,* https://dfpi.ca.gov/2022/02/01/dfpi-sues-to-stop-68-million-precious-metals-and-coin-fraud-targeting-elderly/.

## STATEMENT OF PERTINENT FACTS

### A. Joaquin and the F&S Enterprise: Scheme One and Scheme Two

29. On or about October 18, 2018, Mr. Long received a cold call from Joaquin who claimed to be a precious metals expert and told him that he was a representative of Father & Sons Collectibles, Inc. ("F&S"). Joaquin offered to sell Mr. Long numismatic coins[16] and precious metal bullion coins[17] and represented to Mr. Long that the coins were being offered for sale at significant savings and had extraordinary investment potential. Although Mr. Long admitted to Joaquin that he knew very little about precious metals and numismatics, Mr. Long was intrigued by the prospect of investing in precious metals, and he purchased some Morgan Silver Dollars from F&S in reliance upon Joaquin's representations that the coins were a high-reward/low-risk "investment."

30. Once Joaquin made the initial "score" on Mr. Long, he began an unrelenting barrage of high-pressure sales calls to Mr. Long designed to influence, convince, intimidate, unbalance, and confuse him. Joaquin's immediate goal was to fleece Mr. Long by convincing him to "invest" in coins that were outrageously overpriced and marked up beyond any accepted industry standard based upon misrepresentations as to the coins' market values in combination with false promises of large returns. Joaquin's overarching goal was to gain Mr. Long's confidence and trust so as ultimately to swindle Mr. Long by way of three phase "long con" with the "end game" being to completely impoverish the "mark," Mr. Long.

31. **Scheme One** involved Joaquin inundating Mr. Long with frequent, high-pressure telemarketing coin sales calls and misrepresenting the qualities, grade, market value, and

---

[16] Numismatics is the study or collection of currency, including coins, tokens, paper money, medals and related objects. The discipline also includes the broader study of money and other means of payment used to resolve debts and exchange goods.

[17] Precious metal bullion may occur in various forms – bars (ingots), privately minted coins and coins minted by various countries, including the United States Mint.

investment potential of the coins offered for sale and grossly overcharging Mr. Long for those coins at unconscionable markups while promising Mr. Long that the coins he was purchasing were safe investments that would yield large returns. The repeated high-pressure, fast-talking telemarketing calls by Joaquin left Mr. Long confused and exasperated and unable to keep up with what coins he had agreed to purchase, which transactions were in process, and which coins had been shipped or received. Joaquin's financial exploitation of Mr. Long under Scheme One proved highly effective as Mr. Long paid out a total of $196,619.97 to the Joaquin in furtherance of the F&S Enterprise.

32.    To the extent that Mr. Long's **Scheme One** coin purchases can be documented, reconstructed, and analyzed, they reveal an average markup of 699%, with some markups of over 5,000%. Extrapolation of this pattern of overcharging reveals that Mr. Long lost, in reasonable probability, over 86% of his $196,619,97 total investment, which translates to losses of about **$172,016.35** as a result of Scheme One.

33.    **Scheme Two** by Joaquin appears to be simply an opportunistic offshoot of the first scheme in furtherance of the F&S Enterprise and Joaquin's greed. Mr. Long's coin purchases from Joaquin were paid for by way of personal check or credit card. After a while, Mr. Long noticed what he thought were unauthorized electronic drafts on his bank and credit card accounts representing payments for which Mr. Long had neither backup documentation nor evidence of ever receiving any coins. However, when Mr. Long attempted to question F&S about these unauthorized, undocumented transactions and unreceived coins, he was met with a cacophony of lies, including: (1)  that Mr. Long actually had in fact ordered the coins, (2) that the coins would be shipped out soon, (3) that the coins had already been delivered, (4) that the charges to the credit cards or bank

drafts were for balances owed on prior purchases, and (5) cynically, but accurately, that Mr. Long was just confused.

34.   On other occasions, Mr. Long received shipments of coins without having ever placed an order, which only added to his confusion and tended to further obfuscate the transactions. In furtherance of the F&S Enterprise, Joaquin used various techniques to "gaslight" and keep the elderly Mr. Long off balance and confused so as to take full advantage of Mr. Long's age and increasing infirmity and scam him out of his money.[18]

35.   **Scheme Two** by Joaquin, in furtherance of the F&S Enterprise and to enrich himself, is bank and credit card fraud against Mr. Long resulting in additional actual losses of **$33,815.00**.

## B.   Scheme Three—Joaquin and Rose and the AIF Enterprise; The Conspiracy to "Buy-Back" the Coins for Pennies and Impoverish Mr. Long

36.   Joaquin's greed and desire to make a "big score" at Mr. Long's expense, resulted in his adding John C. Rose ("Rose") and Rose's coin company (Legend) as accomplices and the formation of the AIF ("association-in-fact") Enterprise to pull-off **Scheme Three**.

37.   As expenditures and losses from the Scheme One coin purchases and Scheme Two thievery placed Mr. Long under near debilitating financial distress, he began searching for some means of relief and expressed to Joaquin his dire need to sell some of his "investment" coins based upon representations by Joaquin that F&S would buy back the coins for a "fair price" which would at least approximate the original purchase price. Using Mr. Long's confusion and distress against him, Joaquin (in collaboration with Rose) by way of their companies, F&S, Legend, and Elite, and in furtherance of the AIF Enterprise, effectively stole an additional **$497,246.60** from Mr. Long through a series of "buy-back" transactions in which Mr. Long received but a minute fraction of

---

[18] *See* footnote 8, above, regarding similar tactics reported in *United States v. Romano*, No. 09-CR-168 (SJ) (VMS), 2013 U.S. Dist. LEXIS 208446, at *19 n.5 (E.D.N.Y. 2013).

the purchase prices he had originally paid for the coins.

**38.**   The particulars of each of the progressive and interrelated scams—Scheme One, Scheme Two, and Scheme Three—are set out and described below in greater detail.

### Scheme One Specifics—Fraudulent Overpricing/Markup of Coins (the F&S Enterprise)

**39.**   From October of 2018 until approximately April of 2022, Joaquin repeatedly telephoned Mr. Long and cajoled, tricked, harassed and ultimately bullied and intimidated him into making some one hundred three (103) distinct purchases of precious metal products from F&S (under either its own name or one of its assumed names) based upon misrepresentations by Joaquin that the coins were exceptional "high-reward/low-risk" investment opportunities that promised tremendous returns upon resale and that Mr. Long needed to "act now" and immediately purchase the coins (by credit card or bank draft) in order for him to receive the "lowest costs" or "dealer's costs" on the coins. After payment by check or credit card cleared, Joaquin shipped Mr. Long the coins via United States mail (or private interstate parcel services) along with enclosed purchase invoices that confirmed the unconscionably high prices of the coins and is independent evidence of the fraudulent pricing and markups.

**40.**   The coins Mr. Long purchased over the telephone from Joaquin and received via shipments from F&S objectively did not have the attributes and values represented to Mr. Long by Joaquin. In fact, the retail markups for those coins were typically over 500%—with some of the coins marked up <u>over 5,000%</u>.[19]

**41.  TABLE ONE** (embedded immediately below) consists of a list of the coins Joaquin tele-marketed, sold, and shipped to Mr. Long on behalf of F&S (including Family Collectables,

---

[19]   By way of comparison, in *California v. Lear*, the State of California determined that an undisclosed 33% markup by Lear Capital was fraudulent. *See California v Lear*, <u>https://docs.simpluris.com/websites/13abd9da-de42-4adb-8903- 54649f9c5695/documents/fcc995e5-6132-42f9-8608-aea59c728a84/CA%20Complaint(11118433.2).pdf</u>.

Collector's Heaven, and Collector's Choice, all assumed names of F&S) and Legend, all in furtherance of the F&S Enterprise and to enrich Joaquin. The TABLE includes, *inter alia*, the purchase prices of the coins and the coins' fair market values and reveals that Mr. Long paid Joaquin $196,619.97[20] for the coins. (As regards the coins for which Mr. Long still retains invoices,[21] he paid $78,378.97, but only received coins worth approximately $9,805.00 (a 699% mark-up) which establishes that Mr. Long lost $68,573.97 on the coins for which invoices are available.)

**TABLE ONE**
**UNCONSCIONABLY OVER-PRICED COINS SOLD TO MR. LONG**
**(THE F&S ENTERPRISE)**

| Date | Invoice | Vendor | Description | # coins | Price Paid | FMV Date of Purchase | Losses to Plaintiff | % Markup |
|------|---------|--------|-------------|---------|-----------|---------------------|--------------------|----------|
| 10/30/2018 | 1810090 | F&S Collectibles | 1885-O $1 Morgan | one (1) | $ 331.66 | $ 100.00 | $ 231.66 | 232% |
| 10/30/2018 | 1810090 | F&S Collectibles | 1887-P $1 Morgan | one (1) | $ 331.66 | $ 100.00 | $ 231.66 | 232% |
| 10/30/2018 | 1810090 | F&S Collectibles | 1889-P $1 Morgan | one (1) | $ 331.66 | $ 100.00 | $ 231.66 | 232% |
| 2/1/2019 | 1901088 | F&S Collectibles | 1883-CC $1 Morgan MS62 UC | one (1) | $ 1,495.00 | $ 225.00 | $ 1,270.00 | 564% |
| 7/24/2020 | 9054 | Family Collectables | 1883 $1 Morgan MS62 | one (1) | $ 1,072.50 | $ 50.00 | $ 1,022.50 | 2045% |
| 7/24/2020 | 9054 | Family Collectables | 1886 $1 Morgan MS62 | one (1) | $ 1,072.50 | $ 50.00 | $ 1,022.50 | 2045% |
| 8/18/2020 | 9094 | Family Collectables | 1926 50c Liberty MS64 | one (1) | $ 1,995.00 | $ 1,050.00 | $ 945.00 | 90% |
| 9/4/2020 | 10048 | Family Collectables | 1887 $1 Morgan MS64 | one (1) | $ 1,145.00 | $ 85.00 | $ 1,060.00 | 1247% |
| 9/4/2020 | 10048 | Family Collectables | 1897 $1 Morgan MS61 | one (1) | $ 1,145.00 | $ 85.00 | $ 1,060.00 | 1247% |
| 9/18/2020 | 10086 | Family Collectables | 1884 $1 Morgan MS62 | one (1) | $ 1,225.00 | $ 50.00 | $ 1,175.00 | 2350% |
| 9/18/2020 | 10086 | Family Collectables | 1886 $1 Morgan MS62 | one (1) | $ 1,225.00 | $ 50.00 | $ 1,175.00 | 2350% |
| 9/21/2020 | 10102 | Family Collectables | 1870-CC $1 Liberty XF | one (1) | $ 3,800.00 | $ 1,000.00 | $ 2,800.00 | 280% |
| 9/29/2020 | 10114 | Family Collectables | 1880-S $1 Morgan MS63 | one (1) | $ 1,447.50 | $ 150.00 | $ 1,297.50 | 865% |
| 9/29/2020 | 10014 | Family Collectables | 1885 $1 Morgan MS62 | one (1) | $ 1,447.50 | $ 150.00 | $ 1,297.50 | 865% |
| 10/13/2020 | 10150 | Family Collectables | 1880-S $1 Morgan MS62 | one (1) | $ 1,400.00 | $ 150.00 | $ 1,250.00 | 833% |
| 10/13/2020 | 10150 | Family Collectables | 1889 $1 Morgan MS62 | one (1) | $ 1,400.00 | $ 150.00 | $ 1,250.00 | 833% |
| 10/13/2020 | 10150 | Family Collectables | 1921 $1 Morgan MS62 | one (1) | $ 1,400.00 | $ 150.00 | $ 1,250.00 | 833% |
| 10/30/2020 | 10174 | Family Collectables | 1872 $10 Gold Amazonian | one (1) | $ 3,999.00 | $ 1,000.00 | $ 2,999.00 | 300% |
| 11/3/2020 | 10182 | Family Collectables | 1882-CC $1 Morgan MS64 | one (1) | $ 2,465.00 | $ 275.00 | $ 2,190.00 | 796% |

---

[20]  Mr. Long has no invoices for 59 of the coins because no invoices accompanied the coins sold to Mr. Long under the F&S assumed names ("Collectors Heaven" and "Collectors Choice") or Legend Thirty-two of thirty-six of the F&S invoices disappeared after Joaquin made the first visit to Mr. Long's home during the "buy-back" scam (Scheme Three). However, what information that is available (such as dates, amounts and coin species) from the missing invoices can be, and have been, reconstructed from credit card and bank records and Mr. Long's handwritten notes.

[21]  As discussed below, during the "buy-back" scam (Scheme Three), Joaquin personally visited Mr. Long's home and on two occasions Mr. Long realized that invoices were missing after Joaquin left. On information and belief, Joaquin took the invoices to destroy evidence of the fraudulent overpricing and markups when Mr. Long purchased the coins under Scheme One.

| Date | Invoice # | Company | Item | Qty | Price | Cost | Profit | % |
|---|---|---|---|---|---|---|---|---|
| 12/1/2020 | 10189 | Family Collectables | 1853 3c Trime BU | one (1) | $ 2,895.00 | $ 250.00 | $ 2,645.00 | 1058% |
| 2/19/2021 | 10625 | Family Collectables | 1922 $1 Peace MS60 | one (1) | $ 2,255.00 | $ 40.00 | $ 2,215.00 | 5538% |
| 2/19/2021 | 10625 | Family Collectables | 1923 $1 Peace MS61 | one (1) | $ 2,255.00 | $ 45.00 | $ 2,210.00 | 4911% |
| 3/22/2021 | 10749 | Family Collectables | 1923 $1 Peace MS63 | one (1) | $ 2,745.00 | $ 65.00 | $ 2,680.00 | 4123% |
| 3/22/2021 | 10749 | Family Collectables | 1925 $1 Peace MS63 | one (1) | $ 2,745.00 | $ 65.00 | $ 2,680.00 | 4123% |
| 4/2/2021 | 10811 | Family Collectables | 1924 $1 Morgan MS62 | one (1) | $ 2,317.50 | $ 50.00 | $ 2,267.50 | 4535% |
| 4/2/2021 | 10811 | Family Collectables | 1926 $1 Morgan MS64 | one (1) | $ 2,317.50 | $ 65.00 | $ 2,252.50 | 3465% |
| 4/9/2021 | 10836 | Family Collectables | 1925 $1 Peace MS61 | one (1) | $ 2,315.00 | $ 45.00 | $ 2,270.00 | 5044% |
| 4/9/2021 | 10836 | Family Collectables | 1926-S $1 Peace MS61 | one (1) | $ 2,315.00 | $ 75.00 | $ 2,240.00 | 2987% |
| 5/25/2021 | 25624 | Family Collectables | 2013 $1 SAE MS70 | one (1) | $ 998.33 | $ 150.00 | $ 848.33 | 566% |
| 5/25/2021 | 25624 | Family Collectables | 2014 $1 SAE MS70 | one (1) | $ 998.33 | $ 150.00 | $ 848.33 | 566% |
| 5/25/2021 | 25624 | Family Collectables | 2015 $1 SAE MS70 | one (1) | $ 998.33 | $ 150.00 | $ 848.33 | 566% |
| 6/15/2021 | 25716 | Family Collectables | 2011-W $1 SAE PR69 | one (1) | $ 1,447.50 | $ 100.00 | $ 1,347.50 | 1348% |
| 6/15/2021 | 25716 | Family Collectables | 2012-S $1 SAE PR69 | one (1) | $ 1,447.50 | $ 100.00 | $ 1,347.50 | 1348% |
| 7/22/2021 | 25879 | Family Collectables | 2017-W $1 SAE MS70 | one (1) | $ 1,647.50 | $ 175.00 | $ 1,472.50 | 841% |
| 7/22/2021 | 25879 | Family Collectables | 2018-W $1 SAE MS70 | one (1) | $ 1,647.50 | $ 175.00 | $ 1,472.50 | 841% |
| 8/5/2021 | 25938 | Family Collectables | 2014 $1 SAE MS70 | one (1) | $ 1,745.00 | $ 175.00 | $ 1,570.00 | 897% |
| 8/5/2021 | 25938 | Family Collectables | 2015 $1 SAE MS70 | one (1) | $ 1,745.00 | $ 175.00 | $ 1,570.00 | 897% |
| 10/29/2021 | 28032 | Family Collectables | 1926 $2.5 Gold Liberty MS64 | one (1) | $ 3,645.00 | $ 700.00 | $ 2,945.00 | 421% |
| 11/26/2021 | 28120 | Family Collectables | 1926 50c Silver Liberty MS64 | one (1) | $ 1,895.00 | $ 200.00 | $ 1,695.00 | 848% |
| 12/22/2021 | 28167 | Family Collectables | 1976-S $1 Silver Liberty (2 PF rolls) | 40 | $ 2,895.00 | $ 1,200.00 | $ 1,695.00 | 141% |
| 1/18/2022 | 28218 | Family Collectables | 1883-O $1 Morgan MS62 | one (1) | $ 995.00 | $ 50.00 | $ 945.00 | 1890% |
| 3/1/2022 | 28314 | Family Collectables | 2013-W $1 SAE PR69 | one (1) | $ 2,490.00 | $ 85.00 | $ 2,405.00 | 2829% |
| 3/22/2022 | 28375 | Family Collectables | 1891-CC $1 Morgan | one (1) | $ 2,895.00 | $ 550.00 | $ 2,345.00 | 426% |
| | | | | 82 | $ 78,378.97 | $ 9,805.00 | $ 68,573.97 | 699% |
| 10/18/2018 | 1810040 | F&S Collectibles | Invoice Missing | | $ 495.00 | $ 61.95 | $ 433.05 | 699% |
| 11/5/2018 | Unk | F&S Collectibles | Invoice Missing | | $ 1,995.00 | $ 249.69 | $ 1,745.31 | 699% |
| 11/27/2018 | Unk | F&S Collectibles | Invoice Missing | | $ 1,945.00 | $ 243.43 | $ 1,701.57 | 699% |
| 12/6/2018 | Unk | F&S Collectibles | Invoice Missing | | $ 1,735.00 | $ 217.15 | $ 1,517.85 | 699% |
| 12/19/2018 | 1812038 | F&S Collectibles | Invoice Missing | | $ 1,995.00 | $ 249.69 | $ 1,745.31 | 699% |
| 1/2/2019 | 1812078 | F&S Collectibles | Invoice Missing | | $ 1,991.00 | $ 249.19 | $ 1,741.81 | 699% |
| 1/29/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 1,980.00 | $ 247.81 | $ 1,732.19 | 699% |
| 2/4/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 1,972.00 | $ 246.81 | $ 1,725.19 | 699% |
| 2/19/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 1,876.00 | $ 234.79 | $ 1,641.21 | 699% |
| 3/5/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 1,742.00 | $ 218.02 | $ 1,523.98 | 699% |
| 3/12/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 1,795.00 | $ 224.66 | $ 1,570.34 | 699% |
| 3/16/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 2,995.00 | $ 374.84 | $ 2,620.16 | 699% |
| 3/20/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 2,495.00 | $ 312.27 | $ 2,182.73 | 699% |
| 3/20/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 2,645.00 | $ 331.04 | $ 2,313.96 | 699% |
| 3/26/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 1,850.00 | $ 231.54 | $ 1,618.46 | 699% |
| 4/1/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 2,395.00 | $ 299.75 | $ 2,095.25 | 699% |
| 4/9/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 1,980.00 | $ 247.81 | $ 1,732.19 | 699% |
| 4/29/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 2,693.00 | $ 337.05 | $ 2,355.95 | 699% |
| 4/30/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 2,790.00 | $ 349.19 | $ 2,440.81 | 699% |
| 5/6/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 2,680.00 | $ 335.42 | $ 2,344.58 | 699% |
| 5/14/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 2,895.00 | $ 362.33 | $ 2,532.67 | 699% |
| 5/20/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 2,200.00 | $ 275.34 | $ 1,924.66 | 699% |
| 5/24/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 2,790.00 | $ 349.19 | $ 2,440.81 | 699% |
| 6/5/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 2,800.00 | $ 350.44 | $ 2,449.56 | 699% |
| 8/12/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 2,443.00 | $ 305.76 | $ 2,137.24 | 699% |
| 8/30/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 2,235.00 | $ 279.72 | $ 1,955.28 | 699% |
| 9/6/2019 | Unk | F&S Collectibles | Invoice Missing | | $ 1,980.00 | $ 247.81 | $ 1,732.19 | 699% |

| 11/26/2019 | 1911024 | F&S Collectibles | Invoice Missing | | $ | 199.00 | $ | 24.91 | $ | 174.09 | 699% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/16/2020 | unk | Legend | Invoice Missing | | $ | 450.00 | $ | 56.32 | $ | 393.68 | 699% |
| 9/16/2020 | unk | Legend | Invoice Missing | | $ | 479.00 | $ | 59.95 | $ | 419.05 | 699% |
| 9/17/2020 | unk | Legend | Invoice Missing | | $ | 410.00 | $ | 51.31 | $ | 358.69 | 699% |
| 9/17/2020 | unk | Legend | Invoice Missing | | $ | 480.00 | $ | 60.08 | $ | 419.92 | 699% |
| 9/17/2020 | unk | Legend | Invoice Missing | | $ | 499.00 | $ | 62.45 | $ | 436.55 | 699% |
| 1/25/2021 | unk | Family Collectables | Invoice Missing | | $ | 2,895.00 | $ | 362.33 | $ | 2,532.67 | 699% |
| 2/11/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 1,600.00 | $ | 200.25 | $ | 1,399.75 | 699% |
| 2/16/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 1,495.00 | $ | 187.11 | $ | 1,307.89 | 699% |
| 3/10/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 3,995.00 | $ | 500.00 | $ | 3,495.00 | 699% |
| 3/25/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 3,150.00 | $ | 394.24 | $ | 2,755.76 | 699% |
| 4/5/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 3,300.00 | $ | 413.02 | $ | 2,886.98 | 699% |
| 4/27/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 1,895.00 | $ | 237.17 | $ | 1,657.83 | 699% |
| 6/7/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 950.00 | $ | 118.90 | $ | 831.10 | 699% |
| 6/7/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 995.00 | $ | 124.53 | $ | 870.47 | 699% |
| 6/25/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 1,495.00 | $ | 187.11 | $ | 1,307.89 | 699% |
| 12/1/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 2,995.00 | $ | 374.84 | $ | 2,620.16 | 699% |
| 12/13/2021 | unk | Collectors Heaven | Invoice Missing | | $ | 1,995.00 | $ | 249.69 | $ | 1,745.31 | 699% |
| 12/31/2021 | unk | Family Collectables | Invoice Missing | | $ | 4,100.00 | $ | 513.14 | $ | 3,586.86 | 699% |
| 1/25/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 995.00 | $ | 124.53 | $ | 870.47 | 699% |
| 1/26/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 990.00 | $ | 123.90 | $ | 866.10 | 699% |
| 1/27/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 3,495.00 | $ | 437.42 | $ | 3,057.58 | 699% |
| 2/1/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 950.00 | $ | 118.90 | $ | 831.10 | 699% |
| 2/4/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 995.00 | $ | 124.53 | $ | 870.47 | 699% |
| 2/7/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 1,980.00 | $ | 247.81 | $ | 1,732.19 | 699% |
| 2/10/2022 | unk | Collectors Heaven | Invoice Missing | | $ | 1,995.00 | $ | 249.69 | $ | 1,745.31 | 699% |
| 3/24/2022 | unk | Collectors Choice | Invoice Missing | | $ | 900.00 | $ | 112.64 | $ | 787.36 | 699% |
| 11/17/2020 | 10169 | Family Collectables | Invoice Missing | | $ | 2,495.00 | $ | 312.27 | $ | 2,182.73 | 699% |
| 12/30/2019 | unk | F&S Collectibles | 1898-O $1 Morgan | one (1) | $ | 990.00 | $ | 123.90 | $ | 866.10 | 699% |
| 4/16/2019 | unk | F&S Collectibles | 1909-D $5 Gold Indian Head MS62 | one (1) | $ | 1,911.00 | $ | 239.17 | $ | 1,671.83 | 699% |
| 4/21/2019 | unk | F&S Collectibles | 1884-O $1 Morgan MS64 | one (1) | $ | 2,395.00 | $ | 299.75 | $ | 2,095.25 | 699% |
| 2/10/2019 | unk | F&S Collectibles | 1887-P $1 Silver Liberty MS65+ | one (1) | $ | 1,791.00 | $ | 224.16 | $ | 1,566.84 | 699% |
| 9/8/2020 | unk | Family Collectables | Invoice missing | | $ | 3,595.00 | $ | 449.94 | $ | 3,145.06 | 699% |
| | | | | | $ | 118,241.00 | $ | 14,798.62 | $ | 103,442.38 | 699% |
| | | | Extrapolation @ 669% markup | | $ | 196,619.97 | $ | 24,603.62 | $ | 172,016.35 | 699% |

**42.** There are fifty-nine (59) transactions that form part of Scheme One for which Mr. Long no longer has purchase invoices. F&S (when doing business under the assumed names "Collectors Heaven" and "Collectors Choice") and Legend simply did not enclose purchase invoices when they shipped coins to Mr. Long. In addition, thirty-two of thirty-six of the F&S invoices disappeared after Joaquin made the first visit to Mr. Long's residence as part of the Scheme Three "buy-back." However, hand-written notes and check and credit card receipts indicate that Mr.

Long paid out $118,241.00.00 for those transactions. From the pattern and averages established on the first 44 transactions, Joaquin marked up the coins to 699%. Extrapolating this markup to the other 59 transactions (as shown on the lower half of TABLE ONE), it is reasonable to infer that Mr. Long lost approximately $96,566.86 of his investment (i.e., an 87% loss).[22]

43.    The coins Mr. Long purchased from Joaquin and received in shipment from F&S (and Legend) did not have the attributes and values represented in the sales pitches to Mr. Long. In furtherance of the F&S Enterprise, Joaquin represented to and convinced Mr. Long that each of the coin purchases detailed and described above were "investments." Unbeknownst to Mr. Long, however, was the fact that immediately upon purchase, he was losing well over 85% of the value of the principal of his "investment" and unwittingly rewarding Joaquin and the F&S Enterprise as a result of the unconscionably overpriced coin scam with a substantial portion of Mr. Long's life savings.

44.    Discovery will ultimately reveal the full quantum of Mr. Long's losses and damages attributable to Joaquin and the F&S Enterprise through the Scheme One fraudulent coin sales to Mr. Long, but Plaintiff anticipates that the evidence will establish that Mr. Long lost *at least* 86% of his $196,619.97 "investment" to Joaquin and the F&S Enterprise which equates to approximately $172,016.35. The foregoing is textbook "telemarketing fraud directed at elders" as defined in 18 U.S.C. § 2325 and constitutes Scheme One by Joaquin in furtherance of the F&S Enterprise and to enrich himself.

## Scheme Two Specifics—Unauthorized E-Check and Credit Card Charges (the F&S Enterprise)

---

[22]  Of course, discovery should alleviate the need for reliance upon extrapolation.

**45.**   During the period of Joaquin's marketing of coins to Mr. Long in furtherance of Scheme One of the F&S Enterprise, he continually stressed that the purchases needed to occur quickly before Mr. Long lost the "incredible opportunity" to obtain the coins he was hawking. To ensure immediate processing so as to secure the coin(s), Joaquin obtained several of Mr. Long's credit card numbers as well as his bank account information. Joaquin began to use this sensitive financial information through two of the F&S aliases (specifically "The Family Collectables" and "Collectors Heaven") to make illegal, unauthorized charges and thereby to steal an additional $33,815.00 of Mr. Long's life savings. The details of **Scheme Two** (bank fraud) are set out immediately below and summarized *infra* in **TABLE TWO.**

**46.**   Between 7/22/20 and 7/7/2021, Joaquin, in furtherance of the F&S Enterprise and to enrich himself, made six (6) fraudulent electronic check transactions in which he wrote checks to the fictitious "Family Collectables" entity drawn on Mr. Long's checking accounts with fake check and/or out-of-sequence check numbers in the total amount of $23,095.00. When Mr. Long called to confront F&S about the unauthorized bank drafts, an unidentified F&S representative made several false representations meant to confuse or confound Mr. Long, including: (1) claiming that they had recordings in which Mr. Long authorized the purchases; (2) claiming that the bank draft charges were for outstanding orders that had not been fully processed earlier, and (3) claiming that Mr. Long had just forgotten about the purchases and that the coins would soon be shipped. These obfuscation and stalling tactics were effective as they compounded Mr. Long's confusion already intentionally created by Joaquin's constant harassing and bullying coin telemarketing calls.[23]

**47.**   Having already used "Family Collectables" as the payee in the first bank fraud scam, Joaquin instituted a second check fraud scam in furtherance of the F&S Enterprise and to enrich himself.

---

[23] *See* footnote 8, *supra.*

Between 12/12/21 and 2/10/22, Joaquin fraudulently made seven (7) unauthorized electronic check transactions payable to the fictitious Collectors Heaven entity with fake check numbers and/or out-of-sequence check numbers from Mr. Long's checking accounts in the total amount of $9,820.00. When Mr. Long again called to confront F&S about the unauthorized bank drafts, another unidentified F&S representative again "gas-lighted" Mr. Long with false representations to confuse Mr. Long and shut him up; again: (1) claiming that they had recordings in which Mr. Long authorized the purchases; (2) claiming that the bank draft charges were for outstanding orders that had not been fully processed earlier, and (3) claiming that Mr. Long had just forgotten about the purchases and that the coins would soon be shipped.

**48.** A third financial fraud scheme targeting Mr. Long soon followed. In a quick sequence between 3/24/22 and 4/22/22, Joaquin, in furtherance of the F&S Enterprise and to enrich himself, used the F&S "Collectors" alias to make six (6) unauthorized charges on Mr. Long's credit cards in a total amount of $15,680.00. Fortunately, Mr. Long's family discovered the credit card fraud and intervened in time to have all but one of these fraudulent charges reversed, limiting Mr. Long's losses from the credit card fraud to only $900.00.[24]

---

[24] That Joaquin and F&S never questioned or contested the reversal of these credit card charges is circumstantial evidence that the charges were unauthorized and fraudulent.

**TABLE TWO**
**UNAUTHORIZED ELECTRONIC CHECKING / CREDIT CARD CHARGES**
**(THE F&S ENTERPRISE)**

| DATE | FRAUD TYPE | CHECK / CC # | Financial Entity | Joaquin Enterprise | AMOUNT |
|---|---|---|---|---|---|
| 7/22/2020 | Unauth electronic check | 4648 | Fifth Third | The Family Collectables, Inc. | $ 2,145.00 |
| 8/17/2020 | Unauth electronic check | 4655 | Fifth Third | The Family Collectables, Inc. | $ 1,995.00 |
| 10/13/2020 | Unauth electronic check | 4668 | Fifth Third | The Family Collectables, Inc. | $ 4,200.00 |
| 3/17/2021 | Unauth electronic check | 4684 | Fifth Third | The Family Collectables, Inc. | $ 5,490.00 |
| 3/30/2021 | Unauth electronic check | 4689 | Fifth Third | The Family Collectables, Inc. | $ 4,635.00 |
| 4/7/2021 | Unauth electronic check | 4688 | Fifth Third | The Family Collectables, Inc. | $ 4,630.00 |
| 12/13/2021 | Unauth electronic check | 1111 | Fifth Third | Collector's Heaven | $ 1,995.00 |
| 1/25/2022 | Unauth electronic check | 1119 | Fifth Third | Collector's Heaven | $ 995.00 |
| 1/26/2022 | Unauth electronic check | 2123 | Fifth Third | Collector's Heaven | $ 990.00 |
| 2/2/2022 | Unauth electronic check | 2124 | Fifth Third | Collector's Heaven | $ 950.00 |
| 2/4/2022 | Unauth electronic check | 2238 | Fifth Third | Collector's Heaven | $ 995.00 |
| 2/7/2022 | Unauth electronic check | 2239 | Fifth Third | Collector's Heaven | $ 1,900.00 |
| 2/10/2022 | Unauth electronic check | 1189 | Fifth Third | Collector's Heaven | $ 1,995.00 |
| 3/24/2022 | CC No reversal allowed | 1795 | VISA | Collectors | $ 900.00 |
| **4/15/2022** | CC reversal allowed | 8834 | Citi Costco | Collectors | $ 3,800.00 |
| **4/16/2022** | CC reversal allowed | 8834 | Citi Costco | Collectors | $ 1,995.00 |
| **4/19/2022** | CC reversal allowed | 8834 | Citi Costco | Collectors | $ 2,895.00 |
| **4/21/2022** | CC reversal allowed | 8834 | Citi Costco | Collectors | $ 2,895.00 |
| **4/22/2022** | CC reversal allowed | 8834 | Citi Costco | Collectors | $ 3,195.00 |
| | | | | | $ 48,595.00 |
| | | | | Recovered | (14,780.00) |
| | | | | | **$ 33,815.00** |

49.  Elderly customers almost never challenge credit card or bank drafts within the tight time frame (60-90 days) of the transaction as required by banking regulations. Thus, the elderly who suffer from memory and other aging issues, like Mr. Long, are easily fooled and too often left without recourse even when they manage to catch the unauthorized electronic charges.  At this stage of his life, Mr. Long is mostly incapable of a careful review of credit card charges and banking records against purchases within the time period required for contesting the transactions with the banks or credit card companies. Check and credit card fraud (*i.e.* 18 U.S.C. § 1344 Bank Fraud) by Joaquin,

in furtherance of the F&S Enterprise and to enrich himself, ostensibly on behalf of F&S (by making its assumed names, "Family Collectables," "Collectors Heaven," and "Collectors" the payees), constitutes **Scheme Two**.

### Scheme Three Specifics–Buying (Stealing) Back the Coins (the AIF Enterprise)

**50.** As Mr. Long's liquid funds were dissipated by Joaquin's overpriced coin telemarketing scheme (Scheme One) and bank/credit card fraud scheme (Scheme Two) in furtherance of the F&S Enterprise, Mr. Long became increasingly desperate and despondent and told Joaquin that he was in immediate need of cash and wanted to sell some of his coins to pay his debts and living expenses. Joaquin recognized Mr. Long's fiscal dilemma as the awaited golden opportunity to bring the "long con" to fruition via a "buy-back" scam—essentially stealing back Mr. Long's coin inventory by paying him "pennies on the dollar" for them. Joaquin responded to Mr. Long's expressed desire to sell the coins by representing to Mr. Long that he would be willing to buy the coins for a "fair price," which he indicated would approximate the prices Mr. Long had originally paid for the coins. As detailed in the following paragraphs and summarized in **TABLE THREE**, *infra*, Joaquin and Rose came to an agreement and conspired together, individually and as representatives of F&S, Legends, and Elite, and in furtherance of the AIF Enterprise, to use Mr. Long's distress against him to purchase his coin inventory, including the very coins Joaquin had sold him for unconscionably high prices under Scheme One, for "pennies on the dollar" and effectively to steal an additional **$497,246.60** from Mr. Long.[25] The details of the three (3) "buy-back" transactions constituting Scheme Three are as follows:

**51.** On or about May 30, 2019, Joaquin traveled from New York to Mr. Long's home in Arizona to review the coins that Mr. Long had previously purchased from F&S as well as precious metal

---

[25] This is strikingly similar to the "buy-back" scheme alleged by the plaintiff in another pending coin fraud case. *Van Gundy v. Atlas Rare Coins, Inc. et al*.; Case No.: 2:23-cv-02072(NJC) (JMW) (filed March 17, 2023).

coins Mr. Long had purchased from other coin dealers. Joaquin claimed that he was there representing F&S. Taking advantage of Mr. Long's mental decline, Joaquin convinced Mr. Long that a "fair" purchase price for the coins Mr. Long presented for sale was a mere **$8,000.00**, even though Mr. Long had not so long before paid **$114,280.00** for those very same coins. In his confusion and desperation, Mr. Long agreed to Joaquin's low-ball offer and thereby realized a loss of **$106,280.00** (i.e., a 93% investment loss) on those coins. Moreover, after Joaquin left with the coins, Mr. Long discovered that he could no longer locate many of the purchase invoices and receipts for his original coin purchases. On information and belief, Joaquin took the original invoices and receipts with him to destroy evidence of Scheme One (fraudulent overpricing and unconscionably high markups).

**52.**   On October 5, 2020, Joaquin returned to Arizona because Mr. Long was refusing to buy any additional coins from F&S and was again complaining of needing cash and wanting to sell some of his coins. Joaquin utilized the same cynical, predatory pattern outlined above, except that this time Joaquin claimed to Mr. Long that he was there are a representative of Legend (whose principal is Rose). This second time Joaquin convinced Mr. Long to accept **$42,830.00** in exchange for some 77 coins for which Mr. Long had originally paid **$236,442.00**. Joaquin provided Mr. Long with a "Legends Collectibles" Check No. 91, dated 10/5/20 drawn on Ridgewood Savings Bank Account No. 701481939 in the amount of $10,000.00 which was signed by "John Rose." The business address printed on the "Legends Collectibles" check is actually John C. Rose's Sayville, New York home address. A true and correct copy of the check is embedded below:



Joaquin instructed Mr. Long to hold the check until he cleared it with Rose. Instead, Rose told Mr. Long over the telephone that he needed to pay Mr. Long the full amount "over a period of time" due to "cash flow" issues, and Rose and Mr. Long agreed that Mr. Long would not cash the check but instead would receive the funds in accordance with a payment schedule over a period of months. As it turns out, Mr. Long never did cash the $10,000 "Legend Collectibles" check and has never received any funds from this second "buy-back" transaction. Joaquin and Rose conspired to and did take advantage of Mr. Long in furtherance of the AIF Enterprise and to enrich themselves at Mr. Long's expense. In fact, in this second "buy-back" Mr. Long realized a 100% investment loss of **$236,442.00**. Again, after Joaquin departed, Mr. Long discovered that he could no longer locate many of the original invoices and receipts for his original coin purchases. On information and belief, Joaquin again purloined the original invoices and receipts to destroy evidence of Scheme One (fraudulent overpricing and unconscionably high markups).

**53.** On November 12, 2020, Joaquin and Rose decided to "go to the well" a third time. Claiming that he "just happened" to be in the Mesa, Arizona area, Joaquin returned yet again to Mr. Long's residence. Joaquin indicated to Mr. Long that on this occasion he was acting as a representative of *both* Legend and "Collectors Heaven" (the latter being one of the assumed names of F&S). Again, taking advantage of Mr. Long's confusion and desperation, this time Joaquin convinced Mr. Long

to accept a $7,790.00 Check No. 89 (again signed by Rose and drawn on the same Ridgewood Savings Bank "Legend Collectibles" bank account as before) as payment for coins that Mr. Long had originally purchased for **$156,824.60**. Again, Joaquin told Mr. Long to hold the check until he cleared it with Rose. A true and correct copy of the check is embedded below:



Mr. Long was never able to cash this check either. After he attempted numerous times to telephone Rose without success, Rose finally agreed to send Mr. Long a teller's check in the amount of $800 dated December 21, 2020 that was also drawn on Ridgewood Savings Bank with the same routing number as the two previous checks from the "Legend Collectibles" account. A true and correct copy of the teller's check is embedded below:



Rose also agreed to pay Mr. Long monthly amounts of $500.00, but Mr. Long only received three (3) $500 USPS Money Orders (totaling $1,500), with the last one being on or about August 12, 2021. A true and correct copy of the final money order receipt is embedded below:

The upshot is that Rose (ostensibly on behalf of Legend, but really in furtherance of the AIF Enterprise) paid Mr. Long a total of just **$2,300.00** in exchange for coins for which Mr. Long had originally paid **$156,824.60**. As a result of this third coin "buy-back" by Joaquin and Rose, Mr. Long realized a loss of **$154,524.60** (i.e., a 98.5% investment loss). This time, when Joaquin attempted to take some of the original coin purchase invoices, Mr. Long demanded them back.[26]

---

[26] The invoices referenced which Mr. Long rescued are the same invoices used to create TABLE ONE, *supra*.

**TABLE THREE**
**STEALING BACK MR. LONG'S COIN INVENTORY FOR "PENNIES ON THE DOLLAR"**
**(THE AIF ENTERPRISE)**

| "Buy-Back Date" | Purchase Year | Original purchase price | Sell Back Price Pd | Loss | Sold To | Comments |
|---|---|---|---|---|---|---|
| | | | | | | |
| 5/30/2019 | 2017-2019 | $114,280 | $8,000 | $106,280 | F&S/Michael Joaquin | Coins taken from Mr. Long's Mesa, AZ home by Joaquin. Check issued by Father & Sons Collectibles Inc. |
| 10/05/2020 | 2017-2019 | $236,442.00 | $0 | $236,442.00 | Legend/Michael Joaquin/ John Rose | 77 coins taken from Mr. Long's home by Joaquin based on promise to pay $42,830. Joaquin gave Mr. Long a $10,000 Legends Collectibles check signed by Rose. Mr. Long was never able to cash the check. |
| 11/12/2020 | 2017-2020 | $156,824.60 | $2,300 | $154,524.60 | Legend/Michael Joaquin/ John Rose | Coins taken from Mr. Long's home 10/5/20 & 11/12/20. $800 payment in 2020 and $1500 payment in 2021 by Joaquin on behalf of F&S's dba "Collectors Haven" or "Collectors Heaven." Checks issued from Ridgewood Savings Bank. |
| | TOTALS | $507,546.60 | $10,300 | $497,246.60 | | |

**54.**  On March 23, 2022, one of Mr. Long's family members overheard an intimidating phone call to Mr. Long from a coin telemarketer who is believed to have been Joaquin. In discussion with Mr. Long, his family finally learned of the problems he had encountered through his dealings with Joaquin and Rose, the F&S Enterprise, and the AIF Enterprise, as described above and detailed in TABLES ONE, TWO, and THREE. Investigations by Mr. Long's family members ultimately brought to light the multiple frauds perpetrated against Mr. Long by the Defendants, including the unauthorized electronic checks and credit card charges pursuant to Scheme Two and the "buy-back" scam comprising Scheme Three.

**55.**  As a direct and/or proximate result of the above-described and carefully catalogued wrongful acts and practices by Joaquin in furtherance of the F&S Enterprise (Scheme One and Scheme Two) and by Joaquin and Rose working in tandem and in furtherance of the AIF Enterprise (Scheme

Three), Mr. Long has suffered (and continues to suffer) substantial economic damages and mental distress, which the Defendants have refused to remedy. This case has resulted.

## CLAIMS FOR RELIEF/CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) FOR MAIL FRAUD AND WIRE FRAUD (18 U.S.C. §§ 1341, 1343) AGAINST DEFENDANT MICHAEL E. JOAQUIN (SCHEME ONE and SCHEME TWO)

**56.** Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**57.** At all relevant times, Bruce K. Long was a "person" within the meaning of 18 U.S.C. § 1964(c).

**58.** At all relevant times, Father & Son Collectibles, Inc. ("F&S") was an "enterprise" within the meaning of 18 U.S.C. § 1961(4). The F&S Enterprise was engaged in telemarketing, selling, trading and buying precious metal products, and the activities of said enterprise affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4), 1962(c), and 1962(d).

**59.** At all relevant times, Individual Defendant Michael E. Joaquin ("Joaquin") was a "person" within the meanings of 18 U.S.C. §§ 1961(3), 1962(b), 1962(c) and 1962(d).

**60.** By the acts described herein, Individual Defendant Joaquin, as a member of the F&S Enterprise, knowingly executed or intentionally participated in a scheme ("**Scheme One**") that defrauded, and was intended to defraud, Mr. Long, and on information and belief numerous other elderly citizens, and employed the use of the mails, as an integral part of said scheme and in furtherance thereof. The predicate acts described herein as Scheme One constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); 1962(c) and are part of a common scheme to further the F&S Enterprise and to enrich Joaquin at the expense of

29

Plaintiff through acts constituting: (i) mail fraud, in violation of 18 U.S.C. § 1341 and wire fraud, in violation of 18 U.S.C. § 1334.

**61.**    Central to, and in furtherance of, that scheme, and as described above in minute detail, Individual Defendant Joaquin, in his capacity as the principal, officer, and telemarketing sales agent and "investment advisor" for F&S, and acting at all times in furtherance of the F&S Enterprise, made grossly inaccurate misrepresentations over the telephone to Mr. Long as to the: (1) grade of the coins, (2) the fair market value of the coins, and (3) the investment potential of the coins Joaquin marketed to and advised Mr. Long to purchase from F&S (including its multiple assumed names) and Defendant Legend on five (5) occasions in September 2020 (*see* TABLE ONE, *supra*). Joaquin, taking advantage of Mr. Long's trust and reliance on such misrepresentations, overcharged him for those coins by factors of hundreds or thousands of times more than any commercially supported price for the coins. Joaquin's use of the U.S. wires in perpetrating this scheme was neither incidental to the fraud and misrepresentations as to grade and value of the coins but rather, given that the scheme was dependent upon telemarketing technology, was instrumental to the scheme in that Mr. Long was never able during Scheme One to see Joaquin in person, look him in the eye, and gauge his sincerity and veracity (or lack thereof)—much less physically examine the coins before purchase. Joaquin further compounded his misrepresentations as to the coins' grade, value, and investment potential by (in most instances) enclosing with the coin shipments via the interstate mails (or rather "private or commercial interstate carrier") sales invoices which repeated (and documented) the gross misrepresentations and fraudulent overpricing of the coins sold to Mr. Long as "investments." Thus, those invoices constitute correspondence sent or delivered by a private or commercial interstate carrier incorporating false

and misleading statements regarding the values and grades of the coins the Individual Defendants

advised Mr. Long to purchase as "investments."

62.  The means by which Joaquin was able to remotely market the coins to Mr. Long at such

exorbitantly outrageous prices in furtherance of Scheme One and the F&S Enterprise, and thereby

defraud him of a significant portion of his life savings is the unholy combination of the obscure

and arcane workings of the retail precious metals telemarketing industry and the soulless greed of

Joaquin in furtherance of the F&S Enterprise. That all interactions, communications,

representations, and sales transpired via wire (i.e. telephone) was not coincidental or happenstance.

Rather, telemarketing enabled, defined, and facilitated the scheme.

63.  As a direct and proximate result of the violations set forth above and summarized in TABLE

ONE embedded above, Mr. Long has been injured. Joaquin's multiple repeated predicate acts in

violation of 18 U.S.C. §§ 1341 and 1343 are the proximate cause of this injury. Pursuant to the

provisions of 18 U.S.C. § 1964(c), Mr. Long is entitled to bring this action and recover treble

damages, the costs of bringing this suit, prejudgment interest, and attorneys' fees under Count I.

## COUNT II
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
## ORGANIZATIONS ACT (RICO) FOR BANK FRAUD (18 U.S.C. § 1344)
## AGAINST DEFENDANT MICHAEL E. JOAQUIN

64.  Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual

statements and allegations therein, as though fully copied and set forth below at length.

65.  At all relevant times, Bruce K. Long was a "person" within the meaning of 18 U.S.C. §

1964(c).

66.  At all relevant times, Father & Son Collectibles, Inc. ("F&S") was an "enterprise" within the

meaning of 18 U.S.C. § 1961(4). The F&S Enterprise was engaged in telemarketing, selling,

trading, and buying precious metal products, and the activities of said enterprise affected, interstate

commerce within the meaning of 18 U.S.C. §§ 1961(4), 1962(c), and 1962(d).

**67.** At all relevant times, Defendant Michael E. Joaquin ("Joaquin") was a "person" within the meanings of 18 U.S.C. §§ 1961(3), 1962(b), 1962(c), and 1962(d).

**68.** By the acts described herein, Individual Defendant Joaquin, as a member of the F&S Enterprise, knowingly executed or intentionally participated in a scheme ("**Scheme Two**") that defrauded, and was intended to defraud, Mr. Long, and on information and belief numerous other elderly citizens, and constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); 1962(c) and are part of a common scheme to further the F&S Enterprise and to enrich Joaquin at the expense of Plaintiff through acts constituting bank fraud in violation of 18 U.S.C. § 1344.

**69.** Specifically, as set forth above in greater detail above and summarized in TABLE TWO, between July 22, 2020 and February 2, 2022, Joaquin, in furtherance of the F&S Enterprise and to enrich himself, and without notice or authorization, forged electronic checks drafted on Mr. Long's bank account and made payable to two of F&S's assumed names, "The Family Collectables, Inc." and "Collector's Heaven," on no fewer than thirteen (13) occasions. In addition, within a one-month period—March 24, 2022 to April 22, 2022, Joaquin, in furtherance of the F&S Enterprise and to enrich himself, and without notice or authorization, made fraudulent charges on Mr. Long's Visa and Citi Costco credit cards. These constitute acts of fraud upon financial institutions in violation of 18 U.S.C. § 1344 and resulted in actual damages to Mr. Long totaling $33,216.00 in furtherance of the schemes to steal Mr. Long's life savings and impoverish him.

**70.** As a direct and proximate result of the violations set forth above, Mr. Long has been injured. Joaquin's violation of 18 U.S.C. § 1344, in furtherance of the F&S Enterprise and to enrich himself, is the proximate cause of this injury. Pursuant to the provisions of 18 U.S.C. § 1964(c),

Mr. Long is entitled to bring this action and recover treble damages, the costs of bringing this suit, prejudgment interest, and attorneys' fees.

**COUNT III**
**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT (RICO) FOR CONSPIRACY TO PARTICIPATE IN AND**
**COMMIT A PATTERN OF FRAUDS (AGAINST ALL DEFENDANTS)**

**71.** Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**72.** At all relevant times, Bruce K. Long was a "person" within the meaning of 18 U.S.C. § 1964(c).

**73.** At all relevant times, Individual Defendants Michael E. Joaquin ("Joaquin") and John C. Rose ("Rose") were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

**74.** At all relevant times, the Entity Defendants, Father and Sons Collectibles, Inc. ("F&S"), Legend Collectibles Corp. ("Legend"), and Elite Collectibles NY, LLC. ("Elite") were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

**75.** At all relevant times the AIF Enterprise: (i) was an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that functioned as a continuing unit. The AIF Enterprise was engaged in buying precious metal products, and the activities of said enterprise affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4), 1962(c), and 1962(d).

**76.** Joaquin and Rose, as members of the AIF Enterprise, individually and as principals and representatives of the Entity Defendants, F&S, Legend, and Elite, had a meeting of the minds and agreed to commit a series of mail and wire frauds knowingly against Mr. Long constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c ), and, on information and belief, numerous other elderly citizens, as detailed *supra*, in violation of 18 U.S.C. § 1962(d). The

33

particular predicate acts of the conspiracy against Mr. Long began in February 2019 and continued at least until November 2020. The Individual Defendants, Joaquin and Rose, each participated in the AIF Enterprise by taking part in, controlling, and directing the affairs of said enterprise, and directly interacted with Mr. Long in their individual capacities and their capacities as principals and agents of F&S, Legend, and Elite, and agreed to facilitate and commit the individual predicate acts of fraud and theft of property as part of the fraudulent "buy-back" scam (Scheme Three) targeting Mr. Long in furtherance of the AIF Enterprise and to enrich themselves. This conspiracy violated 18 U.S.C. § 1962(c) in that it consisted of a pattern of racketeering activity, specifically mail fraud (in violation of 18 U.S.C. § 1341) and wire fraud (in violation of 18 U.S.C. § 1343). Joaquin and Rose, individually, and as principals and representatives of the Entity Defendants, F&S, Legend, and Elite, knew their tactics and practices were misleading and unlawful and would cause Plaintiff to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

77.    Joaquin and Rose, individually, and as principals and representatives of the Entity Defendants, F&S, Legend, and Elite, are members of the AIF Enterprise and as co-conspirators are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by Plaintiff that were caused by any of the members of the conspiracy, regardless of whether they were themselves directly involved in any particular aspect of the AIF Enterprise.

78.    Joaquin's and Rose's pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(d), conducted as individuals and in their representative capacities as principals and representatives of the Entity Defendants, F&S, Legend, and Elite, proximately and/or directly caused Plaintiff to suffer injury to his business and/or property within the meaning of 18 U.S.C. §

1964(c), specifically: Plaintiff was damaged by, *inter alia,* the fraudulent "buy-back" (actual or de facto theft and conversion) of Mr. Long's coins under duress (and while Plaintiff suffered with age-related mental deficits) for either no compensation or unconscionably *de minimis* compensation.

**79.** Joaquin and Rose, individually, and as principals and representatives of the Entity Defendants, F&S, Legend, and Elite, agreed to commit these substantive RICO offenses by using the AIF Enterprise to engage in multiple predicate acts of mail fraud and wire fraud, while at all times knowing about, and agreeing to, the overall objective of the "buy-back" scheme and fraudulent acts in furtherance thereof—that is, furthering the AIF Enterprise and generating exorbitant compensation for themselves. Joaquin and Rose knew their tactics and practices were misleading and unlawful and would cause Plaintiff to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

**80.** As a direct and proximate result of the violations set forth above, Mr. Long has been injured. Joaquin and Rose, in their individual capacities and in their capacities as principals and representatives of Entity Defendants, F&S, Legend, and Elite, engaged in a 18 U.S.C. § 1962(d) conspiracy to violate 18 U.S.C. § 1962(c) in furtherance of the AIF Enterprise, which proximately caused Mr. Long's injury. Pursuant to the provisions of 18 U.S.C. § 1964(c), Mr. Long is entitled to bring this action and recover treble damages, the costs of bringing this suit, prejudgment interest, and attorneys' fees of and from all Defendants under Count III.

## COUNT IV
## AIDING AND ABETTING RICO MAIL AND WIRE FRAUD
## AND/OR COMMON LAW FRAUD AGAINST DEFENDANT JOHN C. ROSE

**81.**  Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**82.**  As set out and demonstrated throughout this First Amended Complaint, Joaquin perpetrated three related fraud schemes against Mr. Long, including the "buy-back" scam (Scheme Three) which was the culmination of the "long con" aimed at impoverishing Mr. Long.

**83.**  Plaintiff has pled that John C. Rose ("Rose") conspired with Joaquin to perpetrate said fraud and in fact committed fraud against Mr. Long.

**84.**  However, to the extent that that the Court were to determine that there were insufficient evidence that Rose was a co-conspirator, then in the alternative, Plaintiff would show that Rose, at minimum, aided and abetted Joaquin in the perpetration of both the "long con" and particularly Scheme Three against Mr. Long.

**85.**  Rose is the principal of Defendant Legend, a precious metals dealer and coin telemarketing company. Rose is in the business of buying, selling, and trading precious metal coins.

**86.**  Rose had actual knowledge that the prices that Joaquin offered Mr. Long for his coin inventory was unconscionably low, yet Rose participated in those transactions and provided substantial assistance providing signed checks for Joaquin to use in "negotiating" the "buy-backs" through which Joaquin obtained possession of Mr. Long's coin inventory for "pennies on the dollar." This constitutes at minimum actual knowledge of the fraud.

**87.**  Rose's actions in assisting Joaquin to obtain Mr. Long's coin inventory by way of the "buy-back" scam which was the culmination of the "long con" against Mr. Long is a proximate cause of the damages suffered by Mr. Long in this action.

**COUNT V**
**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT (RICO) FOR MAIL FRAUD AND WIRE FRAUD**
**(18 U.S.C. §§ 1341, 1343) AGAINST ALL DEFENDANTS**
**(SCHEME THREE)**

**88.**  Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**89.**  At all relevant times, Bruce K. Long was a "person" within the meaning of 18 U.S.C. § 1964(c).

**90.**  At all relevant times, Individual Defendants Michael E. Joaquin ("Joaquin") and John C. Rose ("Rose") were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

**91.**  At all relevant times, the Entity Defendants, Father and Sons Collectibles, Inc. ("F&S"), Legend Collectibles Corp. ("Legend"), and Elite Collectibles NY, LLC. ("Elite") were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

**92.**  At all relevant times the AIF Enterprise: (i) was an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that functioned as a continuing unit. The AIF Enterprise was engaged in buying precious metal products, and the activities of said enterprise affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4), 1962(c), and 1962(d).

**93.**  Joaquin and Rose, as members of the AIF Enterprise, individually and as principals and representatives of the Entity Defendants, F&S, Legend, and Elite, knowingly committed mail and wire fraud against Mr. Long constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), and, on information and belief, numerous other elderly citizens, as detailed *supra*, in violation of 18 U.S.C. § 1962(d). The particular predicate acts of mail fraud and wire fraud against Mr. Long began in May 2019 and continued at least until November 2020. The Individual

Defendants, Joaquin and Rose, each participated in the AIF Enterprise by taking part in, controlling, and directing the affairs of said enterprise, and directly interacted with Mr. Long in their individual capacities and their capacities as principals and agents of F&S, Legend, and Elite, and agreed to facilitate and commit the individual predicate acts of fraud and theft of property as part of the fraudulent "buy-back" scam (Scheme Three) targeting Mr. Long in furtherance of the AIF Enterprise and to enrich themselves. The predicate acts of Joaquin and Rose constituted a pattern of racketeering activity, specifically mail fraud (in violation of 18 U.S.C. § 1341) and wire fraud (in violation of 18 U.S.C. § 1343). Joaquin and Rose, individually, and as principals and representatives of the Entity Defendants, F&S, Legend, and Elite, knew their tactics and practices were misleading and unlawful and would cause Plaintiff to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

**94.** Joaquin's and Rose's predicate acts constituting the pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(d), conducted as individuals and in their representative capacities as principals and representatives of the Entity Defendants, F&S, Legend, and Elite, proximately and/or directly caused Plaintiff to suffer injury to his business and/or property within the meaning of 18 U.S.C. § 1964(c), specifically: Plaintiff was damaged by, *inter alia,* the fraudulent "buy-back" (actual or de facto theft and conversion) of Mr. Long's coins under duress (and while Plaintiff suffered with age-related mental deficits) for either no compensation or unconscionably *de minimis* compensation.

**95.** Joaquin and Rose, individually, and as principals and representatives of the Entity Defendants, F&S, Legend, and Elite,  agreed to commit these substantive RICO offenses by using the AIF Enterprise to engage in multiple predicate acts of mail fraud and wire fraud, while at all times

38

knowing about, and agreeing to, the overall objective of the "buy-back" scheme and fraudulent acts in furtherance thereof—that is, furthering the AIF Enterprise and generating exorbitant compensation for themselves. Joaquin and Rose knew their tactics and practices were misleading and unlawful and would cause Plaintiff to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

96.   As a direct and proximate result of the violations set forth above and summarized in TABLE THREE embedded above, Mr. Long has been injured. Joaquin's and Rose's multiple, repeated predicate acts in violation of 18 U.S.C. §§ 1341 and 1343, in their individual capacities and in their capacities as principals and representatives of Entity Defendants, F&S, Legend, and Elite, committed in furtherance of the AIF Enterprise, are the proximate cause of this injury. Pursuant to the provisions of 18 U.S.C. § 1964(c), Mr. Long is entitled to bring this action and recover treble damages, the costs of bringing this suit, prejudgment interest, and attorneys' fees under Count IV of and from all Defendants.

## COUNT VI
## COMMON LAW FRAUD
## (AGAINST ALL DEFENDANTS)

97.   In addition, or else in the alternative, Plaintiff alleges a cause of action against all Defendants for common law fraud and incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

98.   In order to sell the overvalued coins to Mr. Long (Scheme One), Joaquin, individually as in his representative capacity on behalf of F&S, intentionally or recklessly made false and/or misleading representations to Mr. Long as to the grades and attributes of the coins and misrepresented to Mr.

Long that he was purchasing coins at (or even below) market value and that the coins were good investments. Joaquin, individually as in his representative capacity on behalf of F&S and Legend, also intentionally or recklessly falsely represented the then-current values of the coins with full knowledge that the coins were not worth the values at which they were sold and purchased and that the coins would never attain the return of investment to Plaintiff as promised.

**99.** Joaquin, individually as in his representative capacity on behalf of F&S, then doubled down on his misrepresentation of the coins' values by enclosing with most of the coin shipments purchase invoices documenting the misrepresentations as to value (i.e. the overpricing of the coins).

**100.** Joaquin, individually as in his representative capacity on behalf of F&S, made the false representations of the coins' values and the representations as to the "investment" potential of the coins to Mr. Long with the intent that he rely upon them and with full knowledge that such representations were false when made. Mr. Long reasonably relied on those material and false representations when deciding to purchase the grossly overpriced and unconscionably marked up coins which, in fact, he purchased to his financial detriment and the financial gain of Joaquin and F&S.

**101.** As a direct and/or proximate result of the false and misleading representations about the overvalued coins, Mr. Long suffered (and continues to suffer) damages in the form of, *inter alia,* the amounts paid for the coins in excess of their actual value and mental anguish damages.

**102.** The wrongful actions of Joaquin, individually as in his representative capacity on behalf of F&S, constitute fraud at New York common law.

**103.** In addition, in regards to the "buy-back" scam (Scheme Three), both Joaquin and Rose took advantage of Mr. Long's financial duress (which Joaquin had caused in the first place by way

of Scheme One and Scheme Two) and age-related decline to once again intentionally or recklessly defraud him by convincing him to sell them back all or most of his inventory of coins (both those purchased as a result of Scheme One, as well as coins purchased from other coin dealers) for literally "pennies on the dollar," and sometimes not even that.

**104.**    Joaquin and Rose, individually and  in their representative capacities on behalf of F&S, Legend, and Elite, intentionally or recklessly took advantage of and defrauded Mr. Long via the "buy-back" scam (Scheme Three) by falsely representing to Mr. Long that his coins were worth a pittance of the prices he had previously paid for them and then essentially stealing the coins back from Plaintiff based upon their lies and misrepresentations fueled by Plaintiff's personal financial panic.

**105.**    As a direct and/or proximate result of the false and misleading representations as to the values of Mr. Long's coin inventory, Mr. Long suffered (and continues to suffer) damages in the form of, *inter alia,* the difference between the amounts he paid for the coins and the negligible, *de minimis* amounts Joaquin and Rose paid him for those coins, as well as mental anguish damages.

**106.**    Scheme Three (the "buy-back" scam) by Joaquin and Rose, individually and in their representative capacities on behalf of F&S, Legend, and Elite, constitutes fraud at New York common law.

**COUNT VII**
**NEGLIGENCE**
**(AGAINST ALL DEFENDANTS)**

**107.**  In addition, or else in the alternative, Plaintiff alleges a cause of action sounding in common law negligence and incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**108.** Defendants negligently valued, promoted, marketed, advertised, and sold grossly *overvalued* coins to Plaintiff and when grossly *undervaluing* those same coins and repurchasing them from Plaintiff. Defendants owed a duty to Plaintiff to exercise reasonable care in valuing, promoting, marketing, advertising, selling, and buying back the coins. Defendants breached their duty to Plaintiff by failing to exercise reasonable care in valuing, promoting, marketing, advertising, selling and buying back the coins. Defendants' wrongful conduct directly and/or proximately caused plaintiff to suffer damages. Defendants' wrongful conduct constitutes negligence at New York common law.

**COUNT VIII**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
***(Deceptive and Unfair Business Practices)***
**(AGAINST ALL DEFENDANTS)**

**109.** Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**110.** Mr. Long is a "consumer" and Defendants are "persons" that may be sued pursuant to § 349 of New York's General Business Law (GBL).

**111.** By their above-described wrongful acts and/or misrepresentations constituting the three-part scam (Scheme One, Scheme Two, and Scheme Three), Defendants engaged in various false, misleading, and deceptive acts and practices in violation of GBL § 349. Defendants have made, and continue to make, deceptive, false and material misleading statements to their numerous telemarketing consumers across the United States concerning the coins they market and sell including: (i) representing that the coins have values, grades, and attributes that they do not have and that significant investor and collector demand exists for the coins that will cause them to appreciate in value as "investments," which does not exist and will not happen; (ii) representing that the coins being marketed are rare and/or unique and have substantial desire to investors and

42

collectors, which will cause the coins significantly to appreciate as investments in the future, which they are not, do not, and will not; and (iii) failing to disclose the above information about the coins, which Defendants knew at the time of the transactions, with the intent to induce Plaintiff to purchase coins that Plaintiff would not have purchased had Defendants disclosed such information. Further, after having sold such misrepresented coins at grossly overinflated prices, Defendants turn around and offer to buy back those same coins for "pennies on the dollar". Mr. Long is just one of the numerous elderly consumers who relied on Defendants' above-described misrepresentations and omissions in purchasing—and then selling back—the coins to his financial detriment.

**112.**  By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices by, *inter alia*, inducing Mr. Long to purchase collectible numismatic, semi-numismatic, and bullion coins that were grossly overvalued with unconscionably high markups that are not worth the value at which they were purchased and will never attain the value as claimed or return on investment as represented and then, having put Mr. Long in a financial corner, inducing Mr. Long to sell back those same coins (and coins obtained from other coins dealers) to Defendants for "pennies on the dollar".

**113.**  The practices employed by Defendants whereby they advertised, promoted, marketed, and sold their coins at exorbitant markups and based on misrepresentations as to the coins' grade, value, and investment potential (and then bought them back for next to nothing) are unfair, deceptive, and materially misleading.

**114.**  The Entity Defendants are liable for the above-detailed wrongful acts committed by Joaquin and Rose, in their individual capacities and as principals and representatives of the Entity Defendants, under the doctrine of *respondeat superior* because Defendants' agents'/employees' wrongful conduct was committed (i) within their general authority, (ii) in furtherance of

Defendants' business, and (iii) to accomplish the objective for which the agents/employees were hired (*e.g.,* marketing overvalued coins to customers such as Mr. Long)—all of which directly and/or proximately caused Mr. Long to suffer damages to the financial benefit of Defendants.

**115.** The foregoing deceptive acts and practices were directed at consumers across the nation, of which Mr. Long is merely an example.

**116.** Mr. Long suffered a loss as a result of Defendants' deceptive and unfair trade practices. Specifically, as a proximate result of same, he suffered monetary losses associated with the purchase—and sale—of the coins he obtained from Defendants and/or the premium price (including outrageous markups) paid by Mr. Long insofar as said purchases were based on the inaccurate representations of Defendants as alleged herein.

## COUNT IX
## CONSPIRACY TO COMMIT FRAUD
## (AGAINST ALL DEFENDANTS)

**117.** Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**118.** Specifically, Plaintiff incorporates the allegations set out in Count III, above, as if they were fully copied and set out at length.

**119.** Defendants (and possibly others), either working together as a combined group or in sub-combinations of two or more, affirmatively conspired to engage in the wrongful actions set forth above. By doing so, Defendants conspired to accomplish an unlawful purpose or a lawful purposed by an unlawful means.

**120.** As such, Defendants conspired to commit the wrongful actions outlined in Count IV, above, and took one or more affirmative measures in furtherance thereof, all of which directly and

proximately caused Plaintiff to sustain actual and consequential damages. Defendants' wrongful actions constitute civil conspiracy to commit fraud at New York common law.

### COUNT X
### MONEY HAD AND RECEIVED
### (AGAINST ALL DEFENDANTS)

**121.**  In addition, or else in the alternative, Plaintiff alleges a cause of action for money had and received and incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**122.**  By their above-described wrongful actions and/or inaction, Defendants hold money obtained by a) the wrongfully charged and collected purchase prices paid by Plaintiff for the grossly overvalued coins misrepresented and sold to Mr. Long by Defendants; and b) coins impermissibly taken by Defendants and/or sold to third parties and the funds retained without payment to Plaintiff or replacement of his coins, that, in equity and good conscience, belong to Plaintiff.  Defendants, therefore, should be compelled to refund such wrongfully charged and collected funds under the equitable doctrine of money had and received.

### COUNT XI
### UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

**123.**  In addition, or else in the alternative, Plaintiff alleges a cause of action for unjust enrichment and incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**124.**  Defendants have been unjustly enriched by (i) being paid an excessive value for coins that are not supported by any reasonable valuation; (ii) using the fraudulently obtained revenues and profits paid by Plaintiff, (iii) generating a return on the amounts described in (i) and (ii); and obtaining possession of Plaintiffs' coins for no consideration or, at best, unconscionably inadequate consideration.

**125.** Accordingly, Plaintiff seeks to impose a constructive trust over (and recover) all amounts by which Defendants (and possibly other persons and entities, including Defendants' agents/employees) have been unjustly enriched.

**COUNT XII**
**CONVERSION**
**(AGAINST ALL DEFENDANTS)**

**126.** In addition, or else in the alternative, Plaintiff alleges a cause of action for conversion and incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**127.** Plaintiff has, and maintains, a possessory right and interest over all funds (coins) that Plaintiff invested with Defendants, including the profits earned on any sales of said coins.

**128.** Plaintiff requested a full liquidation of his account, including the return of his invested funds (i.e., the coins).

**129.** Defendants had an obligation to return Plaintiff's funds (i.e., coins).

**130.** Defendants wrongfully continue to exercise control over plaintiff's funds (i.e., coins).

**131.** Defendants' wrongful control over plaintiff's funds (i.e., coins) and refusal to return such funds (coins) is an interference with Plaintiff's ownership rights.

**132.** As a result of Defendants' wrongful control over his funds (i.e., coins), Plaintiff has been damaged in the amount $699,546.60, being a loss of the purchase price and consequential damages, as well as interest thereon.

**133.** By virtue of the foregoing, Defendants have committed the tort of conversion, and Plaintiff is entitled to damages in an amount to be determined at trial, but in no event less than $699,546.60 plus interest.

## TOLLING OF THE STATUTES OF LIMITATIONS

**134.** Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**135. EQUITABLE ESTOPPEL.** Defendants took active steps to conceal their above-described wrongful actions and/or inaction. The details of Defendants' efforts to conceal their unlawful conduct are in their possession, custody, and control, and await further discovery. At such time as this material information was first revealed to Plaintiff, he exercised due diligence by retaining counsel and pursuing his claims. As such, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable estoppel.

**136. EQUITABLE TOLLING.** Defendants took active steps to conceal their above-described wrongful actions and/or inaction. The details of Defendants' efforts to conceal their unlawful conduct are in their possession, custody, and control, and await further discovery. Even by exercising reasonable diligence, Plaintiff could not have discovered this information if for no other reason than he had no reason to make such inquiries. At such time as this material information was first revealed to Plaintiff, he exercised due diligence by retaining counsel and pursuing his claims. As such, all applicable statutes of limitations (if any) are tolled under the doctrine of equitable tolling.

## ALTER EGO

**137.** Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**138.** Alter-ego liability is established upon a showing that a defendant has complete domination of a corporation in respect to the transaction at issue and that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. Because a decision to

"pierce the corporate veil" will necessarily depend on the attendant facts and equities of the case at issue, there are no definitive rules governing the circumstances when this power may be exercised.

**139.** Based upon information and belief, the Individual Defendants, Joaquin and Rose, individually and/or collectively, use the corporate forms of F&S, Legend, and Elite as alter-egos and as mere tools or business conduits. The Individual Defendants, Joaquin and Rose completely dominate F&S, Legend, and/or Elite to shield assets and thus cause a diminution of available resources from which Plaintiff may obtain satisfaction of the damages directly and/or proximately caused by Defendants' wrongful conduct. Upon information and belief, there are undocumented funds transfers between F&S, Legend, and/or Elite and the Individual Defendants, Joaquin and Rose, and there is an unclear allocation of profit and losses between F&S, Legend, and/or Elite and the Individual Defendants, Joaquin and Rose. In short, F&S, Legend, and/or Elite are substantially one and the same and indistinguishable from the Individual Defendants, Joaquin and/or Rose, and the relationship between them is an illegitimate use of the corporate form.

## RESPONDEAT SUPERIOR

**140.** The preceding factual statements and allegations are incorporated herein by reference. Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**141.** Defendants also are liable for the above-described wrongful acts committed by their agents/employees during the course and scope of their employment by the Defendants; to wit, the agents'/employees' wrongful conduct was committed (i) within their general authority, (ii) in furtherance of Defendants' business, and (iii) to accomplish the objective for which the agents/employees were hired (*e.g.*, selling overvalued coins to customers like Plaintiff)—all of which

directly and/or proximately caused Plaintiff to suffer damages to the financial benefit of Defendants—thus, Defendants are liable under the doctrine of *respondeat superior*.

## RELIEF REQUESTED

**142.** Plaintiff incorporates by reference the preceding paragraphs, including specifically all factual statements and allegations therein, as though fully copied and set forth below at length.

**143.** ACTUAL AND CONSEQUENTIAL DAMAGES.  As direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered (and continues to suffer) damages in the form of, *inter alia*, the amounts paid to Defendants for the coins in excess of their value, the value of coins taken from the Plaintiff, and the amounts of the unauthorized checks and credit card charges made by Defendants and stolen from Plaintiff.  In addition, Plaintiff is entitled to recover consequential damages related to the funds he borrowed to purchase the coins and the mental anguish he has suffered in connection with these transactions—in an amount to be determined by the trier of fact.  All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

**144.** PUNITIVE DAMAGES. To the extent it is determined that Defendants' wrongful actions and omissions (or failure to disclose such wrongful actions) were committed intentionally, willfully, with malice, and/or with conscious and/or reckless disregard for Plaintiff's rights and interests, Plaintiff also is entitled to an award of punitive damages against Defendants, both as punishment and to discourage such wrongful conduct in the future. All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

**145.** TREBLE DAMAGES.  Plaintiff also is entitled to treble damages for Defendants' knowing, willful and intentional wrongful conduct in violation of the RICO statute under 18 U.S.C. § 1964(c) and New York GBL § 349.  All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

146. **ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS.** Plaintiff also is entitled to recover his reasonable and necessary attorneys' fees, litigation expenses, and court costs in prosecuting this action pursuant to, *inter alia*, New York GBL § 349 insofar as Defendants' aforesaid actions are determined to have been willful and knowing.

**WHEREFORE**, Plaintiff, Brian C. Long, as Assignee of all claims asserted by Assignor, Bruce K. Long, requests judgment in his favor and against the Defendants, jointly and severally, awarding compensatory damages for all actual and consequential losses, treble damages under 18 U.S.C. § 1964(c), exemplary damages, and all amounts by which Defendants have been unjustly enriched; directing an equitable accounting for all benefits, consideration and profits received, directly or indirectly, by Defendants, including the imposition of a constructive trust and the voiding of unlawful transfers; and awarding attorneys' fees and litigation expenses pursuant to 18 U.S.C. § 1964(c) and New York GBL § 349(h) and the costs of suit pursuant to 28 U.S.C. § 1920 and Fed. R. Civ. P. 54(d); together with pre-judgment interest pursuant to New York C.P.L.R. § 5004 or any higher applicable rate and post-judgment interest at the highest legal rate, and such other and further relief as the Court deems just, proper, and equitable.

## <u>JURY DEMAND</u>

Plaintiff respectfully demands a trial by jury on all of his claims and causes of action so triable.

Dated: Thornwood, New York
   April 12, 2024

          **LAW OFFICES OF KENNETH G. WALSH**


     By:  */s/ Kenneth G. Walsh*
       Kenneth G. Walsh (1654)
       59 Kensico Road, Suite 7
       Thornwood, New York 10594
       (929) 241-7307
       *kwalsh@kgwalshlegal.com*

       -and-

       **STEVENS LAW FIRM**

       R. Lyn Stevens (pro hac vice forthcoming)
       210 Clearview Avenue, Suite C
       Friendswood, Texas 77546
       (409) 880-9714
       *Lyn@Stevens.Law*
       Texas Bar No. 19189020

       *Attorneys for Plaintiff, Brian C. Long, as*
       *Assignee of all claims asserted by Assignor,*
       *Bruce K. Long*